**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Compañia del Bajo Caroni (Caromin), C.A., and V.M.C. Mining Company, C.A., <br><br> Plaintiffs, <br><br> v. <br><br> Bolivarian Republic of Venezuela and Ministry of Basic Industries and Mines, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 07-CV-3179 (NRB) |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

Foley Hoag LLP
Kenneth S. Leonetti (KL7368)
Paul S. Reichler
Ronald E.M. Goodman
1875 K Street, N.W.
Washington, D.C., 20006
(202) 223-1200
Attorneys for Defendants Bolivarian Republic of Venezuela
and Ministry of Basic Industries and Mines

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .............................................................................................. 1

II.  ARGUMENT ................................................................................................... 4

    A.  DEFENDANTS HAVE NOT WAIVED THEIR SOVEREIGN IMMUNITY BECAUSE THE PURPORTED "WAIVER" ON WHICH PLAINTIFFS RELY IS A FAKE ................................................. 4

    B.  THE ACT OF STATE DOCTRINE BARS THE COURT FROM INQUIRING INTO THE VALIDITY OF THE SOVEREIGN ACTS OF VENEZUELA WITHIN ITS OWN TERRITORY ............................ 18

    C.  THIS COURT IS AN INCONVENIENT FORUM FOR LITIGATING CLAIMS CONCERNING THE ALLEGED BREACH OF AN AGREEMENT BETWEEN VENEZUELAN PLAINTIFFS AND THE VENEZUELAN GOVERNMENT THAT WAS TO BE PERFORMED WHOLLY IN VENEZUELA ........................................... 21

        1.  This Case Has No Bona Fide Connection to New York ................. 22

        2.  There Is an Adequate Alternative Forum ......................................... 23

        3.  The Relevant Private and Public Interest Factors Support Dismissal ........................................................................................ 24

III.  CONCLUSION ................................................................................................ 25

## I.   **INTRODUCTION**

Plaintiffs invoke the jurisdiction of this Court based on a fake document and a forged signature.

They do not belong before this or any other court, and certainly not before any court in the United States of America. They both are Venezuelan corporations, whose shareholders are Venezuelan nationals. They have sued the Government of Venezuela over sovereign actions conceived and carried out entirely within Venezuelan territory. The mining concessions that they allege were prematurely terminated were located in Venezuela. The agreement that they allege to have been violated was negotiated, signed and to be performed exclusively in Venezuela. There is no connection to the United States, and no reason for our courts to exercise jurisdiction over what is a 100% Venezuelan matter.

No *legitimate* reason, that is.

That is why, in order to bring this matter here -- to what they apparently believe is a more sympathetic forum -- they have resorted to illegitimate means. Specifically, they have presented a fake document with a forged signature and alleged that it constitutes a waiver of sovereign immunity by the Bolivarian Republic of Venezuela and its Ministry of Energy and Mines, and an express consent by that sovereign state to adjudication by a U.S. court pursuant to New York law.

The fake document is the so-called "Addendum" attached to the Complaint as Exhibit 3. While Plaintiffs characterize it as an agreement executed on behalf of the sovereign state of Venezuela, it is a complete fabrication that was never seen, let alone reviewed or consented to by any authorized representative of that Government. In fact, the first time any Venezuelan officials saw the document was when they read the

Complaint and its Exhibits after this suit was filed. The purported signature of the Minister of Energy and Mines is also a fake. He never saw, let alone signed, this document. The English translation of the "Addendum" supplied by Plaintiffs carries the legend "Illegible" next to the Minister's purported signature. It is not only illegible. It is not the Minister's signature.

The falsity of the "Addendum" is manifest from its outlandish premise: that the Minister of Energy and Mines, one of the most senior officials of the Venezuelan government, who was directly appointed to this position of maximum responsibility and trust by President Hugo Chavez, would gratuitously submit his government's quintessentially sovereign actions, undertaken exclusively within Venezuela and affecting only Venezuelan companies and nationals, to the jurisdiction of the U.S. courts. Given the state of U.S.-Venezuela relations -- epitomized by U.S. support for a military coup d'etat that temporarily threw President Chavez out of office and jailed him not long before the "Addendum" was purportedly signed -- this voluntary subordination by one of President Chavez's chief lieutenants to U.S. jurisdiction is about as likely to have occurred as if the U.S. Secretary of Energy, a political appointee of President Bush, had freely consented to the jurisdiction of the Venezuelan courts over a dispute between the U.S. government and U.S. corporations over actions within U.S. territory.

But the Court need not rely solely on common sense, as compelling as it is, to reject Plaintiffs' false pretensions and dismiss their Complaint. The Court can also rely on the testimony supplied herewith, including the sworn statements of four senior officials of the Ministry of Energy and Mines, including the Minister himself, that the "Addendum" was never seen, reviewed, processed or agreed to by any of them. Their

sworn statements also aver that it is inconceivable to them that such a document could have been approved or signed by the Minister or any other responsible official.

