GREENBERG TRAURIG, LLP
James W. Perkins (JWP-6684)
200 Park Avenue
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400
perkinsj@gtlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

|  |  |  |
|---|---|---|
| COMPAÑIA DEL BAJO CARONI, C.A. and V.M.C. MINING COMPANY, C.A., | * * * * | |
| Plaintiffs, | * * | Civil Action No. 07 CV 3179 (NRB) |
| - against - | * * | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, and MINISTRY OF BASIC INDUSTRIES AND MINES | * * * | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | * * | |

## PRELIMINARY STATEMENT

Plaintiffs, Compania del Bajo Caroni, C.A. ("CAROMIN"), and V.M.C. Mining

Company, C.A. ("VMC"), respectfully submit this memorandum in opposition to the motion of

Defendants Bolivarian Republic of Venezuela (Venezuela") and its Ministry of Basic Industries

and Mines ("the Ministry") to dismiss this action on the grounds that this Court lacks subject

matter jurisdiction over them. Plaintiffs herewith offer sworn declarations and official

documents of the Government of Venezuela directly contradicting the statements made by

Defendants' witnesses, and establishing a prima facie demonstration that the document by which

Defendants waived sovereign immunity is genuine. The conflicting evidence shows at the very

least that there are significant and genuine issues of fact concerning the authenticity of the

document that lies at the heart of this case, which this Court should resolve only after permitting the parties to conduct discovery and development of a proper factual record. The motion should therefore be denied, or, in the alternative, deferred until after an evidentiary hearing.

### Defendants' Motion to Dismiss

Venezuela is a foreign sovereign. Venezuela and the Ministry are therefore presumptively entitled to immunity from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604. That immunity may, however, be waived under § 1605(a)(1). Plaintiffs have submitted documentary evidence of such a waiver applicable in this case. That evidence demonstrates that the then-Minister of Mines, Rafael Ramírez Carreño, signed a document, styled as an "Addendum" to legal arrangements governing payment of compensation due to Plaintiffs for the nationalization of their property (hereinafter "the Addendum"). The Addendum contains an express waiver of sovereign immunity in any action by Plaintiffs to collect Venezuela's debt to them. Venezuela now concedes the authenticity of the legal arrangements for establishing the compensation, and does not dispute that the confiscation take place or that payment has now been due for five years. However, it denies that the Minister signed the Addendum.[1] Defendants contend that the document is a forgery. Plaintiffs respond that the Addendum is what it appears to be: an official document through which Defendants expressly accepted the jurisdiction of this Court in any action to enforce an award of compensation for an expropriation, in the event that such an award was not timely honored.

Under the Federal Rules of Evidence, and the caselaw interpreting them, the mere fact that a person denies that a signature is his is insufficient to sustain the conclusion that the

---

[1] In addition to sovereign immunity, Venezuela asserts three other defenses: (1) the act of state doctrine, (2) *forum non conveniens*, and (3) lack of personal jurisdiction. As is explained below, this Court need not reach these defenses, which, in any event, do not apply here.

document bearing that signature is a forgery.  Indeed, the denial raises significant issues of material fact, especially where, as here, not only do other witnesses attest that the document is authentic and the signature genuine, but other evidence generated by Venezuela's affiants themselves directly contradicts the statements they have presented to this Court.

<h3 align="center">Plaintiffs' Witness Statements and Evidence</h3>

Plaintiffs submit herewith three sworn Declarations.  Two are signed by Manuel Fernandez, the legal representative of Plaintiffs; Adrian Zerpa Leon, at the relevant time Head of Mining Processing within the Ministry of Mines of Venezuela.[2]  These witnesses attest to facts that, if accepted by the Court, provide ample demonstration that the Addendum is real. Moreover, they present documents attached to their Declarations -- documents authored by Defendants' own affiants -- that are entirely inconsistent with the version of the facts that Defendants present.

Mr. Fernandez recounts the history and genesis of the Addendum.  He explains that he tendered to the Ministry a draft of the document, as an offer to resolve several questions that remained open in ongoing negotiations over compensation for the nationalized mining concessions.  Immediately after he did so, Ministry representatives spoke with him about the terms that they were willing to accept.  A few days later, he was summoned by Mr. Zerpa to the Ministry, where he was handed a signed, sealed document identified by Mr. Zerpa as the Ministry's response to his offer, acceptable to (and in fact already accepted by) the Minister.  Mr. Fernandez countersigned the original, and returned it to Mr. Zerpa, who also signed it.

Mr. Zerpa testifies that he received the Addendum, signed by the Minister, through the

---

[2] A third Declaration, from James W. Perkins, Esq., authenticates certain materials submitted to rebut the Minister's contention that, during the relevant period, neither he nor his Ministry nor his Government ever waived Venezuela's sovereign immunity in U.S. courts, and attaches the report of Gus Lesnevich, an expert in handwriting analysis.

inter-office mail, and was instructed to obtain Mr. Fernandez's agreement to it, which he did. He states that he recognized the signature of the Minister, with which he was personally familiar. It should be noted that Mr. Zerpa was not only an attorney in the Ministry and Head of one of its units: he was the principal author, according to Defendants' submissions, of the two documents that formed the framework of the arrangements regarding the expropriation of Plaintiffs' mining concessions and the compensation to be paid for them. He was one of the small group of Ministry functionaries assigned to work closely on the resolution of this file.[3]

The Exhibits attached to the Fernandez and Zerpa Declarations are entirely consistent with the account that those affiants provide, and entirely inconsistent with the version of Defendants' witnesses. Thus Minister Ramírez professes complete ignorance of the Addendum, and claims never to have seen it before -- yet Plaintiffs' documents trace the path of the Addendum's first draft into the Minister's Office, and the last draft from that Office back to Mr. Fernandez. Defendants' witnesses deny that they have ever had the Addendum in their files -- yet Plaintiffs' documents show that the Addendum was in fact in the file in 2004, well after it was executed by the Minister. Mr. Salas testifies that he knew nothing of the Addendum or any "similar" document -- yet Plaintiffs submit a memorandum written by Mr. Salas himself to the Office of the Minister, recommending that the contents of the Addendum be approved.

