GREENBERG TRAURIG, LLP
James W. Perkins (JWP-6684)
200 Park Avenue
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400
perkinsj@gtlaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
:
COMPAÑIA DEL BAJO CARONI (CAROMIN), C.A., : ECF CASE
Calle Cuenca, Manzana 7, Campo B de Ferrominera :
Quinta Analú, Puerto Ordaz, Estado Bolivar Venezuela, :
and : Civil Action No. 07 CV 3179 (NRB)
:
V.M.C. MINING COMPANY, C.A., :
Calle Cuenca, Manzana 7, Campo B de Ferrominera : **DECLARATION OF**
Quinta Analú, Puerto Ordaz, Estado Bolivar Venezuela, : **ADRIAN ZERPA LEON**
: **IN OPPOSITION TO**
                            Plaintiffs, : **DEFENDANTS' MOTION**
: **TO DISMISS THE COMPLAINT**
            - against - :
:
BOLIVARIAN REPUBLIC OF VENEZUELA, :
c/o Consulate General of Venezuela :
7 East 51st Street :
New York, New York 10022, and :
:
MINISTRY OF BASIC INDUSTRIES AND MINES :
c/o Consulate General of Venezuela :
7 East 51st Street :
New York, New York 10022, :
:
                            Defendants. :
:

DECLARACION DE ADRIAN ZERPA LEON

Yo, Adrián Zerpa León, declaro y establezco cuanto sigue:

1. Soy ciudadano de la República Bolivariana de Venezuela ("Venezuela") y resido en Caracas, Venezuela.

2. Hago esta declaración porque el señor Fernández, en su carácter de Representante Legal de las empresas CAROMIN y VMC Mining Company C.A., me contó el proceso por el cual estaba atravesando; me explicó que se vio forzado a demandar a la República Bolivariana de Venezuela en un caso que yo había conocido cuando fui Jefe de la División de Tramitaciones Mineras del Ministerio de Energía y Minas. Pues bien, yo como abogado y como parte del sistema de justicia, me siento en la obligación personal y ética de ofrecer mi declaración por el conocimiento personal que tengo de las circunstancias del caso. Además, es inconcebible que después de tantos años no le hayan cancelado a los antiguos concesionarios una deuda que se encuentra documentada por un procedimiento ejecutado en aplicación de la Ley.

3. Soy abogado con licencia para ejercer el derecho en Venezuela. Mantengo mi propia firma de abogados en las oficinas de Quiara & Zerpa Consultores, en Caracas, Venezuela. Soy graduado de la Universidad Católica Andrés Bello, ubicada en Caracas, donde obtuve el título de abogado en 1996. He cursado estudios de Arbitraje Comercial Internacional en la misma casa de estudios y en la Universidad Internacional del Caribe. Luego de que obtuve mi título de abogado ejercí el derecho en una firma de abogados que se dedicaba principalmente a la materia bancaria.

4. En 1998 me uní al Ministerio de Energía y Minas (el "Ministerio") del gobierno de Venezuela como abogado, con la categoría de Abogado II, trabajando en el Departamento Legal (Consultoría Jurídica). En 1999 fui parte del equipo legal que redactó la Ley de Minas vigente y su Reglamento General, así como otros instrumentos legales relacionados a la legislación minera. Desde 2000 hasta 2001 trabajé como consultor jurídico dentro del Ministerio de Minas encabezando el departamento legal de ese Ministerio. Desde 2001 hasta 2003 trabajé como Abogado III en el Departamento Legal. Durante el período de 2000 a 2002 desempeñé el cargo de Director Suplente del Instituto Nacional de Geología y Minería de Venezuela, tiempo durante el cual fui invitado por el Departamento de Estado de los Estados Unidos de América a participar en el Programa Internacional de Visitantes, sobre el tema Legislación y Energía, y recibí una beca para cursar el Programa de Petróleo, Gas y Electricidad para la Nueva Era, auspiciado por la Universidad de Houston, Texas.

5. Desde 2003 hasta 2004 ocupé la posición de Jefe de la División de Tramitaciones Mineras en el Ministerio. Bajo mi responsabilidad estaba evacuar los mecanismos para la ejecución y aplicación de la Ley de Minas y su Reglamento,

conjuntamente con la Dirección de Concesiones Mineras y la Dirección General de Minas. A mi cargo se encontraban seis ingenieros de minas y dos abogados.

