UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

COMPAÑIA DEL BAJO CARONI, C.A.
and V.M.C. MINING COMPANY, C.A.,

                  Plaintiffs,

      - against -

BOLIVARIAN REPUBLIC OF VENEZUELA,
and MINISTRY OF BASIC INDUSTRIES AND MINES

                 Defendants.

Civil Action No. 07 CV 3179 (NRB)

**DECLARATION OF MANUEL ALFREDO FERNANDEZ**

I, Manuel Alfredo Fernández, declare and establish the following:

1.     I am a citizen of the United States of America and reside in Peachtree City, Georgia. I make this declaration in opposition to Defendants' motion to dismiss the complaint, in my capacity as director and legal representative of the companies Compañia Del Bajo Caroni (CAROMIN) and V.M.C. Mining Company, C.A. (VMC), which positions I have held since 1994. The facts set forth below are based on my personal knowledge. In particular, as explained below, the facts show that at my insistence the Government of Venezuela did agree in the document called the Addendum to a mechanism by which its obligation to pay a stipulated amount of compensation, in exchange for taking valuable mining concessions from Plaintiffs, could be enforced in this Court if it was not honored within two years.

2.     Since the year 2000, I have been the person in charge of CAROMIN's and VMC's judicial and administrative proceedings that they initiated against the Government of Venezuela, in relation to the Government's efforts to acquire

Plaintiffs' gold and diamond mining concessions known as Alfa 1, Alfa 2, Alfa 3, Delta A, Delta B, Delta C, and Delta D. These actions culminated in the declaration by the Government of Venezuela of the EARLY REDEMPTION of the concessions. CAROMIN is a Venezuelan corporation owned entirely by an Aruban corporation and VMC is a Venezuelan corporation owned entirely by a Panamanian corporation. I personally own all of the shares of the parent corporations of CAROMIN and VMC. Although both companies have an office in Venezuela, I manage them and operate as director and legal representative of CAROMIN and VMC from my offices in the United States.

3.    My experience in the mining industry dates from the year 1993 and encompasses the administration of approximately 25 mining fields and the exploitation of minerals such as gold and diamonds.

Background of This Dispute

4.    In 1994, CAROMIN and VMC acquired the gold and diamond concessions known as ALFA and DELTA (seven properties). At the time of their acquisition, they were under exploitation, which we maintained until the year 2002, when representatives of CVG-EDELCA (a Venezuelan Government-owned company) and the Venezuelan National Guard seized the properties by force. When they were seized, we maintained more than 25 mining dredges in the concessions, operated by more than 250 employees. The ALFA and DELTA concessions were located within the area of construction of the Tocoma Hydroelectric Project, on the Caroni River, in the Bolivar State of Venezuela. A true and correct copy of a

brief description of the project, taken from a web posting of the Inter-American Development Bank, is attached hereto as Exhibit 1.

5.      Following these seizures, on April 18, 2002, CAROMIN and VMC filed a lawsuit in the First Administrative Law Court in Venezuela. On May 16, 2002, the Court ordered CVG-EDELCA immediately to stop all construction, activity, operation, or work, of any nature whatever, that was taking place in the geographical areas corresponding to the "Alfa 1," "Alfa 2," "Alfa 3," and "Delta A," "Delta B," "Delta C," and "Delta D" concessions. Subsequently, on August 18, 2003, the Supreme Court of Justice set aside the decision, on the procedural grounds that the proper defendant should have been the Ministry of Energy and Mines.

6.      Following the decision by the Supreme Court of Justice, in order to avoid having to initiate a new round of litigation, this time against the Ministry, I requested, on November 3, 2003, that the Ministry of Energy and Mines, specifically the Office of the Director General of Mines, apply the law and follow the applicable established procedures with respect to the proposed seizure of the concessions.

7.      As a result of my request, on December 2, 2003, the Office of the Director General of Mines of the Ministry of Energy and Mines issued "Administrative Order No. 003," authorizing the early redemption of the mining concessions belonging to the two companies, and recognizing the rights of CAROMIN and VMC to be compensated for the early termination of the concessions.

8.      On December 5, 2003, I requested the Director General of Mines to set up a working group that would be in charge of drafting the General Conditions stipulated in Administrative Order No. 003 and in the Organic Law for the

3

Promotion of Private Investment through Concessions. In response to this request, on December 12, 2003, I was summoned by the Director General of Mines himself to a meeting, where the working group was established. It comprised the following individuals: Francisco Salas Blanco, Director General of Mines; Martha Acosta García, Director of Mining Concessions; Adrián Zerpa León, Head of the Mining Processing Division; Rosa Toro, attorney with the Legal Department of the Ministry of Energy and Mines; Manuel Navas, Assistant to the Director General of Mines (representing the Government); and Manuel Fernández Gonzalo, legal representative; and Luis Andrés Guerrero Rosales, judicial attorney-in-fact (for the companies CAROMIN and VMC). The purpose of the meeting was to determine the scope of the General Conditions, including the amounts to be paid by the Government, the mechanisms for determining those amounts, and other such matters.