Plaintiffs cannot sustain their burden of demonstrating the authenticity of the "Addendum" for the plain reason that it is not authentic. As indicated, the version of the document affixed to the Complaint lacks a legible signature. That is not the only flaw rendering it inauthentic and inadmissible. It is not an original document, or even a copy of one. Plaintiffs cannot produce an original of the "Addendum" because none exists. What they have produced to the Court is a photocopy of a document that someone has manufactured and labeled "Addendum." As discussed within, it is Plaintiffs' burden to demonstrate the authenticity of any document upon which they rely to establish that the Defendants expressly and knowingly waived their sovereign immunity and consented to the jurisdiction of this Court. That is a burden that Plaintiffs do not and cannot meet.

Under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), sovereign defendants like the ones in this case are presumptively immune from suit in the United States unless one of the exceptions to immunity listed in the FSIA applies. While there are several listed exceptions, the only one invoked by Plaintiffs in their Complaint is the first, set forth in § 1605(a)(1) of the FSIA, which provides that there shall be no immunity where it has been expressly and knowingly waived by the foreign sovereign. Plaintiffs' argument for invoking this exception rests entirely on the fraudulent "Addendum." Absent this document, there is nothing to support Plaintiffs' waiver argument, and no other basis for finding an exception to sovereign immunity. Accordingly, the FSIA precludes the Court from exercising jurisdiction over the sovereign Defendants in this case, and the Complaint must be dismissed.

Although the Court need not reach these issues, dismissal of the Complaint is also warranted on the separate grounds of Act of State and *forum non conveniens*, as set forth within.

## II.    ARGUMENT

### A.    DEFENDANTS HAVE NOT WAIVED THEIR SOVEREIGN IMMUNITY BECAUSE THE PURPORTED "WAIVER" ON WHICH PLAINTIFFS RELY IS A FAKE

The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the federal and state courts in the United States. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989)); *Human Rights in China v. Bank of China*, No. 02 Civ. 4361 (NRB), 2003 WL 22170648 at *4 (S.D.N.Y. Sept. 18, 2003). Under the FSIA, a foreign state is presumed immune from the subject matter jurisdiction of the courts of the United States, unless an exception enumerated in §§ 1605 to 1607 of the FSIA applies. 28 U.S.C. §§ 1330(a) and 1604; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. at 434-39; *Human Rights in China v. Bank of China*, 2003 WL 22170648 at *4. Moreover, there can be no personal jurisdiction over a foreign sovereign unless (i) there is subject matter jurisdiction under one of the limited exceptions set forth in the FSIA and (ii) there are sufficient "minimum contacts" with the US so as to satisfy the Due Process Clause. *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993); *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 313-14 (2d Cir. 1981); *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 479 F.Supp.2d 376, 383-86 (S.D.N.Y. 2007).

Plaintiffs' sole basis for jurisdiction in this case is the "waiver exception" to sovereign immunity set forth in §1605(a)(1) of the FSIA. Complaint, ¶10. Section 1605(a)(1) of the FSIA provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case --
>
> (1)    in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

Plaintiffs' entire case for jurisdiction under § 1605(a)(1) rests on a copy of a three-page, Spanish language document entitled "Addendum," dated December 19, 2003, and attached as Exhibit 3 to the Complaint. The document attached to the Complaint is largely effaced. To the extent that signatures can be discerned on it at all, they are illegible, and the typed names of whom, if anyone, might have signed it are almost wholly illegible. The English language translation of the "Addendum" submitted by Plaintiffs has the typed name "Eng. Rafael Ramirez" in the middle of the third page of the document, with the legend "Illegible signature" above it. The Complaint itself does not allege who signed the Addendum, only that it constitutes a waiver by the Ministry of Energy and Mines on its own and Venezuela's behalf, of "any sovereign immunity to which either might otherwise have been entitled" in this action. Complaint, ¶10 and Exhibit 3. Plaintiffs have not submitted an original of the "Addendum," and have advised Defendants through counsel that they do not have one.

The "Addendum" is a fabrication. It was never seen, let alone signed, by any authorized representative of the Venezuelan government prior to the commencement of this lawsuit -- more than three years after the document was supposedly executed. As

such, the "Addendum" does not and cannot serve as a basis for jurisdiction over the

sovereign Defendants in this case. In particular, Mr. Rafael Ramírez Carreño, the

Minister of Energy and Mines in December 2003 -- and presumably the official indicated

by the typed name "Eng. Rafael Ramirez" on the English translation supplied by

Plaintiffs -- *did not sign* the "Addendum." In fact, until he saw the copy of it submitted

by Plaintiffs with their Complaint, he had never seen or had any other knowledge of the

"Addendum" or any document like it. As the Minister has testified:

> I reviewed the content of the complaint and the documentation attached
> thereto, and I was able to confirm that the signature on the "Addendum"
> placed above and below the name "Ing. RAFAEL RAMIREZ" is not
> mine. In fact, I did not sign this document and, as I stated above, I only
> had notice of the "Addendum" when it was filed as an exhibit to the
> complaint. I can affirm that I had never seen it, and that prior to this
> occasion, I had no knowledge of any similar document.

Exhibit 1, *Declaration of Rafael Ramírez Carreño* (hereinafter *"Ramírez Carreño*

*Declaration"*), pp. 2-3 (original Spanish and English translation).

Nor did the Minister give or delegate authority to anyone else to sign the

"Addendum," or any other document submitting to the jurisdiction of the U.S. courts.