Finally, Mr. Lesnevich, a highly-regarded expert in handwriting analysis,[4] testifies that

---

[3] Memorandum in Support of the Motion to Dismiss ("Def. Mem."), at 9-10.

[4] Mr. Lesnevich's expertise has been recognized in approximately 500 cases in which he has testified, often on behalf of the United States. Among these are: *United States v. Chacko,* 169 F.3d 140, 149 (2d Cir. 1999); *United States v, Rutland,* 372 F.3d 543 (3d Cir. 2004); *United States v. Cusack,* 66 F.Supp.2d 493, 499 (S.D.N.Y. 1999); *United States v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y. 1995); *Firma Melodiya v. ZYX Music GmbH,* 882 F.Supp. 1306, 1314 (S.D.N.Y. 1995); *Alfieri v. Guild Times Pension Plan,* 446 F.Supp.2d 99, 107 (E.D.N.Y. 2006); *Commonwealth of Pennsylvania v. Coleman,* 905 A.2d 1003 (Pa. Sup. Ct. 2006).

4

the signature on the Addendum was written by the same hand as the signature on the statement

of Minister Rafael Ramírez Carreño submitted to this Court.

Plaintiffs' sworn witness Declarations and their Exhibits give rise to a presumption that

the Addendum was signed by the Minister, and was presented to Mr. Fernandez as an official

document of the Government of Venezuela.  The requirement under Rule 901 of the Federal

Rules of Evidence that a document be authenticated or identified as a condition precedent to its

admissibility is satisfied by a *prima facie* showing that the document is what it purports to be,

leaving the ultimate determination of authenticity to the finder of fact.  *Rothstein, Federal Rules

of Evidence (3d ed.)* at 660-661.  That *prima facie* showing has been made here.

For that reason alone, Defendants' motion to dismiss must be denied on the present

record.  Plaintiffs respectfully submit that the Court should simply reject the motion now without

prejudice to its renewal at trial, or should afford the parties an opportunity to conduct discovery

limited to issues concerning the authenticity of the waiver, and then to come before the Court for

a full evidentiary hearing on that question.

### Chronology of Events

In 2002, Venezuela seized Plaintiffs' concessionary rights to exploit seven gold and

diamond mines as part of the politically significant and time-sensitive Tocoma Hydroelectric

Power Plant Project.[5]  Plaintiffs challenged this expropriation in Venezuelan courts and

ultimately before the Supreme Court, which affirmed dismissal of the case, but only on the

technical grounds that Plaintiffs had filed suit against the wrong government agency.  The

prospect that the litigation would be reformulated and re-filed, and that it would ultimately pose

---

[5] The Tocoma Power Plant is a very substantial hydroelectric construction project in Bolivar
State, which will cost over $3 billion before it commences operations in 2012-14.  *See* Fernandez
Declaration ("Fernandez Dec."), attached hereto, Exh. 1.  All of the stated facts are set forth in
the accompanying Declarations filed in opposition to the pending Motion.

a successful challenge to the expropriation, threatened to delay and even jeopardize the viability of the high-visibility, politically sensitive Project.

In November, 2003, Plaintiffs made a formal request that the Ministry assert jurisdiction over the proceedings, and proposed that the parties agree to terms and conditions for the exercise of eminent domain and the payment of appropriate compensation. In response, the Ministry issued Administrative Resolution No. 3,[6] and established a "working group" to negotiate the specific terms required to permit the plans to go forward. Venezuela's representatives were Francisco Salas Blanco, Director General of Mines; Manuel Navas, an assistant to Mr. Salas; Mr. Zerpa; Martha Acosta Garcia, Director of Mining Concessions; and Rosa Toro, an attorney from the Ministry's Legal Department. Plaintiffs' legal representatives were Mr. Fernandez and their outside counsel, Luis Andres Guerrero Rosales.

Messrs. Salas, Zerpa, and Navas, and Mses. Acosta and Toro, met Messrs. Fernandez and Guerrero on December 12, to discuss terms and conditions. At that meeting, Venezuela's representatives suggested invoking the Organic Law for the Promotion of Private Investment through Concessions, according to which compensation for exercises of eminent domain were to be established by binding assessments by disinterested expert appraisers. This proposal resulted in an agreement that Venezuela would obtain an independent appraisal of the value of the concessions, with the amount awarded by the appraiser to be paid promptly, without further review in any judicial forum. The agreement was incorporated into a document styled "*Pliego*

---

[6] Administrative Resolution No. 3, dated December 2, 2003 (with an English translation), is Exhibit 1 to the Complaint herein.

6

*de Condiciones*," signed by all of the members of the working group on December 17, 2003.[7] As

Defendants now state in their moving papers:

> As part of its formal, eminent domain-like process, Venezuela issued (in
> Venezuela) two official documents formally canceling Plaintiffs' concessions and
> recognizing their right to fair compensation, in an amount to be determined by
> independent appraisal (to be conducted in Venezuela). Both of these documents -
> - dated December 2 and 17, 2003 -- are attached to the Complaint, as Exhibits 1
> and 2, respectively. Taken together, these documents -- **which are authentic** --
> completed the formal administrative procedure for canceling Plaintiffs'
> concessions and assuring them fair compensation, save only for the subsequent
> determination of the amount of that compensation and, of course, payment itself.

Def. Mem. at 8 (emphasis added).

The Complaint alleges, and Defendants do not deny, that Venezuela then: (a)

commissioned the appraisal, just as it agreed to do; (b) received the report from the appraiser,

just as it agreed to do, which valued the mining concessions (with interest) at approximately

$265 million;[8] (c) took possession of the land encompassing the mines, and utilized it for the

Tocoma project (later submerging the mines, making them permanently unworkable); and (d)

failed to make any payment to Plaintiffs, and continues to refuse to do so.

When the *Pliego de Condiciones* was signed, however, the working group recognized

that certain issues remained unresolved. At a meeting on December 17, 2003, attended by the

same individuals on both sides who signed the *Pliego de Condiciones*, Mr. Fernandez raised at

least two open issues: which party would be responsible for paying the appraiser's fee, and how

Venezuela would assure Plaintiffs of prompt payment of the appraised value of the concessions.