6. En 2004 decidí dejar voluntariamente el Ministerio de Energía y Minas para establecer mi propio bufete, que mantengo en la actualidad. Debe mencionarse que durante este tiempo he sido consultor externo de la Organización de Alimentación y Agricultura de las Naciones Unidas (FAO) en el Programa Especial de Seguridad Alimentaria en Venezuela.

7. La primera vez que tuve conocimiento de este caso fue en el año 2002, en ocasión de una solicitud realizada por la Corporación Venezolana de Guayana (C.V.G), una agencia del gobierno de Venezuela, mediante la cual pidieron la extinción de las concesiones mineras denominadas Alfa y Delta otorgadas a las compañías CAROMIN y VMC Mining Company. Esta solicitud fue hecha en virtud de que las concesiones antes mencionadas se encontraban en el área afectada por la construcción del Proyecto Hidroeléctrico TOCOMA. Yo hice el análisis jurídico conforme al cual se concluyó que la solicitud no se podía satisfacer por cuanto las compañías mineras VMC y CAROMIN, cumplían con todas y cada una de las obligaciones que les imponía la Ley y, en consecuencia, las concesiones mineras no podían ser extinguidas.

8. En respuesta a una solicitud formulada por VMC y CAROMIN con fundamento en un dictamen del Tribunal Supremo de Justicia en que se declaraba que el Ministerio, en su condición de ente responsable de las actividades mineras en Venezuela y de la Ley, tenía que aplicar la Ley y los procedimientos, en 2003 el Ministerio emitió la "Providencia Administrativa No. 003", fechada 2 de diciembre de 2003, la cual fue redactada por mí, mediante la cual se declara el rescate anticipado de las concesiones mineras y se reconfirman los derechos de propiedad de las minas, así como los derechos de CAROMIN y VMC a una indemnización.

9. En fecha 5 de diciembre de 2003, el representante legal de las empresas concesionarias solicitó al Ministerio de Energía y Minas la constitución del grupo de trabajo que se encargaría de redactar el Pliego de Condiciones estipulado en la Providencia No. 003 y en la Ley Orgánica para la Promoción de la Inversión Privada bajo el Régimen de Concesiones. El grupo fue convocado para ese fin por el Director General de Minas en fecha 12 de diciembre de 2003, y en ese momento el grupo de trabajo estaba conformado por los siguientes ciudadanos:

   a. Francisco Salas Blanco, Director General de Minas (Encargado),
   b. Martha Acosta García, Directora de Concesiones Mineras (Encargada),
   c. Manuel Navas, Asistente del Director General de Minas,
   d. Adrián Zerpa León, Jefe de la División de Tramitaciones Mineras (Encargado)
   e. Rosa Toro, Abogado del Ministerio de Energía y Minas,

      f.    Manuel Fernández Gonzalo, Representante Legal de las empresas CAROMIN y VMC,

      g.    Luis Andrés Guerrero Rosales, Apoderado de CAROMIN y VMC.

10. El propósito de estas reuniones era discutir los términos y lineamientos generales que debería contener el Pliego de Condiciones referido en el artículo 53 de la Ley Orgánica para la Promoción de la Inversión Privada mediante el Régimen de Concesiones, tal y como lo establecía el procedimiento legalmente establecido para determinar el monto de la indemnización producto de la declaratoria del rescate anticipado por razones de utilidad pública de las concesiones de oro y diamante Alfa y Delta.

11. Durante estas reuniones se discutieron, entre otras cosas, asuntos tales como la metodología que se utilizaría para la determinación del valor de las concesiones rescatadas, el pago de los honorarios del perito, el posible monto de la indemnización, el método de pago de la indemnización, la ejecución y cobro para el pago de la indemnización en caso de falta de cumplimiento por parte del Ministerio, el uso de de arbitraje y de otros medios de resolución de conflicto considerando la posibilidad de que se ejercieran de nuevo procesos judiciales por los concesionarios en caso de que el Ministerio fallase en sus obligaciones adquiridas y en el evento de una paralización o retraso de las obras para la construcción del Proyecto Hidroeléctrico Tocoma. Como conclusión de estas reuniones el documento conocido como Pliego de Condiciones le fue presentado a los asistentes (a saber, Francisco Salas, Martha Acosta, Rosa Toro y mi persona en representación del Ministerio, y los señores Manuel Fernández y Luis Guerrero en representación de los concesionarios) para su firma el día 17 de diciembre de 2003. Una copia fiel y correcta del Pliego de Condiciones está anexada e identificada como Anexo A. El Pliego de Condiciones plasma el procedimiento contemplado en la Ley para la determinación del monto de la indemnización mediante la contratación de un tercero (perito) el cual debe presentar un Informe que tendrá carácter definitivo para ambas partes.