During this meeting, we discussed the appointment of the expert appraiser who would assess and fix the value of the concessions, the expert's professional fees, the payment of the indemnity, the execution of the General Terms, the collection of the indemnity, default, a jurisdictional clause, the use of a bond, the signing of authorizations, and the production of documents relating to the operation of the mines, among other matters. With respect to determining the amount of payment, Martha Acosta, Director of Mining Concessions, suggested that the criteria for the appraisal be chosen by the expert to be selected, as contemplated in the Organic Law for the Promotion of Private Investment through Concessions. Director General Salas and I agreed. The Organic Law provides that the Government and

4

the owner may agree that the appraiser will determine the value of the mines according to criteria that the appraiser establishes. It further provides that the appraiser's determination is final and binding on both the Government and the property owner.

10. After exchanging drafts, the General Conditions ("*Pliego de Condiciones*") were signed on December 17, 2003, by the attorney-in-fact of the Companies, Attorney Luis Guerrero Rosales, and me. For the Ministry of Energy and Mines, the document was signed by Mr. Salas, Ms. Acosta, Mr. Zerpa, Ms. Toro and Mr. Navas. The General Conditions were the logical result of the application of the Organic Law for the Promotion of Private Investment through Concessions, and the follow up to Administrative Order No. 003. They established the points of agreement between the Government and the Companies I represent. But there were important issues that the General Conditions did not address, of which the most important to me was the absence of any procedure by which I could be assured that the Companies would in fact receive timely payment of their entitlement, whatever the amount. All members of the working group were fully aware that additional issues had to be addressed, in particular my demand for assurances that the payment obligations could be enforced in the U.S. courts in the event that the Government of Venezuela failed to meet those obligations. The working group agreed that these provisions would be left to a third document, to be signed by the Minister (who had authority to agree to these terms).

11. On the same day the General Conditions were signed, December 17, 2003, I delivered to the Director General of Mines, Francisco Salas, at his office located

in the Ministry of Energy and Mines, a document that I had prepared, and that I had headed "Complementary Document." I told him, in front of all present, that the Complementary Document contained the positions of the Companies I represented on certain open questions in the negotiations, including responsibility for paying the appraiser, and jurisdiction to enforce the Companies' right to payment in case of default by the Government.  In particular, my proposal was that the Government should be solely responsible for compensation of the expert appraiser, and that, in the event that the indemnity was not paid to the concession holders within two years, it should be open to them to enforce the awards in the United States of America, and in particular in New York City.  In designating New York City, I was responding to the suggestion by Mr. Salas to select New York as the forum, which I found to be consistent with other waivers of sovereign immunity which the Government of Venezuela had previously granted.  I requested that Director General Salas present the document I handed him to Minister Rafael Ramírez, as Minister Ramírez was the only official of the Ministry of Energy and Mines empowered by law to waive sovereign immunity from the jurisdiction of foreign courts. Mr. Salas took the document I presented and indicated to me that he would forward it to the Minister for review and, if acceptable to him, his signature.

12.    On the 17th and the 18th of December, 2003, I received several telephone calls from Julia Van Der Brule, who identified herself as an attorney with the Ministry of Energy and Mines, as well as from Attorney Rosa Toro, in which they indicated to me that the Legal Department was working on changes to the

Complementary Document I had given to Mr. Salas. They said that the draft I delivered did not conform to certain legal formats used by Minister Ramírez, but that, with certain modifications, it would be acceptable.

13. We discussed the changes that the Ministry wanted. There were two that were significant: (a) the Ministry wanted my companies to abandon any right to initiate litigation within Venezuela to challenge the Tocoma project, and (b) the Ministry proposed to change the form of the document into a formal order. I agreed with these changes over the telephone, and told them I would sign the amended document once it was communicated to me by the Ministry.

14. On December 19, 2003, I received a telephone call from Attorney Adrián Zerpa León, Head of Mining Processing of the Ministry of Energy and Mines. He told me that the document covering the questions of jurisdiction to resolve disputes in the event of non-payment, and responsibility for payment to the expert appraiser, was ready for my acceptance as legal representative of the concession holders. He invited me to his office, so that I could countersign and obtain a copy of the fully executed document.