*Id.*, p. 3. Moreover, as he testified, he *could not have signed it* because, in his opinion, he

did not have the legal or constitutional authority to sign (or to authorize anyone else to

sign) a document waiving Venezuela's sovereign immunity in favor of the jurisdiction of

the U.S. or any other foreign courts:

> ….[I] have not made any agreement whatsoever, nor have I given
> instructions or delegated authority to enter into contracts of any nature
> with the defendants on my behalf, nor on behalf of the then-Ministry of
> Energy and Mines, nor on behalf of the Bolivarian Republic of Venezuela,
> either written or verbal, in which jurisdiction would have been attributed
> to the Courts of the United States of America by virtue of a waiver -- as
> the plaintiffs indicate -- of the sovereign immunity that protects the
> Bolivarian Republic of Venezuela and its properties and interests under
> the law of the United States of America….

6

> Moreover, it is necessary to affirm that, neither I, nor anyone else at the Ministry of Energy and Mines had the constitutional or legal capacity to establish a commitment like the one mentioned above.

*Id.*, p. 3.

Since Mr. Ramírez neither signed the "Addendum" nor authorized anyone else to do so, the signature on the document -- to the extent that Plaintiffs allege it belongs to Mr. Ramírez himself or someone carrying his authorization -- cannot be legitimate. It can only have been placed on the document with an intent to deceive -- most probably by Plaintiffs themselves, or at least with their knowledge, in order to create a "right" to litigate their claims against Defendants in a forum that they regard as more hospitable than the Venezuelan courts. But Plaintiffs cannot, in the end, fool anyone with the "Addendum." The falsity of the document is exposed, in the first instance, by Mr. Ramírez's sworn statement that he never saw, let alone signed, the "Addendum" or anything like it. And the document's illegitimacy is further exposed by the facts and circumstances surrounding this case, which demonstrate the extreme unlikelihood of the Minister's true signature appearing on such an extraordinary document, voluntarily submitting the sovereign acts of the Venezuelan government to the jurisdiction of the U.S. courts in a case that has no connection whatsoever to the United States.

The only jurisdiction to which Plaintiffs and their claims have a nexus is Venezuela. Plaintiffs are Venezuelan corporations owned by Venezuelan nationals. The mining concessions that they formerly operated are located in Venezuela. The Government of Venezuela, by its Ministry of Energy and Mines, took action (within Venezuela) to terminate the concessions before the end of their term for a public purpose, *i.e.*, because the land on which they were located was needed for the development of a major Venezuelan hydroelectric power project. *See* Complaint, ¶13 and Exhibit 1

7

thereto, pp. 82 (introductory paragraph), 77 (second full paragraph), and 76 (paragraph numbered 3). As part of its formal, eminent domain-like process, Venezuela issued (in Venezuela) two official documents formally canceling Plaintiffs' concessions and recognizing their right to fair compensation, in an amount to be determined by independent appraisal (to be conducted within Venezuela). Both of these documents -- dated December 2 and 17, 2003 -- are attached to the Complaint, as Exhibits 1 and 2 respectively. Taken together, these documents -- which are authentic -- completed the formal administrative procedure for canceling Plaintiffs' concessions and assuring them fair compensation, save only for the subsequent determination of the amount of that compensation and, of course, payment itself. There was no need for any further administrative procedure or document unrelated to fixing the precise amount or actual payment of compensation. And, in fact, no further documents were issued or signed.

Yet, Plaintiffs have affixed to their Complaint an extraordinary *third* document -- an "Addendum" -- that they claim was executed on December 22, 2003 (five days after the administrative process was completed), but which did not fix the amount of compensation or provide for payment, but instead simply and magnanimously gave them the right to sue Venezuela in this court in the event they ultimately received no compensation or less than they believed their concessions were worth. Even Plaintiffs do not claim that documents of this nature are routinely issued as part of the normal administrative process, or that there is any precedent for the Minister's issuance of such a document or Venezuela's purported waiver of sovereign immunity in their favor.

The process for cancellation of mining concessions is a strictly formal one, that follows established procedures and requires various levels of internal review. In this

case, these procedures led to the issuance of Administrative Resolution No. 003 dated December 2, 2003 (the "Order"), which was signed by the Director General of Mines, Francisco Salas Blanco. Complaint, Exhibit 1; Exhibit 2 to this Memorandum, *Declaration of Francisco Salas Blanco* (hereinafter "*Salas Declaration*"), ¶4. The Order declared the cancellation of Plaintiffs' concessions well-founded, and approved their early termination in accordance with the Law Organizing the Promotion of Private Investment Through Concessions; the Order also approved the payment of an "indemnity," or compensation, for the early termination. Complaint, Exhibit 1, pp. 77 (final paragraph) and 76 (paragraph numbered 3); *Salas Declaration*, ¶4.

The Order was prepared on the basis of a legal analysis of Plaintiffs' application to the Ministry, performed by Adrián Zerpa León, an attorney at the Ministry who was Head of Mining Applications. Mr. Zerpa's legal analysis and the text of the Order were then reviewed and approved by Martha Acosta García, Director of Mining Concessions and an attorney who was Mr. Zerpa's superior at the Ministry. After her review and approval and after his own review, Director General Salas signed and issued the Order. *Salas Declaration*, ¶4.