---

[7] This "List of Conditions" is attached to the Complaint, with a translation, as Exhibit 2. It is
also Exh. A to the Declaration of Adrian Zerpa Leon ("Zerpa Dec."), attached hereto.

[8] The documentation recording the appointment of ABECIR, C.A., as the independent appraiser
is attached to the Fernandez Declaration as Exh. 3, and to the Zerpa Declaration as Exh. C.
Executive summaries of the ABECIR reports are Exhs. 4 and 5 to the Complaint.

To address these two matters, Mr. Fernandez had prepared a draft of what he called a "Complementary Document" ("*Documento Complementario*"), proposing that Venezuela be responsible for the appraiser's honoraria. He also asked for agreement that, if payment of the compensation to Plaintiffs was not made within two years, recourse could be had to this Court in any enforcement action, with Venezuela waiving sovereign immunity and other procedural defenses. Mr. Fernandez asked Mr. Salas to present the document to the Minister, as the only official empowered to agree to its terms, for signature. Mr. Salas reviewed the draft, and sent it on to the Minister's Office for signature, defending his agreement with the proposal to accept the jurisdiction of this Court, although recommending that the appraiser's fee be split between the parties 50/50. *See* Fernandez Dec., Exh. 4.

Over the next two days, Mr. Fernandez spoke on several occasions with Ministry lawyers Rosa Toro and Julia van der Brule (the Minister's Executive Assistant) regarding his "*Documento Complementario.*" They told him that they were preparing changes to the draft to conform to the Minister's preferences and practices. In fact, Ms. Toro sent her comments and revisions to the Minister on December 18, Fernandez Dec., Exh. 5, and on the very next day, Mr. Zerpa called Mr. Fernandez, announcing that the revised document had been executed, and inviting Mr. Fernandez to come to Mr. Zerpa's office to get it.

On December 22, Mr. Zerpa handed Mr. Fernandez a document now styled "Addendum," which the latter recognized as a revised version of his "*Documento Complementario.*" He checked to see that the changes were acceptable, and that the document had been signed by the Minister, which Mr. Zerpa also confirmed. Additions included a provision precluding Plaintiffs from mounting new judicial challenges in Venezuela. This was acceptable to Mr. Fernandez,

because the assurance of enforceability in United States courts meant that it would not be necessary to initiate litigation in Venezuela.

Mr. Fernandez then signed the document as requested, and signed each page along the margin. At his request, Mr. Zerpa signed as well. Mr. Fernandez asked for a copy of the signed and executed document, and Mr. Zerpa had one made for him, which Mr. Fernandez took with him (and placed in secure storage). The original was then delivered by Mr. Zerpa to the Ministry's file room for retention as an official document.

From that day forward, Mr. Fernandez tried repeatedly to have Plaintiffs' compensation paid through normal administrative channels. At first he encountered bureaucratic resistance, as the Government shuffled the file between Ministries. When the Finance Ministry received the file in April 2005, the Addendum was in it. Fernandez Dec., Exh. 6. In October 2005, the Finance Ministry told Mr. Fernandez that it did not have jurisdiction over the case and was returning the file to the Ministry of Mines. *Id.*, Exh. 5. Although it is unclear what happened to the documents after that, the latter Ministry conveniently claimed to have lost the file, noting that copies of the pertinent documents had to be obtained from Plaintiff's outside counsel. *Id.*, Exh. 7. The Ministry, in the same memorandum, acknowledged that the debts to Plaintiffs were legitimate Government obligations and had to be paid.

Mr. Fernandez waited out the two-year period stipulated in the Addendum, and then brought suit this Court to collect the sums owed to Plaintiffs, as the parties had agreed.

### Defendants' Witness Statements

Defendants deny that Minister Ramírez signed -- indeed, that he ever saw -- the Addendum. Defendants do not deny that they owe Plaintiffs compensation for the nationalized concessions; they deny only that this Court has the authority to order them to pay their just debts.

Venezuela's entire argument is grounded in a carefully-constructed case of "plausible deniability." Defendants submit four statements in denying the authenticity of the Addendum. Exhibit 1 is a letter from Minister Ramírez to the Attorney General of Venezuela, subsequently replaced with a proper sworn declaration. The others are declarations, executed in apparent compliance with 28 U.S.C. § 1746, of Mr. Salas (Exhibit 2), Orlando Ortegano, Mr. Ramírez's Deputy in December 2003 (Exhibit 3), and Ms. Acosta (Exhibit 4).

### The Salas Declaration ("Salas Dec.")

Mr. Salas was Director General of Mines, in the Venezuelan Ministry of Energy and Mines, in December 2003. When the Ministry was reorganized in 2005, he was assigned to the Ministry now called "People's Power for Energy and Petroleum," headed by Minister Ramírez. In other words, he reported to Mr. Ramírez in 2003, and he continues to report to him today.

Mr. Salas now claims before this Court is that he "never saw or had knowledge of" the Addendum (Salas Dec., ¶ 6). Technically, this may not contradict Plaintiffs' account of what happened: Messrs. Fernandez and Zerpa testify that the *Documento Complementario*," not the Addendum, was handed to Mr. Salas for transmission to the Minister. And it was the original draft, not the final, that he transmitted to the Minister's Office with his recommendation. Fernandez Dec., Exh. 4. Mr. Salas goes on to assert that he never saw "any document **similar to the alleged Addendum**" (emphasis added). But this use of the term "similar" begs the question whether, in Mr. Salas's view, the first draft prepared by Mr. Fernandez was or was not "similar" to the final version prepared by the Ministry's lawyers and signed by the Minister.

Without the opportunity for cross-examination, it is impossible to determine whether Mr. Salas is being crafty in his choice of words, or whether he will testify that he never saw the earlier draft. Plaintiffs offer credible, independent evidence (*inter alia* through both Messrs.