12. Al cabo de varias reuniones, conversaciones telefónicas, e intercambios de correo electrónicos, después de que las partes que asistieron a la reunión del 17 de diciembre de 2003 suscribieran el Pliego de Condiciones, el Sr. Fernández hizo entrega de un documento al cual se refirió como "Documento Complementario" al Ingeniero Francisco Salas y le indicó que el documento en cuestión correspondía al pago de los honorarios profesionales del perito y la jurisdicción en caso de incumplimiento, y finalmente le solicitó que se lo presentara al ciudadano Ministro Rafael Ramírez, por cuanto éste era el funcionario con competencia para desistir de la inmunidad jurisdiccional. El Sr. Salas tomó posesión del documento del Sr. Fernández.

13. En fecha 19 de diciembre de 2003, yo recibí un documento titulado "Addendum", copia fiel y correcta del cual (acompañada de traducción certificada al inglés) se encuentra anexa como Anexo B. El Addendum es un documento de tres (3)



páginas firmado en la tercera página con la firma del Ministro Ramírez, con un logo en la primera página que dice "República Bolivariana de Venezuela, Ministerio de Energía y Minas, Despacho del Ministro". Como funcionario del Ministerio, puedo asegurar que yo he visto la firma del Ministro Ramírez en reiteradas oportunidades, y en ese sentido, reconozco la firma de la tercera página del Addendum como la del Ministro Ramírez, así como el sello y el logotipo que obran en el documento antes citado. El sello es un sello oficial del Ministerio, utilizado para designar documentos oficiales (aunque el ministro también tiene otros sellos a su disposición para este propósito). He visto ese sello en particular utilizado en muchas ocasiones para designar documentos oficiales autorizados por el ministro. El sello se guarda de manera segura en el despacho del ministro y puede usarse únicamente para las funciones oficiales de éste. El hecho de que conste en el Addendum me indica claramente, en mi carácter de funcionario del ministerio, que el documento fue un acto oficial del ministerio que, en virtud de sus términos, puede hacerse valer contra Venezuela. El documento que vi fue un original y no una copia o un facsímil. La copia que vi era original, estampada con pluma y tinta. El sello también era original.

14. Cuando recibí el Addendum, lo leí y pude constatar que contenía materias que fueron discutidas, pero sin resolver, en las reuniones sostenidas con ocasión de la firma del Pliego de Condiciones. Estos asuntos correspondían al pago de los honorarios del perito y a la jurisdicción para la ejecución y cobro del pago en el evento de que el Ministerio no pagara la indemnización acordada a los concesionarios.

15. El Addendum me fue enviado mediante correo interno dentro de un sobre de Manila, con una nota sujeta a la carpeta con un clip o presilla. Esa nota es conocida como "Nota de Remisión", y es comúnmente usada dentro del Ministerio para enviar documentos. La "Nota de Remisión" se encontraba fechada e indicaba que fue enviada por el Director General de Minas Francisco Salas a la División de Tramitaciones Mineras con instrucciones expresas de hacer que el representante legal de CAROMIN y VMC firmara el Addendum. Ese mismo día (19 de diciembre) llamé por teléfono al representante legal de VMC Mining Company y CAROMIN, Sr. Manuel Fernández, y le pedí que viniera a mi oficina, tal y como me había sido indicado en la Nota de Remisión por el Director General de Minas.

16. En fecha 22 de diciembre de 2003, Manuel Fernández vino a mi oficina en el Ministerio, en atención a mi llamada. En ese momento le presenté el original del Addendum y le solicité que lo firmara en la tercera página en el espacio dispuesto para tal efecto, indicando su aceptación de los términos y condiciones del Addendum. Luego de que el Sr. Fernández revisara el documento, lo firmó en la tercera página, y colocó su firma también en cada página del Addendum en el margen lateral izquierdo. El Sr. Fernández me solicitó después que yo firmara y fechara el Addendum y escribiera las palabras "Entregado por la División de Tramitaciones Mineras".