15. On December 22, 2003, I went to Attorney Zerpa's offices, located in the PDVSA Building, La Campiña, in response to his call (PDVSA is the energy company wholly-owned by the Government of Venezuela within the Ministry of Energy and Mines). He presented me with an original document entitled "Addendum," a true and correct copy of which (together with a certified English translation) is attached hereto as Exhibit 2, and requested that I read it. Mr. Zerpa told me that if I was in agreement with the terms of the Addendum, I should sign it on the third

7

page, in the space provided for that purpose. I recognized that the Addendum was my "Complementary Document" as edited within the Ministry as we had discussed. After reviewing the Addendum and in particular the changes made by the Ministry's Legal Department (and determining that the scope and nature of those changes was acceptable and in accordance with my discussions with Ms. Van Der Brule on December 17 and 18), I signed the Addendum on the third page to indicate my acceptance. As is my custom, I also affixed my signature on the left margin of each page of the Addendum. I then asked Attorney Zerpa to place his signature also on the document, and to indicate the name of his office. I asked Mr. Zerpa to give me a copy of the Addendum signed by the Minister, by himself, and by me. He called his secretary to have her make the copy I had requested, and then handed it to me, and I took it with me when I left his office. That copy was retained in a locked safe in Venezuela since that date, until recently when I had it sent to me in the United States to use in this proceeding.

16. On January 19, 2004, the Ministry of Energy and Mines proposed the company, ABECIR, to perform the appraisals. On January 30, 2004, CAROMIN and VMC accepted the Government's proposal. On February 13, 2004, ABECIR accepted the appointment. True and correct copies of the relevant correspondence between the Government and ABECIR (together with an English translation) are attached hereto as Exhibit 3.

17. ABECIR submitted the CAROMIN appraisal report (ALFA 1, 2 and 3) on April 21, 2004, and the VMC appraisal report (DELTA A, B, C and D) on April 22, 2004. Copies of these reports are attached to the Complaint filed in this matter.

18.   On May 12, 2004, upon my instruction, the attorney for CAROMIN and VMC, Luis Andres Guerrero Rosales, requested the Head of Mining Processing to forward CAROMIN and VMC's files to the Ministry of Finance so that the indemnity could be processed and paid. We received no response.

19.   As the authorized representative of CAROMIN and VMC, in accordance with the custom and practice in Venezuela for private citizens having such business with the Government, I had the right to visit the Ministry and inspect and make copies of the documents in the files that pertain to our mines. Between 1994 and 2004, I regularly did so. In 2003 and 2004 in particular, I visited the Ministry quite frequently to review the file, as it pertained to the Government's seizure, the litigation, the negotiations and our collection efforts.    I am, therefore, very familiar with the Ministry's file in this case, and at the time I reviewed them, I made and kept copies of many of the documents in that file.   Indeed, I can confirm having seen the original Addendum in the file and correspondence among the Ministry's representatives and attorneys concerning the Addendum, as well as the other related agreements and many legal opinions regarding VMC and CAROMIN.

20.   I have seen in the Ministry's files (and have kept copies for myself) the correspondence between Ministry lawyers regarding the changes they proposed to my draft "*Documento Complementario*" (referenced in paragraph 12 above), which acknowledge receipt of the draft, and the transmission of the revision (*i.e.*, the Addendum) on December 18, 2003, to the Office of the Minister himself.   A

9

true and correct copy of this memorandum (together with a certified English translation) is attached hereto as Exhibit 4.

21. Between May 2004 and March 2007, I repeatedly communicated directly and through my lawyers to the Minister of Finance, the National Treasury, the Ministry of Mining, and even the Vice President of the Republic, to seek payment of the compensation owed by the Government of Venezuela to CAROMIN and VMC. Nonetheless, the Government has never paid the Companies anything at all. Yet no representative of Venezuela has ever suggested that the Government did not owe the Companies the amounts determined by ABECIR, or that there was any fault, error, or defect in the process of arriving at those amounts

22. In October 2005, I received a letter from the Finance Ministry claiming that they were not the proper party to process the payment. A true and correct copy of this letter (together with a certified English translation) is attached hereto as Exhibit 5. From reviewing the documents in the file, I was able to determine that the Ministry of Mines did in fact send the file -- including the Addendum -- to the Ministry of Finance in June 2004. This was confirmed by one of the documents I found in the file: a copy of the Addendum, with a stamp indicating that it had been received in the Office of the Minister (of Finance) on June 29, 2004. A true and correct copy of this document (together with a certified English translation) is attached hereto as Exhibit 6. Apparently, however, the Ministry of Finance made the decision that the file was properly the responsibility of the Ministry of Mines, and it was duly returned to that Ministry.