Following issuance of the Order, the Ministry proceeded to the next and final step to establish the terms under which the Ministry would compensate Plaintiffs for the termination of their concessions. These terms were set forth in an agreement between the Ministry and Plaintiffs, dated December 17, 2003, which was entitled "List of Conditions."[1] *See* Complaint, Exhibit 2; *Salas Declaration*, ¶5. In the List of Conditions, the Ministry and Plaintiffs agreed that a valuator would be appointed by

---

[1]      Plaintiffs refer to the List of Conditions as "the Terms and Conditions" in their Complaint. *See, e.g.*, Complaint, ¶¶2, 15.

mutual agreement and that, on the basis of the valuator's report, the Ministry would initiate the process of compensating Plaintiffs "with the competent body for the payment thereof." Complaint, Exhibit 2, Paragraphs Third through Fifth.

As had been the case with the Order, Mr. Zerpa drafted the List of Conditions. *Salas Declaration*, ¶5. His text was reviewed and discussed by his superiors in the Ministry -- Mining Concessions Director Martha Acosta García and Director General Fernando Salas Blanco -- and by Rosa Toro, another attorney in the Ministry's Legal Department. *Id.* The List of Conditions was executed on behalf of the Ministry by all four of the officials who had been involved in its preparation and approval: Director General of Mines Salas, Director of Mining Concessions Acosta, Head of Mining Applications Zerpa, and attorney Toro of the Ministry's Legal Department. Complaint, Exhibit 2, p. 96. It was executed for Plaintiffs by their "legal representative," Manuel Fernandez. *Id.* Neither Minister Ramírez, his Deputy Minister nor any other Ministry official above the rank of Director General Salas, reviewed or signed the Order or the List of Conditions; nor were they consulted or informed about this routine procedure.

While the Order and the List of Conditions were produced via the administrative process relating to the cancellation of mining concessions -- and were drafted, reviewed, discussed, and signed by the responsible Ministry officials -- the "Addendum" was not. It went through *none* of the required administrative procedures, and was neither signed nor seen by *any* of the Ministry officials who were involved in processing the cancellation of Plaintiffs' concessions, or who would have necessarily reviewed the "Addendum" before it could have been submitted to the Minister for execution. There is

a good reason for this: it never existed. The responsible officials all confirm this in sworn testimony.

Orlando Ortegano, who held the position of Deputy Minister of Mines from July 2003 to December 2004 and was responsible for vetting and submitting to the Minister all documents that required his signature or other action, never saw the "Addendum" or any document like it. He has testified:

> Under the internal document control process used at the [Ministry] at that time, each document sent to the [Minister]…which required an action to be taken was accompanied by an Action Slip [*Punto de Cuenta*]. In general, in my capacity as a Deputy Minister, I would send the document to the Minister accompanied by the Action Slip, which had to be agreed to in advance by the Director related to the matter. The Action Slip followed an established format and contained a summary of the relevant matter, the action requested of the Minister and the justification for it.
>
> The Addendum is dated December 19, 2003. If the alleged Addendum had been signed by the Minister, in accordance with the procedure referred to previously, it would have been sent by me, especially because it was a document which required the Minister's signature. Before seeing the alleged Addendum as an attachment to the complaint, I had never seen the alleged Addendum or any document like it. I have also never seen any Action Slip relating to it….

Exhibit 3, *Declaration of Orlando Ortegano*, ¶¶4-5.

Francisco Salas Blanco, the Director General of Mines who signed both the Order and the List of Conditions and who, as "the Director related to the matter," would have been responsible for submitting the "Addendum" to Deputy Minister of Mines Ortegano for presentation to the Minister, has testified that he never saw the "Addendum" or any document similar to it, and that no one ever mentioned it to him. In particular:

> Before seeing the alleged Addendum presented by the plaintiffs in this case, I never saw or had knowledge of the document presented as the alleged Addendum, or of any document similar to the alleged Addendum.
>
> As I was the Director General of Mines (acting) during the period in question and I issued the documents relating to this matter, including the

11

Administrative Decision No. 3 [the Order] and the List of Conditions, it seems incredible to me that I would have never seen and no one would have ever mentioned the alleged Addendum, which is dated only two days after the List of Conditions. Moreover, for such a document to have been signed by the Minister…, I would have had to present it to the Deputy Minister of Mines so he could have sent it accompanied by an Action Slip, summarizing the matter at hand and justification for the requested signature, to the Minister's Office. I never saw, or had knowledge of, or sent the alleged Addendum or an Action Slip to the Deputy Minister. Therefore, to the best of my knowledge, the alleged Addendum presented in this case did not exist.

Exhibit 2, *Salas Declaration*, ¶¶6-7.