Fernandez and Zerpa) directly impeaching any such testimony. Moreover, Mr. Salas's own memo to the Minister's Executive Assistant, identifying the *Documento Complementario* and discussing the proposed waiver of sovereign immunity and the election of this Court as the venue for resolving disputes over payment, *see* Fernandez Dec., Exh. 4, provides powerful support for the suggestion that this witness may already have perjured himself.

Notably absent from the Salas Declaration is any definitive assertion that Mr. Ramírez did not sign the Addendum. Mr. Salas, who has worked for Minister Ramírez for years, offers no opinion on whether the signature on the Addendum resembles the signature of the Minister. All he says is that when documents were routed to the Minister, a certain procedure should have been observed, and he was not aware that it was followed in this instance. He does not attest that the procedure was uniformly followed, or that he is unaware of any other instance in which the Minister signed an official document routed to him outside normal channels. He does not testify that he undertook any review of files, notes, diaries, or other documents available to him, or that he consulted with any former or current subordinates, to determine whether, now nearly four years later, his unrefreshed recollection might be incomplete or outright wrong.

At most for Defendants, the Salas declaration demonstrates the existence of factual disputes that make it inappropriate to consider dismissal of the Complaint without discovery. At worst, it is perjurious, warranting serious sanctions against Venezuela and the Ministry.

### The Ortegano Declaration ("Ortegano Dec.")

Orlando Ortegano was Mr. Ramírez's Deputy (or "Vice Minister") in December 2003. Like Mr. Salas, he now works for Mr. Ramírez in the Ministry of Energy and Petroleum. Mr. Ortegano was not part of the working party. Nor is he mentioned in the Addendum. Plaintiffs' witnesses do not allege that he signed (or even saw) any document relevant to this case.

11

Mr. Ortegano does not state in his Declaration that the Minister did not sign the Addendum. The entire substance of his statement is his opinion that, because certain bureaucratic procedures appear not to have been followed in this instance, he "do[es] not believe that the alleged Addendum was signed by the Minister." While Mr. Ortegano presents himself as the Minister's "gatekeeper," across whose desk all documents intended for the Minister would pass, he does not address whether there were ever exceptions to this supposed "rule." And Mr. Zerpa's testimony directly contradicts any implication that Mr. Ortegano ever had any kind of "veto power" over what the Minister could see. Zerpa Dec., ¶ 20.

The Ortegano Declaration contains no claim that the procedures -- according to which an "action slip" (in Spanish, *punto de cuenta*," evidently a kind of routing memo) would be attached to documents requiring the Minister's attention -- were universally observed, nor does he say whether he is (or is not) aware of other situations in which they were not followed. Mr. Ortegano says merely that, had his office's protocols been followed, he would have expected to see the Addendum. Since he does not now recall having seen it, he asks the Court to infer that the document is not authentic. Mr. Zerpa, however, a senior official in the very same Ministry, states that to his personal knowledge the Minister signed documents "at his sole discretion, with or without a *Punto de Cuenta*, just like any other Minister." Zerpa Dec., ¶ 22.[9]

Moreover, Mr. Ortegano does not even state that there was no *Punto de Cuenta*: all he attests is that, in July 2007, he does not recall having seen one nearly four years before. Nor does he testify that he searched the files to see whether, in fact, a *Punto de Cuenta* might in fact have accompanied the Addendum in its journey into the Minister's office.

---

[9] In addition, Fernandez Dec. Exh. 4 provides one possible explanation of why there may have been no *punto de cuenta*: the document was sent to the Minister directly by Mr. Salas.

In sum, Mr. Ortegano's Declaration is useless as evidence regarding the authenticity *vel non* of the Addendum, and in any event, it is inconsistent with the testimony of Mr. Zerpa: a direct conflict that the Court should not resolve on dispositive motions.

### The Acosta Declaration ("Acosta Dec.")

Martha Acosta Garcia, an attorney, was acting Director of Mining Concessions at the Ministry of Mines in December 2003. She too now works for Minister Ramírez. And she too was a member of the working party, in regular contact with Mr. Fernandez during the negotiations. But her Declaration addresses none of that.

Instead, she limits her testimony to a denial that the Addendum is genuine for no reason more powerful than that "it seems impossible to me that I never would have seen it and that no one would have mentioned" it. Acosta Dec., ¶ 6. No reason is given why this "seems impossible" to her. She does not say that she saw every document in the file, and indeed she does not mention anything about her substantial involvement in this case after the December 17, 2003, meeting. The Addendum, of course, was signed after that meeting, and found its way into the file sometime after December 22. And she does not report any effort to review files or consult with subordinates or other sources to refresh her In sum, her speculation about what others might, would, or could have done with respect to the Addendum has no probative value in assessing the authenticity of the document or of the Minister's signature affixed to it.

### The Ramírez Declaration ("Ramírez Dec.")

Ultimately, the Salas, Ortegano, and Acosta Declarations are mere distractions from Venezuela's central submission, the declaration of Minister Ramírez, which makes certain categorical assertions that are directly at odds with sworn statements of Messrs. Fernandez and Zerpa. The operative allegations denying that the Addendum is genuine are these:

1.      " the signature on the Addendum placed above and below the name 'Ing.
RAFAEL RAMÍREZ' is not mine. . . . [W]ith regard to the signature imprinted
on the alleged 'Addendum' dated December 19, 2003, it is not my signature";

2.      "In fact, I did not sign this document and . . . I only had notice of the
'Addendum' when it was filed as an exhibit to the complaint. I can affirm that I
had never seen it, and that prior to this occasion, I had no knowledge of any
similar document";

3.      "I have not made any agreement whatsoever, nor have I given instructions
or delegated authority to enter into contracts of any nature with the defendants on
my behalf, nor on behalf of the then-Ministry of Energy and Mines, nor on behalf
of the Bolivarian Republic of Venezuela, either written or verbal, in which
jurisdiction would have been attributed to the Courts of the United States of
America by virtue of a waiver – as the plaintiffs indicate – of the sovereign
immunity that protects . . . Venezuela and its properties and interests under the
law of the United States of America";

4.      "neither I, nor anyone else at the Ministry of Energy and Mines had the
constitutional or legal capacity to establish a commitment like the one mentioned
above";  and

5.      "in my official correspondence, in the past and at the present, for the
purposes of authenticity, I do not place a wet seal such as the one that appears on
the alleged 'Addendum,' but rather a dry seal."