17. A solicitud del Sr. Fernández, le pedí a mi Secretaria que hiciera una copia del Addendum, la cual le entregué al Sr. Fernández. Le di el original del Addendum a mi secretaria con instrucciones de que enviara el documento al Archivo, el cual era mantenido por la Dirección General de Minas; esta Oficina de Archivo estaba ubicada en el mismo piso donde se encontraba la División de Tramitaciones Mineras.

18. La práctica en el Ministerio siempre ha sido mantener los archivos originales durante largos períodos de tiempo. Hasta donde yo sé, el original del Addendum y el expediente administrativo de las concesiones deberían estar en los archivos del Ministerio.

19. Después de firmados los documentos pertinentes, el próximo paso fue identificar y contratar a una empresa evaluadora que fuese sastifactoria para ambas partes. Yo me comuniquie con la Procuraduria General de la Republica y solicitie nombres y telefonos de empresas avaluadora con prestigio en el pais. La Procuraduria General de la Republica me informio que la empresa mas calificada para tazar una propiedad minera era ABECIR, C.A., que había realizado esa labor en numerosas ocasiones. El 18 de diciembre de 2003, el Ministerio de Energía y Minas presentio a ABECIR como posible firma Avaluadora, y yo firmé por el Ministerio (conjuntamente con la Sra. Acosta) un documento en que se proponía la candidatura de ABECIR. El 19 de enero de 2004, la Sra. Acosta le escribió al representante de CAROMIN y ABECIR, oficialmente designando a ABECIR supeditada al veto de los dueños de las concesiones. El 30 de enero, el Sr. Guerrero, en nombre de las compañías, dio la aprobación de sus representadas. Y el 9 de febrero, la Sra. Acosta envió notificación oficial a ABECIR de que se le ofrecía esta comisión, que ABECIR aceptó por medio de su carta del 12 de febrero. Copias fieles y correctas de esta correspondencia (junto con su traducción certificada al inglés) obra adjunta como Anexo C.

20. Yo tuve la oportunidad de leer las declaraciones consignadas en el caso *Compañía Minera del Bajo Caroní (Caromin), C.A., et al., v. Bolivarian Republic of Venezuela*, et al., Caso No. 07-CV-3197 (NRB), Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Nueva York, por Francisco Salas, Orlando Ortegano, y Martha Acosta Rafael Ramírez Carreño; así como la comunicación del Ministro Rafael Ramírez Carreño dirigida a Gladys Gutiérrez Alvarado, Procuradora General de la República, y la respuesta a la demanda ("Motion to Dismiss") consignada en este caso.

21. En el escrito de respuesta a la demanda ("Motion to Dismiss") página 11, línea 4, los abogados defensores de la República Bolivariana de Venezuela, distorsionan las declaraciones del ex Viceministro de Minas, Orlando Ortegano, cuando le atribuyen una facultad de veto que ningún Viceministro conforme a la legislación venezolana posee, aunado a que en su Affidávit, el Sr. Ortegano, nunca afirmó poseer tal facultad de veto.



22.  Las declaraciones hechas por el Director General de Minas Francisco Salas, de que él nunca vio el Addendum o cualquier documento similar son falsas. El Sr. Fernández le entregó al Sr. Salas, en presencia de cinco personas, incluyéndome a mí, un documento al cual se refirió como Documento Complementario y le solicitó que se lo presentara al ciudadano Ministro Rafael Ramírez, para que resolviera los asuntos que quedaron pendientes en la reunión y no fueron incluidos en el Pliego de Condiciones luego de las discusiones y largas negociaciones. Tengo entendido que correspondía al pago de los honorarios del perito y la jurisdicción para la ejecución y cobro del pago en el evento de que el Ministerio no pagara la indemnización acordada a los concesionarios.

23.  Por otra parte, el ministro Ramírez da a entender que carecía de autoridad para renunciar de la inmunidad soberana en nombre de Venezuela. Como abogado y como autor de la ley a tenor de la cual se resolvió este asunto, es mi opinión que el ministro sí tenía autoridad para desistir de la inmunidad soberana en las circunstancias de este asunto.