10

23.     In March, 2007, the Ministry contacted my lawyer, Mr. Guerrero, to advise that it had lost the entire original file. I provided a copy of my own file on this matter to the Ministry. Naturally, my copy included the Addendum. Internal documents of the Ministry confirm that its officials claim to have lost the original file. A true and correct copy of one such document, a memorandum from an official of the Office of the Director General of Mining Concessions to the Legal Department of the Ministry, dated March 30, 2007 (together with a certified English translation) is attached hereto as Exhibit 7 hereto. The second and third paragraphs of this document recount the efforts of that Office to locate the missing materials. That portion of the memorandum explains that the Office finally "obtained a copy filed by Mr. Luis Andrés Guerrero Rosales in his capacity as judicial attorney-in-fact, which is attached hereto to provide more information on the case." I note that the writer of this memorandum concludes that the full amount declared owing to CAROMIN, by virtue of the ABECIR appraisal, is in fact and at law "an **obligation, due and payable**" by the Government (emphasis in original).

The Statements Offered by the Government Are False

24.     I have had the opportunity to read the statements filed in the case *Compañía Minera del Bajo Caroní (Caromin), C.A., et al. v. Bolivarian Republic of Venezuela et al.*, Case No. 07-CV-3197 (NRB), United States District Court for the Southern District of New York, by Francisco Salas, Orlando Ortegano, and Martha Acosta; as well as a letter from Minister Rafael Ramírez Carreño addressed to the Attorney General of the Republic, and the response to the complaint (motion to dismiss) filed in this case.

11

25.    Mr. Salas states that he never had any knowledge of any document resembling the Addendum. But that is not the truth. At the meeting of December 12, 2003, held at Mr. Salas's own offices, many issues related to the General Conditions were discussed, including jurisdiction to ensure that payment would be made in a timely fashion. The Head of Mining Processing suggested the use of an arbitration panel, but this proposal was rejected by the Director of Mining Concessions, Attorney Martha Acosta, who suggested a single appraiser instead.  She said that this would avoid the need to obtain approval of the Office of the Attorney General of the Republic. My expressed preference always was the jurisdiction of the courts of the United States of America, because of the possibility of execution against the assets of the Government of Venezuela in the event of default.  Mr. Salas was emphatic in saying that it would never be necessary for me to enforce the appraiser's report, as the Government of President Hugo Chávez honored its commitments.  He said that he would never allow himself to be involved in a proceeding where obligations were not honored by an institution he represented; but, if a foreign court were to be designated, he recommended New York City (because this is consistent with the general practices of the Venezuelan Government). As a result of all of this, I represented to Mr. Salas that I would agree to a process involving a single appraiser whose determination would be binding on all parties and enforceable as such in the courts of the U.S. I offered to draft a proposal reflecting this position.  Director General Salas agreed that I should prepare a document to this effect for him to consider.



26.    The letter from Minister Ramírez to the Attorney General of the Republic of Venezuela is incorrect in many of its statements.  First of all, Minister Ramírez did sign the Addendum, as did the Head of Mining Processing, Attorney Adrián Zerpa.  I know this to be true, because when the Addendum was handed to me for my acceptance, Mr. Zerpa specifically told me that the Minister had signed it.  I was able to observe that it was an original signature, made by use of pen and ink, and the Addendum included a seal, which under Venezuelan law and practice, authenticates the document as official.  That the document was official was also confirmed to me by the fact that it was on official Ministry letterhead, and was handed to me in the Ministry's own offices by one of the Ministry's own lawyers.  This is entirely consistent with all of the documents from the file that I have seen since, and which are attached to this Affidavit.  In particular, it is consistent with the evidence that the *Documento Complementario* was forwarded, with changes, from the office of the Ministry's legal counsel (Rosa Toro) to the Office of the Minister (Julia van der Brule) on December 18, one day before it was signed; and also that the Addendum was in the file of the Ministry when it was forwarded to the Ministry of Finance in June 2004.

27.    Minister Ramírez states that he never uses a "wet seal" (*i.e.* a seal that requires use of liquid ink), but always a dry seal, to indicate that a document is official.  This statement is not true.  I have had in my hands innumerable communications from different Ministers of Mines.  Some of them have wet seals, some electronic seals, and some no seals at all, but none of them bears a dry seal.  Attached as

13

Exhibit 8 is an example of an official document from the Office of the Minister of Mines that is authenticated with a wet seal.

28.    Finally, it should also be noted that Mr. Orlando Ortegano, Mr. Francisco Salas, and Ms. Martha Acosta all work at the present time at what is now called "the Ministry of the People's Power for Energy and Petroleum." In other words, all of them are currently employed by, and ultimately report to, Mr. Ramirez, who heads that Ministry.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2007, in Atlanta, Georgia, U.S.A.

MANUEL A. FERNANDEZ