Likewise, Martha Acosta García, the Director of Mining Concessions who reviewed the Order and signed the List of Conditions, has sworn that she also never saw or had knowledge of the purported Addendum, or anything that would appear to be such a document, before it was filed as an exhibit to the Complaint. Exhibit 4, *Declaration of Martha Acosta García*, ¶6. Furthermore, as the Director of Mining Concessions during the period in question, she reviewed the documents relating to this matter, including the Order and the Pliego. *Id.* Ms. Acosta finds it impossible that she "never would have seen it and that no one would have mentioned the alleged Addendum." *Id.* In Ms. Acosta's view, the alleged Addendum presented in this case did not exist. *Id.*

Thus, the three officials through which the "Addendum" would have had to pass before it reached the Minister for his signature, and who would have had to recommend that he sign it, all disclaim any knowledge of it. They have testified not only that they never reviewed it or passed it along to the Minister, but that they never saw or heard about it or anything like it. To obtain the Minister's signature the Plaintiffs would have had to make a successful end run around the entire bureaucracy, and persuade the Minister to sign an extraordinary document without allowing him to pass it through the normal process and obtain the advice of his staff. And, of course, he has testified that this

did not happen.  He is unequivocal in stating that he never saw or signed the document.
The testimony of the responsible officials all the way up the chain of command
corroborates this statement.

The testimonial evidence that the "Addendum" was not signed by Minister
Ramírez or any other Venezuelan official is further corroborated by common sense.  In
fact, the "Addendum" *defies* common sense, because it requires the reader to believe that
Venezuela's Minister of Energy and Mines -- a close and trusted colleague of President
Hugo Chavez to whom he is directly accountable -- voluntarily and (for all practical
purposes) gratuitously, not only renounced Venezuela's sovereign immunity but
expressly submitted its sovereign actions within its own territory to review and judgment
by the courts of (of all places) the *United States*!  In this regard in particular, it would
require an enormous suspension of disbelief to accept the "Addendum" at face value.  It
would require the reader to ignore the strained relations that existed between the
Venezuelan and United States governments at the time the "Addendum" was purportedly
executed.  In December 2003, President Chavez and his Ministers were still bristling over
U.S. endorsement of the coup d'etat that temporarily ousted them from office and
imprisoned President Chavez.  The political tensions between Caracas and Washington
during the period are a matter of public record and need not be repeated here.  Suffice it
to say that the atmosphere was one that did not permit senior Venezuelan officials to
contemplate a renunciation of sovereign immunity in order to allow U.S. courts to sit in
judgment of their actions, even if they might have otherwise been inclined to do so, and
there is absolutely no evidence or reason to believe that they were.

Accordingly, any signature on the "Addendum" purporting to be the Minister's would necessarily be a forgery. Under New York State and general contract law -- even if, *arguendo*, the Court were to apply them instead of Venezuelan law -- a forged signature on the "Addendum" would render it void *ab initio*, because there can be no meeting of the minds of the parties when a forgery has been perpetrated. *See Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 370 (2d Cir. 2003) (quoting *Orlosky v. Empire Sec. Sys.*, 230 A.D.2d 401, 403, 657 N.Y.S.2d 840, 842 (N.Y.App.Div. 1997). Section 1605(a)(1) cannot serve as the basis for jurisdiction over a sovereign state where the purported "waiver" of sovereign immunity is contained in a forged document. *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C.Cir. 2000).

The testimony and other evidence submitted by Defendants in connection with this Motion places the burden squarely on Plaintiffs to present evidence that the "Addendum" is not a forgery but an authentic document, signed by the Minister and constituting a knowing and intentional waiver of Defendants' jurisdictional immunity under the FSIA. *See Robinson v. Gov't of Malaysia*, 269 F.3d 113, 141 (2d Cir. 2001) (citing and quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 911 F.2d 1012, 1016 (2d Cir. 1993)) ("If the [sovereign] defendant challenges the factual basis of the plaintiff's claim, 'the plaintiff has the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted....'"); *Human Rights in China v. Bank of China*, No. 02 Civ. 4361 (NRB), 2005 WL 1278542, at *2 (S.D.N.Y. May 27, 2005) (plaintiff bears the burden of producing supporting facts showing the applicability of an FSIA exception once defendant has made a *prima facie* case for immunity). If Plaintiffs do not meet their evidentiary burden -- which they cannot do

because the "Addendum" is a fake document that was never signed by the Minister or any other Venezuelan official -- this Court must dismiss their Complaint. *See Robinson v. Gov't of Malaysia*, 269 F.3d at 147 (complaint dismissed where plaintiff neither pleaded nor came forward with evidence sufficient to show jurisdiction over Malaysia under an exception to immunity in the FSIA); *Filetech, S.A. v. France Telecom, S.A.*, 304 F.3d 180, 182-83 (2d Cir. 2002) (complaint dismissed where Filetech put forth "little if any" evidence to meet its burden to show jurisdiction over sovereign defendant under the commercial activities exception to immunity).

Plaintiffs cannot meet their burden by reliance on the copy of the "Addendum" attached to their Complaint, which does not indicate that it was signed by anyone, let alone that any signature on it belongs to the Minister or another official. Plaintiffs themselves concede that whatever signature appears on it is "Illegible," rendering it inadmissible as evidence. It is indisputable that they can only satisfy their burden by producing *admissible* evidence showing that Defendants have waived their sovereign immunity; and the courts have uniformly rejected as insufficient in the FSIA context the type of inauthentic documentation that Plaintiffs offer here. *See Tolliver v. Federal Republic of Nigeria*, 265 F.Supp.2d 873, 881-82 (W.D.Mich. 2003), *aff'd* 128 Fed. App. 469 (6th Cir. 2005) (plaintiff, who could not authenticate contract forming the basis of his allegations of Nigeria's "commercial activity" and brought forward no other admissible evidence establishing the FSIA's commercial activity exception to immunity, failed to establish subject matter jurisdiction).