Minister Ramírez's avowals are easily discredited.  For example, he does not merely

deny that he signed the Addendum: he insists -- not once but twice -- that, irrespective of how it

got onto the Addendum, **the signature is simply not his**.  Here, he simply protests too much.

The sworn testimony of Mr. Gus Lesnevich, an expert in handwriting analysis, directly

contradicts the Minister's unambiguous statement, concluding that **the signature on the**

**Addendum is in fact that of Rafael Ramírez Carreño**.[10]

---

[10] From examining the copy (the only version of the document available to Plaintiffs), Mr.
Lesnevich cannot attest that the signature was actually placed on the document by Mr. Ramírez.
Nonetheless, Mr. Lesnevich's expert testimony, if credited, demonstrates  that the Minister is not
telling the truth.  The Minister did not say, "that is my signature, although I do not know how it
got there, since I did not sign that document."  He said "the signature is not mine . . . it is not my
signature."  Mr. Lesnevich's testimony supports the conclusion that the signature was made by
the hand of the Minister himself.  In any event, Mr. Zerpa and Mr. Fernandez both testify that
they did see this signature in its original form on the original Addendum.

14

The Minister's claims are undermined also by the testimony of Mr. Zerpa, who states that he saw the original signature and can identify it positively as that of the Minister. Zerpa Dec. at ¶ 13 ("I have seen Minister Ramírez's signature on numerous occasions and, therefore, I recognize the signature on the third page of the Addendum as being that of Minister Ramírez"). Of course, a layperson may testify to the authenticity of a signature with which he is familiar. Fed. R. Evid. 901(b)(2); *Ladson v. Ultra E. Parking Corp.,* 878 F. Supp. 25, 29-30 (S.D.N.Y. 1995) ("Under Rule 901(b)(2) non-expert identification of the handwriting on the document satisfies the authentication requirement.").

Mr. Ramírez's claims are further eviscerated by two internal Ministry memoranda. In one, written on December 17, Mr. Salas transmitted the draft Addendum to the Minister; in the other, dated December 18, 2003, Rosa Toro, one of the Ministry's legal advisers (and a member of the working party), offered her legal revisions to the document to Ms. van den Brule, the Minister's Executive Assistant. *See* Fernandez Dec., Exh. 4. These materials completely discredit the Minister's insistence that the Addendum never existed, and definitively place it in the hands of the Minister's own assistant, just as Messrs. Fernandez and Zerpa have testified.[11]

Minister Ramírez also falsely asserts that Venezuela generally, and more specifically he himself, on behalf of that government and its agencies and instrumentalities, has **never** waived sovereign immunity in order to accept the jurisdiction of United States courts, and would not have done so in 2003. In fact, even in 2003 (when U.S.-Venezuelan relations were near their

---

[11] It is curious that Defendants offer no Declaration from Ms. Toro, a member of the working party, or from Ms. van den Brule, the Minister's Assistant. These are the two members of his staff who personally discussed the Ministry's proposed changes to the *Documento Complementario* with Mr. Fernandez on the telephone between December 17 (the date of the meeting) and December 19 (when Mr. Zerpa called Mr. Fernandez to tell him that the Addendum had been signed). Presumably, these two officials would have the most to say about whether and when the Addendum was in fact executed by the Minister.

nadir, as they are today), Venezuela and the very agencies for which Mr. Ramírez was himself responsible agreed to waive sovereign immunity in numerous contracts and instruments providing for disputes to be resolved in U.S. courts.[12]

Finally, the Minister claims that the presence of a "wet seal" (*i.e.*, one requiring use of an ink-pad) on the Addendum proves that it is a fake, because he invariably used a dry (*i.e.*, uninked) seal on official documents. But Mr. Zerpa testifies that he had seen official documents, during Minister Ramírez's tenure "bearing no seal, a dry seal, or a wet seal." Zerpa Dec., ¶ 23. And he goes on to be even more specific: "I have seen many documents signed by Mr. Ramírez that bear the particular seal apparent on the face of the Addendum." *Id.*

### Summary

What is pending before the Court is a motion to dismiss. Plaintiffs respectfully submit that their evidence, in the form of the accompanying Declarations and their Exhibits, including official Venezuelan Government documents, strongly supports the allegations of the Complaint, and in particular the contention that the Addendum is a true and authentic document, signed by a Venezuelan Government Minister. Plaintiffs have shown substantial grounds to conclude that the witness statements offered by Defendants are false or, in any event, simply not probative.

The law does not allow a signer of a document to render it a legal nullity simply by denying that the signature on the document is his, without regard to evidence or context. And the material tendered by Defendants amounts to nothing more than such a denial.

---

[12] Plaintiffs' counsel have been able to identify seven such waivers, which occurred during the Chavez regime and Minister Ramírez's tenure. At least two were agreed to by agencies or government-controlled companies under Minister Ramírez's supervision. *See* Perkins Declaration, Exhs. A-G. These documents, incidentally, also destroy the Minister's contention that he did not have the constitutional authority to grant such a waiver.

16

## **ARGUMENT**

A.  The Motion to Dismiss May Not Be Granted unless Venezuela Proves
    The Factual Basis on Which It Claims Lack of Jurisdiction.

The procedures governing a motion to dismiss for lack of jurisdiction, such as

Venezuela's motion here, are set forth entirely at Rule 12(b)(1) of the Federal Rules of Civil

Procedure.  Those procedures apply even where the Rule 12(b)(1) motion is filed in a case

relating to the Foreign Sovereign Immunities Act ("the FSIA").  *See Robinson v. Government of*

*Malaysia*, 269 F.3d 133, 140-142 (2d. Cir. 2001).  There, the Second Circuit held that, if, as here,

> the defendant challenges the factual basis of the plaintiff's claim, "the plaintiff has
> the burden of going forward with evidence showing that, under exceptions set
> forth in the FSIA, immunity should not be granted, although the ultimate burden
> of persuasion remains with the alleged foreign sovereign." . . . In other words, in
> assessing whether a plaintiff has sufficiently alleged or proffered evidence to
> support jurisdiction under the FSIA, a district court must review the allegations in
> the complaint, the undisputed facts, if any, placed before it by the parties, and -- if
> the plaintiff comes forward with sufficient evidence to carry its burden of
> production on this issue -- resolve disputed issues of fact, with the defendant
> foreign sovereign shouldering the burden of persuasion.