24.  El ex Viceministro de Minas Orlando Ortegano dice en su declaración que los documentos que requerían una acción del ciudadano Ministro iban acompañados de un Punto de Cuenta. Esto no es cierto, porque el Ministro firmaba los documentos, Oficios o Memoranda a su sola discreción con punto de cuenta o sin él, como cualquier otro ministro. Vale destacar que en este caso el Viceministro no participó de manera alguna en el procedimiento de declaratoria del rescate anticipado. En cuanto a la afirmación según la cual el antiguo Viceministro de Minas Ortegano asegura que durante el período de diciembre de 2003 la firma del Ministro Ramírez era autenticada por un sello seco y no por un sello húmedo, lo que ello demuestra es una falta de conocimiento de las leyes referidas al uso del sello en Venezuela, por cuanto los sellos no son usados para autenticar firmas; más aún, el Ministro tiene la autoridad de utilizar cualquier sello que él estime apropiado. De hecho, yo he visto documentos firmados por el Ministro Ramírez en que consta ese sello en particular.

25.  He leído también el memorándum, fechado el 18 de diciembre de 2003, de Rosa Toro, una de los integrantes del grupo de trabajo que laboró en las oficinas del asesor legal del ministerio, dirigido a Julia van der Brule, abogada que era asistente del Ministro Ramírez. El memorándum transmite al despacho del Ministro una versión corregida del "Documento Complementario" para que éste la firme. Copia fiel y correcta de este memorándum (acompañado de su traducción certificada al inglés) obra adjunta a esta Declaración como Anexo D. Reconozco que se trata de la firma de la Sra. Toro, con quien trabajé por espacio de cinco años y cuya firma vi en innumerables oportunidades. También reconozco el membrete, que es el que se usaba normalmente en el Ministerio para comunicaciones de este tipo. En condiciones normales, un memorándum como éste debiera haberse colocado en los archivos del Ministerio, que habrían estado a

la disposición del representante legal de los dueños de las concesiones para examinarlos y fotocopiarlos.

Declaro so pena de perjurio bajo las leyes de los Estados Unidos de América y conforme al Título 28 del Código de los Estados Unidos, § 1746, que la declaración que antecede es verdadera y correcta.

Celebrado en Atlanta, Georgia, en los Estados Unidos de América.

_____
ADRIAN ZERPA LEON

Fecha: 10/10/2007

**DECLARATION OF ADRIAN ZERPA LEON**

I, Adrián Zerpa León, declare and establish the following:

1. I am a citizen of the Bolivarian Republic of Venezuela ("Venezuela"), and reside in Caracas, Venezuela.

2. I am making this declaration because Mr. Manuel Fernández, in his capacity as Legal Representative of the companies CAROMIN and VMC Mining Company C.A. told me of the process he was going through; he explained to me that he was forced to sue the Bolivarian Republic of Venezuela in a case I was familiar with when I was the Head of the Mining Processing Division of the Ministry of Energy and Mines; well, then, as an attorney and as part of the justice system, I find myself in the personal and ethical obligation of offering my declaration because of the personal knowledge I have of the circumstances of the case. In addition, it is inconceivable that after so many years, former concession holders have not been paid a debt that is documented by a proceeding conducted under the law.

3. I am an attorney licensed to practice law in Venezuela. I have my own law firm at the offices of Quiara & Zerpa Consultores, in Caracas, Venezuela. I am a graduate of Andrés Bello Catholic University, in Caracas, where I received my law degree in 1996. I have studied international commercial arbitration at that same university and at the International University of the Caribbean. After receiving my law degree, I practiced law at a law firm primarily engaged in banking matters.

4. In 1998 I joined the Ministry of Energy and Mines of the Government of Venezuela as an attorney, with an Attorney II ranking, working at the Legal Department. In 1999 I was part of the legal team that drafted the Mining Act currently in effect and its General Rules and Regulations, as well as other legal instruments related to mining legislation. From 2000 until 2001 I worked as a legal consultant within the Ministry of Mines heading the legal department of that Ministry. From 2001 until 2003 I worked as an Attorney III in the Legal Department. During the 2000 to 2002 period I worked as an Alternate Director of the National Institute of Geology and Mining of Venezuela, during which time I was invited by the U.S. State Department to participate in the International Visitors Program in connection with the issue of Legislation and Energy, and the following year I was granted a scholarship for the New Era Gas, Oil, and Electricity Program sponsored by the University of Houston, Texas.

5. From 2003 to 2004 I held the position of Head of the Mining Processing Division at the Ministry. I was responsible, together with the Offices of the Director of Mining Concessions and the Director General of Mines, for implementing the mechanisms used to execute and apply the Mining Act and its Rules and Regulations. I had six mining engineers and two attorneys working under me.