Nor can Plaintiffs carry their burden by submitting a version of the "Addendum" that is not the original, regardless of whether some photocopy other than the one affixed

to the Complaint may show that there were signatures on it.  Rule 1002 of the Federal

Rules of Evidence provides:

> To prove the content of a writing, recording, or
> photograph, the original writing, recording, or photograph
> is required, except as otherwise provided in these rules or
> by Act of Congress.

Of course, the rules do provide exceptions, where documents other than originals

may be admissible.  Federal Rules of Evidence 901 and 1001(4) provide that a photocopy

of an alleged original document is admissible where the proponent adduces sufficient

evidence to demonstrate to the satisfaction of the trier of fact that the original is authentic.

Rule 1003 states the conditions for allowing a duplicate to be admitted to the same extent

as the original.

> A duplicate is admissible to the same extent as an original
> unless (1) a genuine question is raised as to the authenticity
> of the original or (2) in the circumstances it would be unfair
> to admit the duplicate in lieu of the original.

These conditions are plainly not present here.  In this case, Defendants have, at

the very least, raised a genuine question as to the authenticity of the original

"Addendum."  Indeed, Defendants submit that the testimony and other evidence

submitted herewith demonstrate that the original "Addendum," if it exists at all, cannot

be authentic.  The courts have found a genuine question regarding the authenticity of an

original document in circumstances less egregious than those present here.  For example,

in *United States v. Haddock*, the Tenth Circuit affirmed the District Court's refusal to

admit photocopies of six documents proffered by defendant Haddock, which were

objected to by the U.S. government, on the ground that the photocopies were unreliable.

In finding that the District Court did not abuse its discretion by excluding the

photocopied documents, the Court of Appeals first noted that -- despite the existence of

modern and accurate reproduction techniques -- "a trial court must still be wary of admitting duplicates 'where the circumstances surrounding the execution of a writing present a substantial possibility of fraud.'" *United States v. Haddock*, 956 F.2d 1534, 1545 (10th Cir. 1992) (quoting 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶1003[02], at 1003-9 (1991)).  The Court of Appeals agreed that there was a substantial possibility of fraud where the only person who could recall ever seeing the originals of the documents was Haddock, no one who allegedly prepared the documents or to whom they were allegedly sent was familiar with the contents, and witnesses testified that the documents included statements that did not comport with similar documents prepared in the ordinary course of business.  *Id.* at 1545-46.

Similarly, in *Opals on Ice Lingerie v. Body Lines Inc.*, the Second Circuit affirmed the District Court's exclusion of a photocopy of an alleged contract containing an agreement to arbitrate in New York, which was offered by plaintiff Opals.  In finding that the defendant had raised a genuine question as to the authenticity of the original contract, the Court of Appeals emphasized that Opals had conceded that it could not produce an original of the signed agreement, and the defendants had contended that Opals had altered a note that defendant's signatory had added to the agreement calling for arbitration in California (not New York).  *Opals on Ice Lingerie*, 320 F.3d at 370-72; *see also Osherow v. Porras*, 224 B.R. 367, 370-71 (Bankr.W.D.Tex. 1998) (where there is a possibility of fraud in the circumstances surrounding the execution of a writing, the reliability of the duplicate is impaired, and the court may insist on the original if the opponent demands it; the copy of an alleged "letter" was excludable, where proponents

17

failed to produce the original, their credibility had been challenged in prior hearings, and the copy had suddenly appeared without explanation of why it had not appeared earlier).

Since the "Addendum" upon which Plaintiffs base jurisdiction in this case is an inauthentic document, and is not admissible evidence, they cannot sustain with that document their burden of showing that Defendants knowingly waived the sovereign immunity to which the FSIA entitles them. And since there is no other document showing that Defendants waived their sovereign immunity, the only conclusion that can be reached is that Defendants have not waived their immunity, that § 1605(a)(1) of the FSIA is inapplicable to these proceedings, and that the FSIA deprives this Court of subject matter and personal jurisdiction. In these circumstances, the Complaint must be dismissed in its entirety, with prejudice.[2]

## B. THE ACT OF STATE DOCTRINE BARS THE COURT FROM INQUIRING INTO THE VALIDITY OF THE SOVEREIGN ACTS OF VENEZUELA WITHIN ITS OWN TERRITORY

Plaintiffs ask this Court to rule on the validity of sovereign acts of the Republic of Venezuela, taken pursuant to its own laws, in its own territory, and directed at its own nationals. Under the Act of State doctrine, this is something the Court cannot do.

---

[2]    Besides Plaintiffs' failure to show the applicability of the waiver exception to sovereign immunity, the Complaint must also be dismissed because of Plaintiffs' inability to demonstrate that Defendants have the requisite minimum contacts with the forum (in this case, the United States) to render the exercise of personal jurisdiction consistent with the Due Process Clause of the Constitution. *See Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d at 313-14; *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 479 F.Supp.2d at 383-86. It is Plaintiffs' burden to establish the Defendants' "continuous and systematic" presence in the United States, such that this Court's exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice. *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 479 F.Supp.2d at 379, 383-86. Plaintiffs have not made (and cannot in good faith make) any allegations that Defendants are present in the United States, much less continuously and systematically. The Complaint thus provides no basis for the Court to exercise personal jurisdiction over these Defendants.