*Id.* (citations omitted).

B.  Defendants Bear the Burden of Proving that the Addendum Is a Forgery.

Without any reference to the burden-shifting recognized by the Second Circuit in

*Robinson,* and without citation of any judicial precedent, Venezuela asserts that Plaintiffs are

required to demonstrate that the Addendum is authentic.  Def. Mem. at 15.  If by this Defendants

mean that Plaintiffs bear the burden of proving that proposition, they have it precisely backward.

Under Rule 901(a), Federal Rules of Evidence, the requirement of authentication "as a condition

precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter

in question is what its proponent claims."  There is no burden of proof to carry, and the signer of

a document cannot escape its consequences simply by denying that she or he executed it.  Such a

17

denial must be scrutinized before it can be accepted by the courts, especially where, as here, other evidence is more than sufficient to support the conclusion that the signature is genuine.

As a matter of law, the proponent need make nothing more than a prima facie showing that the paper is what it purports to be. *See* Fed. R. Evid. 901(a); *U.S. v. Tin Yat Chin*, 371 F.3d 31, 37-38 (2d Cir. 2004) ("Rule 901 does not erect a particularly high hurdle. . . . The proponent is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be") (quotations omitted). Here, even without the benefit of discovery and examination of Venezuela's witnesses, the Declarations of Mr. Fernandez and especially of Mr. Zerpa, at all relevant times Venezuela's own attorney, are more than "sufficient to support a finding" that the Addendum was an official act of the Minister.

Once the prima facie case is made, the burden of persuasion shifts. The party contending that the signature on a document is fake bears the burden of proving it.[13] Neither any provision of the FSIA, nor any case applying that statute, suggests that this Federal Rule of Evidence does not apply to the claim of a foreign government that the signature of its representative has been forged, and that its apparent express waiver of sovereign immunity is, in fact, a hoax.

C.    Defendants Cannot Carry Burden of Proof Assigned to Them.

The burden of proof that Venezuela must carry to demonstrate that Minister Ramírez's signature on the Addendum is a forgery is actually quite heavy. It requires a showing by clear

---

[13] *Bradford Trust Co. of Boston, v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F. Supp. 208, 211 (S.D.N.Y. 1985) ("It is incumbent upon a party claiming non-genuineness of a signature to produce firsthand proof of the forgery"); *see French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 925 F.2d 603, 604 (2d. Cir. 1991) (per curiam); *Pereira v. Cogan*, 267 B.R. 500, 512 (Bankr. S.D.N.Y. 2001). Other federal courts have come to the same conclusion. *See, e.g.*, *Jackson v. Allstate Ins. Co.*, 441 F.Supp.2d 728, 731 (E.D. Pa. 2006); *Hernandez v. Comm'r*. No. 17244-06 T.C.M. (RIA), at 5 (T.C. 1998).

and convincing evidence.[14]  The chronology of events, as recounted by Messrs. Fernandez and

Zerpa (the latter a government official who worked for the Minister), in and of itself precludes

such a showing.  The Addendum, on its face, was authenticated: it bears both the official stamp

of the Ministry of Mines[15] and the countersignature of the Ministry's lawyer, Mr. Zerpa, who

acknowledges that he received, read, and signed it, and handed a copy to Plaintiffs'

representative, all in his official capacity.

  In fact, Defendants' evidence is inadequate in nature, credibility, and quantum, to meet

even the lower "preponderance of the evidence" standard.  Venezuela relies entirely on two

propositions: (1) Minister Ramírez denies that he signed the Addendum; and (2) Plaintiffs have

only a copy, and not the original, of the document.  Neither of these facts, however, separately or

together, provides a proper basis for this Court to grant a motion to dismiss, without at least

providing an opportunity for discovery.  And if, in discovery, Plaintiffs are able to demonstrate

that Defendants have or had the original of the Addendum -- as the contents of all of the witness

declarations attached hereto suggest -- then this may be an appropriate case in which to impose

penalties on Defendants for spoliation.

---

[14] Where a government official (like Adrian Zerpa here) has acknowledged the authenticity of a document, New York law applies "a presumption of due execution, which may be rebutted only upon a showing of clear and convincing evidence to the contrary." *Midfirst Bank v. Rath,* 270 A.D.2d 932, 932, 706 N.Y.S.2d 651, 651 (4th Dept. 2000). There is no such evidence available here, and most certainly no such showing has been made in Defendants' motion to dismiss.

[15] Venezuela does not claim that the seal itself is a forgery, although it does protest that it is not the same type of seal that Minister Ramírez regularly used. This factual claim is rebutted by Mr. Zerpa, who worked for Mr. Ramírez. *See* Zerpa Dec., ¶ 24. So the claim that the seal is inauthentic cannot be established by clear and convincing evidence, at least on the record before the Court at this early juncture.