6. In 2004, I decided to leave the Ministry of Energy and Mines voluntarily in order to establish my own law firm which I maintain at this time. It should be mentioned that during this time I have been an outside consultant for the United Nations Food and Agriculture Organization (FAO) in the Special Food Security Program in Venezuela.

7. I first learned of this case in 2002 when Corporación Venezolana de Guayana (C.V.G.), an agency of the Government of Venezuela, filed a request for the extinguishment of the mining concessions known as Alfa and Delta, granted to CAROMIN and VMC Mining Company. This request was made because the aforesaid concessions were in the area affected by the construction of the TOCOMA Hydroelectric Project. I did the legal analysis that reached the conclusion that the request could not be honored, as the mining companies, VMC and CAROMIN, were in compliance with each and every one of their obligations under the Act and, consequently, the mining concessions could not be extinguished.

8. In response to a request made by VMC and CAROMIN based upon an opinion by the Supreme Court of Justice stating that the Ministry, as the entity responsible for mining activities in Venezuela and the Act, had to apply the Act and the procedures, in 2003 the Ministry issued its "Administrative Order No. 003," dated December 2, 2003, drafted by me, declaring the early redemption of the mining concessions, reconfirming the mining property rights, and also CAROMIN and VMC's rights to an indemnity.

9. On December 5, 2003, the legal representative for the concession-holding companies asked the Ministry of Energy and Mines to set up the working group that would draft the General Conditions stipulated in Order No. 003 and in the Organic Law for the Promotion of Private Investment through Concessions. A meeting for that purpose was convened by the Director General of Mines on December 12, 2003, at which time the working group was set up made up of the following individuals:

   a. Francisco Salas Blanco, (Acting) Director General of Mines
   b. Martha Acosta García, (Acting) Director of Mining Concessions
   c. Manuel Navas, Assistant to the Director General of Mines
   d. Adrián Zerpa León, (Acting) Head of the Mining Processing Division
   e. Rosa Toro, Attorney of the Ministry of Energy and Mines
   f. Manuel Fernández Gonzalo, Legal Representative of CAROMIN and VMC
   g. Luis Andrés Guerrero Rosales, Attorney-in-Fact for CAROMIN and VMC

10. The purpose of these meetings was to discuss the general terms and conditions to be included in the General Conditions referred to in Article 53 of the Organic Law for the Promotion of Private Investment through Concessions, as contemplated by the legally established procedure to determine the amount of the indemnity

resulting from the declaration of early redemption of the Alfa and Delta gold and diamond concessions on the grounds of public interest.

11. During these meetings other matters were discussed, among them the methods to be used to determine the value of the redeemed concessions, the payment of the expert's professional fees, the possible amount of the indemnity, the method for the payment of the indemnity, the execution and collection of the indemnity in the event of a default by the Ministry, the use of arbitration and other means of conflict resolution, in light of the possibility that legal actions could again be attempted by the concession holders in the event that the Ministry were to default on the obligations it had assumed, and in the event of a stoppage or delay in the construction of the Tocoma Hydroelectric Project. As the result of these meetings, the document known as the General Conditions was submitted to the participants (to wit, Francisco Salas, Martha Acosta, Rosa Toro, and me, representing the Ministry, and Messrs. Manuel Fernández and Luis Guerrero representing the concession holders) for their signature on December 17, 2003. A true and correct copy of the General Conditions (with a certified English translation) is attached hereto as Exhibit A. The General Conditions reflect the procedure contemplated in the Act for the determination of the amount of the indemnity through the hiring of a third-party expert who was to render a Report that would be final for both parties.

12. Following several meetings, telephone conversations, and electronic mail exchanges, after the parties in attendance at the meeting of December 17, 2003, signed the General Terms, Mr. Fernández handed Engineer Francisco Salas a document he referred to as a "Complementary Document" and mentioned to him that the document in question dealt with the payment of the expert's professional fees and the jurisdiction in case of default, and lastly requested that he submit it to Minister Rafael Ramírez, as he was the officer competent to waive jurisdictional immunity. Mr. Salas took delivery of the document from Mr. Fernández.