Accordingly, quite apart from the issue of Defendants' sovereign immunity, Plaintiffs' Complaint must be dismissed for this independently sufficient reason.[3]

The Act of State doctrine "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also Braka v. Bancomer, S.A.*, 762 F.2d 222, 225 (2d Cir. 1985) (finding that it is "impermissible" for U.S. courts to inquire "into the legality, validity, and propriety of the acts and motivations of foreign sovereigns acting in their governmental roles within their own boundaries") (internal citation omitted). The doctrine reflects, among other things, "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs," a matter committed exclusively to the political branches. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 404 (1990)) (citing *Sabbatino*, 376 U.S. at 423). The resolution of this case would require just such an impermissible inquiry into the sovereign acts of Venezuela in Venezuela. Plaintiffs' case must therefore be dismissed.

The gravamen of Plaintiffs' Complaint is their allegation that the Ministry and Venezuela breached their obligations pursuant to the Order and the List of Conditions regarding the redemption of mining concessions located entirely within the territory of Venezuela and operated exclusively by Venezuelan nationals. The Order and List of Conditions were issued pursuant to Article 53 of Venezuela's Law Organizing the

---

[3]    The Act of State doctrine is available to bar the adjudication of claims against foreign states even when jurisdiction otherwise lies under the FSIA. *See, e.g.*, *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465, 1474 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 222 (2d Cir. 1985).

Promotion of Private Investment in Concessions, which "expressly contemplates redemption as a means of extinguishing a concession on the ground of public usefulness or interest[.]" Complaint, Exhibit 1, pp. 78 (final paragraph) and 77 (first paragraph); *see also* Exhibit 2, pp. 98 (Paragraph First) and 97 (Paragraph Second). By their very nature and purpose, the Order and List of Conditions could only be issued by Venezuelan sovereign authorities. If the Complaint were allowed to stand, it would require the Court to assess the legality and propriety of Venezuela's sovereign conduct -- precisely the sort of inquiry that the Act of State doctrine does not permit. *See Bi v. Union Carbide Chemicals & Plastics Co. Inc.*, 984 F.2d 582, 586 (2d Cir. 1993) ("Under the act of state doctrine, we will not sit in 'judgment on...acts of a governmental character done by a foreign state within its own territory and applicable there'") (quoting 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 443 (1987), reflecting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)); *see also World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002) ("Because the relief sought here would require us to question the 'legality' of Kazakhstan's denial of the export license by ruling that denial a breach of contract, the act of state doctrine applies").

The need to abstain on Act of State grounds is especially clear here, where the sovereign acts in question relate to Venezuela's effort to manage its natural resources consistent with its national priorities. United States courts have long recognized that the management of natural resources is a quintessential sovereign function. *See MOL, Inc. v. The People's Republic of Bangladesh*, 736 F.2d 1326, 1329 (9th Cir. 1984) (finding that a country's right to "regulate its natural resources" is "a uniquely sovereign function");

*Int'l Ass'n of Machinists and Aerospace Workers v. The Org. of the Petroleum Exporting Countries*, 477 F.Supp. 553, 568 (C.D.Cal. 1979) (hereinafter "*IAM*") ("there can be little question that establishing the terms and conditions for removal of natural resources from its territory, when done by a sovereign state, individually and separately, is a governmental activity"). Venezuela's conduct that is the subject of this case "stems from the very nature of sovereignty." *IAM*, 477 F.Supp. at 568 (also stating that "[t]he defendants' control over their oil resources is an especially sovereign function because oil … is crucial to the welfare of their nations' peoples"); *see also* VED P. NANDA & DAVID K. PANSIUS, LITIGATION OF INTERNATIONAL DISPUTES IN U.S. COURTS, § 13:28 (September 2006) ("The act of state doctrine almost always precludes inquiry into the exercise of a sovereign nation's rights with respect to oil concessions, [and] maintenance of a domestic oil industry…").

Accordingly, the Court should decline Plaintiffs' invitation to opine on the validity of Venezuela's sovereign conduct within its own territory, and should dismiss the Complaint on Act of State grounds.

C.    **THIS COURT IS AN INCONVENIENT FORUM FOR LITIGATING CLAIMS CONCERNING THE ALLEGED BREACH OF AN AGREEMENT BETWEEN VENEZUELAN PLAINTIFFS AND THE VENEZUELAN GOVERNMENT THAT WAS TO BE PERFORMED WHOLLY IN VENEZUELA**

In addition to all the other reasons this case should be dismissed, it also warrants dismissal on *forum non conveniens* grounds. The matters before the Court involve the alleged obligations of the Government of Venezuela pursuant to an agreement entered into with Venezuelan Plaintiffs implementing a Venezuelan administrative order. All properties that are the subject of dealings between the parties are located in Venezuela, and it is likely that all witnesses and other evidence are also in Venezuela. Neither New

21

York nor the United States in general has any interest in the claims at issue.  Rather, the case can be, and should be, adjudicated in Venezuela .  The Court should thus "resist the imposition upon its jurisdiction" and should dismiss this case.  *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947).