### 1. The Denial by the Signer Does Not Require Dismissal

Case law overwhelmingly demonstrates that a document may be found authentic and enforceable, and on that basis be given legal force and effect, despite the apparent signer's denial.[16] This result is hardly surprising. Were it otherwise, then anyone about to enter into a written contract need only ensure that he signs in private, retaining the original and providing only a copy to the other side. If those "precautions" are taken, signing does not reflect any kind of commitment, and enforceability can always be defeated: the signer has the unqualified ability, if later circumstances warrant, to disavow the signature, by that unilateral measure rendering impossible any proof that in fact the offer was accepted or the contract formed.[17]

The entire regime set by Rule 901, Federal Rules of Evidence, contemplates that the putative author of a document may deny its authenticity. The denial is, without more, non conclusive. Witnesses both lay and expert, analysis of comparables and recourse to public records: all may weigh in the balance as the trier of fact must determine whether to believe the apparent signer's denial that a document is genuine. This kind of disputes is, as one District

---

[16] *See, e.g., Brass Constr. v. Muller,* No. 98 Civ. 5452, 2000 WL 791814, at * 2 (S.D.N.Y. June 20, 2000) (despite defendant's "naked" denial of signature, Court orders trial on authenticity of signature); *Merrill Lynch Bus. Fin. Servs, Inc. v. Kupperman,* No. 06-4802, 2007 WL 2306737, at * 7 (D.N.J. 2007); *Baghdady v. Baghdady,* No. 97-4732, 2007 WL 1537706, at ** 3-4 (Mass. Super. Ct. May 9, 2007); *Banco Popular N. Am. v. Victory Taxi Mgmt., Inc.,* 1 N.Y.3d 381, 383-84, 806 N.E.2d 488, 490, 774 N.Y.S.2d 480, 483-84 (N.Y. 2004); *Acme Am. Repairs, Inc., v. Uretsky,* 39 A.D.3d 675, 677, 834 N.Y.S.2d 542, 544 (2nd Dept. 2007) ("something more than a bald assertion of forgery is required to create an issue of fact contesting the authenticity of a signature") (quotation omitted); *Rath,* 270 A.D.2d at 932.

[17] Moreover, it would undermine the policy behind the express provisions of the FSIA, providing that a sovereign, once having expressly or implicitly waived immunity, may not withdraw that waiver. *See* 28 U.S.C. §1605(a)(1). To allow Venezuela here to invoke the "bald" or "naked" denial by Minister Ramírez to negate its waiver of immunity would simply create a loophole in the FSIA that Congress never intended, and carefully drafted the legislation to avoid.

Court noted, "a classic example of a dispute of material fact that must be resolved at trial." *BP Lubricants USA, Inc. v. Global Saturn, Inc.*, 2007 WL 1589566 (W.D. Ga. 2007), at * 2.

### 2. The Absence of the Original Document Does Not Require Dismissal

The mere fact that Plaintiffs are not able to present to the Court the original document with the original signature is also far from determinative. Numerous courts have found signatures to be authentic, rejecting allegations of forgery, when all they had before them were facsimile copies. *See, e.g., Sheet Metal Workers' Ass'n, Local 19 v. J.S. Mech. Contractors, Inc.*, 973 F.Supp. 516, 521 (E.D. Pa. 1997) (facsimile copy of signature "is sufficient evidence of the contract"); *Hernandez,* No. 17244-06 T.C.M. (RIA), at 5.

There is no general requirement that the proponent of a document proffer the original. Indeed, the Federal Rules of Evidence define a number of circumstances in which a copy is perfectly acceptable: when the originals have been lost or destroyed, when they are not obtainable by judicial process, and when they are in the possession of the party opponent, for example. Plaintiffs submit that at least the second and third of these, and possibly all of them, apply here. According to Mr. Zerpa, the Ministry retained the original, and it is known that at some later time it was transferred to the Ministry of Finance. Thereafter, not only the Addendum, but the entire file was reported missing. So either the original of the document cannot now be found, or it is in the possession of Venezuela (outside the reach of this Court). In either case, the copy is admissible, under Rule 1004(1), (2), and/or (3).

### D.    At a Minimum, Plaintiffs Should Be Given the Opportunity to Take Discovery .

In *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000), sellers of a prefabricated building brought suit against a foreign sovereign for breach of contract. Phoenix alleged that an Angolan Minister, Rocha, signed a contract waiving sovereign

immunity. Rocha presented a sworn statement that he never signed such a contract. *Phoenix* therefore is significantly similar to the case at Bar, and its resolution is of great relevance here.

The District Court, concluding that it was required to accept all of the well-pleaded facts in the complaint as true, denied Angola's motion to dismiss. But the Court of Appeals reversed. The Circuit Court started from the proposition that, when a sovereign moves to dismiss a suit brought against it on the grounds of immunity, it "may challenge either the **legal** sufficiency or the **factual** underpinning of an exception, and how the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge." 216 F.3d at 40 (emphasis added). When **legal** issues are in play, then the facts as pleaded must be taken as true. But this is not the situation when there is a challenge to the **facts** on the basis of which the plaintiff claims immunity to have been waived. In that latter case, the Court must decide.

Citing such cases as *Filetech, S.A. v. France Telecom, S.A.*, 157 F.3d 922, 931-32 (2d Cir. 1998), the Court held that the trial court may not rule on the motion to dismiss without inquiring into the facts: "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling on the motion to dismiss." 216 F.3d at 40. While there is considerable discretion in designing a plan to accomplish that goal, the D.C. Circuit suggested "jurisdictional discovery . . . carefully controlled and limited." *Id.*

In *Phoenix*, Angola presented evidence that the supposed waiver of immunity was a forgery, and the Court held it entitled to have its evidence heard before the question of fact could be resolved against it. Here, Plaintiffs present substantial evidence that the waiver of sovereign immunity by Venezuela -- the Addendum -- is a genuine document, despite Defendants' protestations to the contrary. Here, just as in *Phoenix*, the proper course would be for this Court "to resolve this factual dispute material to its subject matter jurisdiction." *Id.*

E.    This Court Need Not Address Venezuela's Other Defenses,
      Which Have Been Waived, and Do Not Apply Here.

As noted above, Defendants raise three other defenses (act of state, *forum non*

*conveniens*, and lack of personal jurisdiction), although observing that this Court need not reach

them.  Plaintiffs completely agree that, without the waiver of immunity in the Addendum, this

Court lacks jurisdiction under the FSIA, and may dismiss without reaching these issues.

If, for example, the Addendum is effective, then by its terms Venezuela has waived any

right to assert the act of state defense, to invoke *forum non conveniens*, or to object to this

Court's personal jurisdiction.  As a matter of settled law, act of state and *forum non conveniens*

may be waived.[18]  These defenses, however, would have no application even if the Court were to

disregard the express waiver.