13. On December 19, 2003, I received a document entitled "Addendum," a true and correct copy of which (together with certified English translation) is attached hereto as Exhibit B. The Addendum is a three-page document, signed on the third page with Minister Ramírez's signature, and bearing a logo on its first page reading: "Bolivarian Republic of Venezuela, Ministry of Energy and Mines, Office of the Minister." As an officer of the Ministry, I can state with confidence that I have seen Minister Ramírez's signature on numerous occasions and, therefore, I recognize the signature on the third page of the Addendum as being that of Minister Ramírez, and the seal and the logo on the aforesaid document. That seal is an official seal of the Ministry used to designate official documents (although there are other seals available to the Minister for this purpose as well). On many occasions, I have seen that particular seal used to designate official documents authorized by the Minister. That seal is held securely in the Office of the Minister and is available only for the official functions of the Minister. With its inclusion on the face of the Addendum, it would clearly indicate to me as an

official of the Ministry that the document was an official act of the Ministry enforceable by its terms against Venezuela. The document I saw was an original, not a copy or facsimile. The signature was original, made with pen and ink. The seal was also original.

14. Upon receiving the Addendum, I read it and was able to ascertain that it included matters that had been discussed, although not resolved, at the meetings held in connection with the signing of the General Terms. These matters dealt with the payment of the expert's professional fees and the jurisdiction for the execution and collection of payment in the event that the Ministry failed to pay the concession holders the indemnity that had been agreed upon.

15. The Addendum was sent to me by inter-office mail inside a Manila envelope, with a note clipped to the folder. This note is known as a "Cover Sheet," and is commonly used within the Ministry when sending documents. The Cover Sheet was dated, and indicated that it was sent by Francisco Salas, Director General of Mines, to the Mining Processing Division with express instructions to have the Addendum signed by the legal representative of CAROMIN and VMC. That same day (December 19), I telephoned Mr. Manuel Fernández, the legal representative of VMC Mining Company and CAROMIN, and asked him to come by my office, as I had been instructed to do by the Director General of Mines in the Cover Sheet.

16. On December 22, 2003, in response to my telephone call, Manuel Fernández came to my office in the Ministry. At that time I presented him with the original of the Addendum and asked him to sign it on the third page, in the space provided for that purpose, indicating his acceptance of the terms and conditions of the Addendum. After reviewing the document, Mr. Fernández signed it on the third page and also affixed his signature onto each page, on the left-hand margin. Mr. Fernández then asked me to sign and date the Addendum and write the words "Delivered by the Mining Processing Division."

17. At Mr. Fernández's request, I asked my secretary to make a copy of the Addendum, which I delivered to Mr. Fernández. I gave my secretary the original of the Addendum with instructions to send the document to the files maintained by the Office of the Director General of Mines. This file room was located on the same floor as the Mining Processing Division.

18. It has always been the Ministry's practice to maintain the original files for lengthy periods of time. As far as I know, the original of the Addendum and the concessions' administrative files should be in the Ministry's files.

19. After the relevant documents were signed, the next step was to identify and to hire an appraisal company satisfactory to both sides. I contacted the Office of the Attorney General of the Republic and asked for the names and telephone numbers of appraisal companies enjoying prestige in the country. The Office of the

Attorney General of the Republic informed me that the company most qualified to appraise mining properties was ABECIR, C.A., which had performed such work on numerous occasions. On December 18, 2003, the Ministry of Energy and Mines presented ABECIR as a possible appraisal company, and I signed for the Ministry (along with Ms. Acosta) a document proposing the candidacy of ABECIR. On January 19, 2004, Ms. Acosta wrote to the representative of CAROMIN and VMC, officially nominating ABECIR, subject to the concession owners' veto. On January 30, Mr. Guerrero for the companies gave his clients' approval. And on February 9, Ms. Acosta sent ABECIR official notification that it was being offered this commission, which ABECIR accepted by letter of February 12. True and correct copies of this correspondence (together with a certified English translation) are attached hereto as Exhibit C.

20. I had an opportunity to read the declarations by Francisco Salas, Orlando Ortegano, and Martha Acosta, as well as communication from Minister Rafael Ramírez Carreño addressed to Gladys Gutiérrez Alvarado, Attorney General of the Republic, filed in the case *Compañía Minera del Bajo Caroní (Caromin), C.A., et al. v. Bolivarian Republic of Venezuela et al.*, Case No. 07-CIV-3197 (NRB), United States District Court for the Southern District of New York, as well as the response to the complaint (motion to dismiss) filed in this case.