As set forth in *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) (en banc), courts in the Second Circuit follow a clear three-step process in determining whether to dismiss a case on *forum non conveniens* grounds.  *See Republic of Colombia v. Diageo N. Am. Inc.*, 2007 WL 1813744 (E.D.N.Y., June 19, 2007); *Akofin v. Jumbo Navigation, N.V.*, 481 F.Supp.2d 310, 316 (S.D.N.Y. 2007).  In the first step, the Court determines how much deference should be given to the plaintiffs' choice of forum.  In the second step, the Court considers whether an adequate alternative forum exists.  And in the third step, the Court balances the private and public interest factors to determine the appropriate forum.  All three steps prove that this case should not be heard in New York.

### 1.    <u>This Case Has No Bona Fide Connection to New York</u>

Plaintiffs' choice of forum in this case is entitled to minimal deference.  As discussed above, the "Addendum" by which Plaintiffs assert that this Court is the proper forum is void.  Plaintiffs have no additional basis for bringing this case here.  The case involves a Venezuelan agreement, Venezuelan parties, Venezuelan law, and evidence and witnesses located in Venezuela.  Although it is true that ordinarily courts will "give deference to a plaintiff's choice of [] home forum because it is presumed to be convenient," *Iragorri*, 274 F.3d at 71 (citing to *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981)), a foreign plaintiffs' choice of a U.S. forum is afforded a "lesser degree of deference" based on "realistic doubts about the ultimate convenience of a foreign plaintiff's choice to litigate in the United States."  *Pollux Holding Ltd. v. Chase*

*Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003). Key among the factors in deciding whether to credit a foreign plaintiff's choice of forum is the "the lawsuit's *bona fide* connection to the United States and to the forum of choice...." *Iragorri*, 274 F.3d at 72. In this case, neither the Plaintiffs nor the lawsuit has any connection whatsoever to New York or the United States, let alone a *bona fide* connection. As a result, Plaintiffs' choice of forum is entitled to no deference.

### 2.    There Is an Adequate Alternative Forum

An adequate alternative forum other than the United States exists here. Courts have held that "[an] alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux*, 329 F.3d at 75 (citing *Piper Aircraft*, 454 U.S. at 254 n. 22); *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998)). "[G]enerally a court may find a forum inadequate only where there is 'a complete absence of due process and an inability of a plaintiff to obtain substantial justice.'" *Corporación Tim, S.A. v. Schumacher*, 418 F.Supp.2d 529, 532 (S.D.N.Y. 2006) (citation omitted).

There is no basis for such an assertion here. Indeed, Plaintiffs' own forged "Addendum" implicitly acknowledges the adequacy of a Venezuelan forum by providing that certain disputes can only be heard in Venezuelan courts. *See* Addendum, First paragraph. Moreover, courts in the Second Circuit have repeatedly held that Venezuela is an adequate forum. *See, e.g., Blanco v. Banck Indus. de Venezuela, S.A.*, 997 F.2d 974, 981-82 (2d Cir. 1993); *Villalabos v. Loffland Bros. Co.*, 507 F.Supp. 904, 907 (S.D.N.Y. 1981); *Iberian Tankers Co. v. Terminales Maracaibo, C.A.*, 322 F.Supp. 73, 74-75

(S.D.N.Y. 1971)).  The second step in the *forum non conveniens* analysis thus also counsels in favor of dismissal.

### 3.    The Relevant Private and Public Interest Factors Support Dismissal

The third and final step in the *forum non conveniens* analysis requires the court to weigh the relative private and public interests involved in the choice of forum.  *Pollux*, 329 F.3d at 74-75.  Here, all of the private factors support Venezuela as the proper forum. Not only are all witnesses and evidence located there, but the merits of the dispute turn on questions relating to Venezuelan laws and regulations.  As a practical matter, the parties will thus have a much easier time proceeding in Venezuela than in New York (or anywhere else in the United States).  Indeed, given that most if not all witnesses relevant to the issues in dispute are beyond the subpoena power of the Court, it is an open question whether the parties would be able to present an effective case in this country at all.

The public interest factors also weigh heavily in favor of dismissal.  It goes without saying that Venezuela has a much greater interest than the United States in resolving a dispute between two Venezuelan corporations and the Venezuelan government.  *Corporación Tim*, 418 F.Supp.2d at 535 ("there is a significant interest in having localized matters decided in the local forum in accordance with domestic law governing the case").  Indeed, while Venezuela has an obvious interest in this case, the United States has none.  In fact, the only public interest on the U.S. side -- the self-evident interest in seeing that scarce judicial resources are not wasted hearing cases that have no claim on American courts' time -- counsels strongly in favor of dismissal.

For all these reasons, and for each of them, Plaintiffs' action should be dismissed on grounds on *forum non conveniens*.

### III.    CONCLUSION

For each of the foregoing reasons, the Complaint must be dismissed as to both Defendants, with prejudice.

**FOLEY HOAG LLP**


_____/S/ Kenneth S. Leonetti_____
Kenneth S. Leonetti (KL7368 )
Paul S. Reichler
Ronald E.M. Goodman
1875 K Street, N.W.
Washington, D.C.   20006
(202) 223-1200
Attorneys for Defendants Bolivarian
Republic of Venezuela and Ministry
Date:   July 27, 2007                          of Basic Industries and Mines