The Supreme Court has held that adjudication of claims relating the to repudiation of

commercial debts by foreign sovereigns -- such as presented here -- fall outside the scope of the

act of state doctrine.  *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 703-04 (1976)

("Repudiation of a commercial debt cannot . . . be treated as an act of state"); *see also Republic*

*of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 52 n.5 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027

---

[18] Act of state doctrine may be waived: *see Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.,* No. 99 Civ.
12405, 2004 WL 1110414, at * 6 (S.D.N.Y.) (act of state defense waived when not raised in a
timely manner); *Bodner v. Banque Paribas,* 114 F. Supp. 2d 117, 130 n.11 (E.D.N.Y. 2000) (act
of state doctrine inapplicable where "there is a treaty or other unambiguous agreement"); *Cabiri
v. Gov't of Ghana,* 981 F. Supp. 129, 131 (E.D.N.Y. 1997) (addressing extent of government's
express agreement to waive act of state defense).

*Forum non conveniens* may be waived: *AAR Int'l, Inc., v. Nimelas Enterprises S.A.,* 250 F.3d
510, 526 (7th Cir. 2001) (agreement to waive objections to venue applies to claims of *forum non
conveniens*); *Third Ave. Trust v. Suntrust Bank,* 163 F.Supp.2d 215 (S.D.N.Y. 2001) (*forum non
conveniens* objections waivable absent extraordinary circumstances).

(1966). And the Second Hickenlooper Amendment, 22 U.S.C. § 2370, bars application of the doctrine under the circumstances of this case. *See, e.g., Fogade* v. *E.N.B. Revocable Trust,* 263 F.3d. 1274, 1293-96 (11th Cir. 2001).

The act of state doctrine does no more than prevent a U.S. court from inquiring into the validity of the public acts of a recognized sovereign power committed within its own territory. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401 (1964); *Timberlane Lumber Co. v. Bank of Am.,* 549 F.2d 597, 605-07 (9th Cir. 1977). Plaintiffs do not challenge the validity of a Venezuelan public act. Rather, they ask this Court to find that Venezuela's commitment to pay an amount determined by an appraiser in exchange for the purchase of commercially-transferable mining concessions, was wholly valid. Such a claim does not trigger the doctrine. *Af-Cap Inc. v. Republic of Congo,* 383 F.3d 361, 372 n.14 (5th Cir. 2004); *Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.,* No. 02 Civ. 0795, 2003 WL 21878798, at ** 5-7 (S.D.N.Y. 2003).

Nor has Venezuela asserted any basis for dismissal under the *forum non conveniens* doctrine, as to which it has, among other things, "the burden of showing there is another forum adequate to the plaintiff's case." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005). Venezuela simply claims that the elements are met, and in particular that the allegedly more convenient venue -- presumably Venezuela -- offers a fair forum to resolve this litigation. Absent such a showing, *forum non conveniens* may not be invoked. *See Panama Processes, S.A. v. Cities Serv. Co.,* 500 F.Supp. 787, 800 (S.D.N.Y. 1980), *aff'd,* 650 F.2d 408 (2d Cir. 1981); *see also Rasoulzadeh v. Assoc'd Press,* 574 F.Supp. 854, 861 (S.D.N.Y. 1983), *aff'd,* 767 F.2d 908 (2d Cir. 1985); *Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico, S.A.,* 528 F.Supp. 1337, 1342 (S.D.N.Y. 1982), *aff'd,* 727 F.2d 274 (2d Cir. 1984).

Finally, the Court will have no personal jurisdiction over Defendants if the waiver is invalid, but by the same token, the validity of an express waiver of immunity constitutes, as a matter of law, a waiver of the defense of lack of personal jurisdiction.[19]

In sum, each of these secondary defenses fails, both because they have been waived through the Addendum, and because they simply have no application on these facts. If the Court were to determine that the Addendum was not a waiver of sovereign immunity, the case would be properly dismissed under 28 U.S.C. § 1604, without the need to consider personal jurisdiction, act of state, or *forum non conveniens*. But if the Addendum is a waiver of sovereign immunity, then it is also a waiver of these defenses. Hence, there is no reason for this Court to entertain a more detailed separate discussion of these issues at this time.

## CONCLUSION

For all of the foregoing reasons, the motion to dismiss should be denied.

Dated: October 12, 2007
     New York, New York

Respectfully submitted,

James W. Perkins
Bar No. JWP-6684

---

[19] Venezuela's argument on personal jurisdiction is relegated to a single footnote, Def. Mem. at 18 n.2, and relies on a single decision of the Second Circuit, *Texas Trading & Milling Corp. v. Fed. Rep. of Nigeria*, 647 F.2d 300, 313-14 (2d Cir. 1981). The other cases that it cites concern not governments and ministries, but corporations separate from the state entities that own their shares. *See, e.g., Frontera Resources Azerbaijan Co. v. State Oil Co. of the Azerbaijan Rep.*, 479 F. Supp. 2d 376, 383-86 (S.D.N.Y. 2007). But *Texas Trading* actually supports the contention that to establish this Court's personal jurisdiction over these sovereign Defendants, Plaintiffs need do nothing more than to show subject matter jurisdiction within one of the immunity exceptions -- here, the express waiver in 28 U.S.C. § 1605(a)(1) -- as well as proper service of process. *See* 28 U.S.C. § 1330(b); *Texas Trading*, 647 F.2d at 308, 313. A foreign state's "implicit waiver of immunity under [28 U.S.C.] § 1605(a)(1) constitute[s] a waiver of the defense of lack of personal jurisdiction." *Marlowe v. Argentine Naval Commission*, 604 F. Supp. 703, 708-09 (D.D.C. 1985); *Phoenix Consulting*, 35 F. Supp.2d 14 (D.D.C. 1999).

Ervin A. Gonzalez
Roberto Martinez
COLSON HICKS EDSON
255 Aragon Avenue
Coral Gables, Florida 33134
Tel. 305.476.7400
Fax. 305.476.7444

Ronald W. Kleinman
Steven M. Schneebaum
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 530-8544
Fax: (202) 261-2665

GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400