21. In the response to the complaint (motion to dismiss), page 11, line 4, counsel for the Bolivarian Republic of Venezuela distorts the declarations made by the former Under-Secretary of Mines, Orlando Ortegano, attributing to him a veto power that no under-secretary has under Venezuelan law. Additionally, Mr. Ortegano never affirmed in his declaration that he had such veto power.

22. The statements made by Minister Ramírez and Francisco Salas, the Director General of Mines, that they never saw the Addendum or any similar document are false. Mr. Fernández, in the presence of five individuals, myself included, handed Mr. Salas a document he referred to as a Complementary Document, and requested that he submit it to Minister Rafael Ramírez in order to resolve the issues that were, following lengthy discussions and negotiations, left pending at the meeting and were not included in the General Terms. It is my understanding that it dealt with the payment of the expert's professional fees and the jurisdiction for the execution and collection of the payment in the event the Ministry failed to pay the concession holders the indemnity that had been agreed upon.

23. In addition, Minister Ramirez suggests that he lacked authority to waive sovereign immunity on behalf of Venezuela. As an attorney and the author of the statute under which this matter was resolved, it is my opinion that the Minister did have the authority to waive sovereign immunity under the circumstances of this matter.

24. Former Under-Secretary of Mines Orlando Ortegano states in his declaration that documents requiring action by the Minister included a *Punto de Cuenta*. This is not true, because the Minister would sign documents, official communications or

memoranda at his sole discretion, with or without a *Punto de Cuenta*, just like any other minister. It should be pointed out in this instance that the under-secretary did not participate in any way in the proceedings to declare the early redemption of the concessions. As for the assertion by former Under-Secretary of Mines Ortegano that during the time period of December 2003 Minister Ramírez's signature was authenticated by a dry seal and not by a wet seal, this reveals lack of knowledge of the laws governing the use of seals in Venezuela, as seals are not used to authenticate signatures; furthermore, the minister is authorized to use any seal he deems appropriate. As a matter of fact, I have seen documents signed by Mr. Ramírez bearing no seal, a dry seal, or a wet seal. But, as noted above, I have seen many documents signed by Mr. Ramírez that bear the particular seal apparent on the face of the Addendum.

25. I have also read the memo, dated December 18, 2003, from Rosas Toro, a member of the working party who worked in the office of the legal adviser to the Ministry, to Julia van der Brule, an attorney who was an Assistant to Minister Ramírez. The memo transmits an edited version of the "Complementary Document" to the Office of the Minister for his signature. A true and correct copy of this memorandum (together with certified English translation) is attached to this Declaration as Exhibit D. I recognize the signature as that of Ms. Toro, with whom I worked for five years, and whose signature I saw countless times. I also recognize the stationery as the letterhead normally used in the Ministry for communications of this type. Such a memorandum should, under normal office procedures, have been placed in the Ministry's files, which would have been available for inspection and copying by the legal representative of the owners of the concessions.

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28. U.S.C., § 1746, that the foregoing declaration is true and correct.
Executed in Atlanta, Georgia, in the United States of America.

[Illegible signature]

ADRIAN ZERPA LEON

Date: *10/10/2007*

[Each of the first six pages of the Spanish original bears an illegible set of initials on the lower right hand corner.]

# LOPEZ AND DURAN
### Interpreting and Translating
420 South Dixie Highway, Suite 2L
Coral Gables, Florida. 33146
Tele: (305)461-4699 * Fax: (305)461-4799

CERTIFICATE OF ACCURACY

STATE OF FLORIDA  )
                  ) SS.
COUNTY OF DADE    )

Before me, a notary public in and for the State of Florida at large, appears Nelson Duran, Ph.D., who is personally known to me, a certified court interpreter, qualified by the Administrative office of the United States Courts, for and on behalf of Lopez and Duran Interpreting and Translating, who, after being duly sworn, deposes and says that he is fully versed in the Spanish and the English languages, and that the aforegoing is a true and correct translation of the attached document consisting of __six__ pages, and that this is the last of the attached.

Nelson Duran, Ph.D.

Sworn to and subscribed this __12th__ day of __October__, 200_7_.

MARLEN ABASCAL
Notary Public,
State of Florida at Large

My commission expires:


MARLEN ABASCAL
MY COMMISSION # DD 342829
EXPIRES: August 2, 2009
Bonded Thru Notary Public Underwriters

The utmost care has been taken to ensure the accuracy of all translations. Lopez and Duran Interpreting and Translating and its employees shall not be liable for any damages due to negligence or error in typing or translation.