FOLEY HOAG LLP
Ronald E.M. Goodman (RG6698)
Paul S. Reichler
1875 K Street, N.W.
Washington, D.C. 20006
(202) 223-1200
(202) 785-6687
preichler@foleyhoag.com
rgoodman@foleyhoag.com
Attorneys for Defendants

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Compañia del Bajo Caroni (Caromin), C.A., and V.M.C. Mining Company, C.A.,<br><br>                            Plaintiffs,<br><br>v.<br><br>Bolivarian Republic of Venezuela and Ministry of Basic Industries and Mines,<br><br>                            Defendants. | Case No. 07-CV-3179 (NRB) |

**DEFENDANTS' REPLY MEMORANDUM
TO PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

## DEFENDANTS' REPLY MEMORANDUM

There is conclusive and indisputable proof that Venezuela's Minister of Energy and Mines, Rafael Ramirez, <u>did not sign</u> the "Addendum" on which Plaintiffs base their claim that Venezuela waived its sovereign immunity in this case. Indeed, the irrefutable evidence shows that Minister Ramirez <u>could not have signed</u> the document.

Above all, the evidence establishes that Minister Ramirez <u>was not even in Venezuela at the time Plaintiffs claim he signed the "Addendum" in his office in Caracas</u>. This in itself is sufficient to defeat Plaintiffs' claim that the "Addendum" is "authentic" and that it constitutes a "waiver" of Venezuela's sovereign immunity. For this reason alone, Defendants' Motion to Dismiss the Complaint should be granted forthwith. But there is much more that mandates this outcome.

Plaintiffs have failed to produce a signed original of the "Addendum." They have failed to produce any eyewitnesses claiming to have seen the Minister sign the document. They have failed to produce expert testimony that the signature on the document was put there by the Minister himself. In fact, their own expert's testimony is consistent with Defendants' assertion that <u>the signature was photocopied from another document and transplanted onto the "Addendum" by Plaintiffs themselves</u>. Attached are reports from two other distinguished experts -- former document-and-handwriting analysts for the FBI and the State of Arizona -- supporting this conclusion and further establishing that the "Addendum" is a fabricated document whose signature cannot possibly be authenticated. *Exs. A and B.*

Beyond this, Plaintiffs have now unwittingly exposed the fraud they are attempting to perpetrate by passing off a fabricated document and a forged signature as genuine. Their claim that the Minister signed the "Addendum" is based on the testimony of one Adrian Zerpa, a former Ministry employee, who swears in his declaration that the Minister signed the "Addendum" <u>in Caracas on December 19, 2003</u>. Plaintiffs' witness avers that he knows this to be the case because he received the document in his office at the Ministry <u>on that date,</u> and it bore the Minister's original signature, which he recognized. *Zerpa Decl.*, ¶¶13, 15.

This is the only "evidence" Plaintiffs have submitted that the signature on the document was actually inscribed there by the Minister. And it is demonstrably and irrefutably false, because <u>the Minister was out of the country</u> at the time Plaintiffs' lone witness claims that the Minister signed the "Addendum." In fact, Minister Ramirez was in the United States from December 17 to December 19, 2003, attending an international conference of petroleum ministers at the U.S. Department of Energy in Washington. He did not even land in Venezuela until almost 8 p.m. on the evening of December 19 (a Friday night). This is shown conclusively by his Supplementary Declaration, attached hereto as Exhibit C, and by:

- The Minister's passport, which shows entry stamps into the United States on December 17, 2003 and into Venezuela on December 19 on page 30. (*Ex. D*);

- The flight records and passenger list for his travel to Washington on December 17 and his return to Venezuela on December 19, recording the precise times of arrival at both destinations (*Ex. E,* Annexes A-D);

- The testimony of the pilot who flew the Minister and his party to Washington and back to Venezuela on those dates (*Ex. E*);

- The testimony of the Minister's assistant, Julia van den Brule, who accompanied him on both flights and during his stay in Washington (*Ex. F*);

2

- Contemporaneous newspaper articles from the U.S. and Venezuela reporting on the Minister's presence and remarks at the conference in Washington, including a group photograph of the attendees in which he is depicted (*Ex. G*).

Plaintiffs' fraud is manifest. Their fictitious version of events simply does not hold up. According to them, a draft of the "Addendum" was sent to Ms. van den Brule in Caracas by Ministry employee Francisco Salas on December 17; it was allegedly revised pursuant to Ms. van den Brule's request and sent back to her by Ministry attorney Rosa Toro on December 18; it was purportedly signed by the Minister in his office on December 19 and then sent by him the same day to Mr. Salas, who supposedly affixed a cover note and sent it that very day to Plaintiffs' witness, Mr. Zerpa. *Fernandez Decl.*, Ex. 4; *Zerpa Decl.*, ¶¶13, 15. Plaintiffs' story is not only false; it is <u>impossible</u> -- since both Ms. van den Brule and the Minister <u>traveled to Washington on December 17, and did not return until the evening of December 19</u>, by which time it was <u>not physically possible</u> for the Minister to have gone from the airport to his office an hour away, signed the "Addendum" and sent it to Mr. Salas, and for Mr. Salas to have received it, attached a cover note and sent it to Plaintiffs' witness who just happened to be there waiting to receive it in the inter-office mail -- all well after 8 p.m. on a Friday night.

Moreover, Mr. Salas, attorney Toro and Ms. van den Brule have all submitted sworn statements, attached hereto as Exhibits H, I and F, that none of this happened, and that they never saw, discussed or even heard of the "Addendum" or anything like it before this lawsuit was filed in April 2007.

The "Addendum" is plainly a fabricated document that was not signed, and could not have been signed, by the Minister. Upon examination, it reeks of its own illegitimacy. First of all, Plaintiffs have submitted to the Court <u>two markedly different</u>

3

versions of what they claim to be the genuine first generation photocopy of the original document. The copy of the "Addendum" submitted by Plaintiffs on August 10, which they claimed was their "best" photocopy, bore the signature of Plaintiffs' principal, Manuel Fernandez, in the left-hand margin of each of the three pages of the document. *Ex. J.*, Attachment 1. In his affidavit, submitted as an attachment to Plaintiffs' opposition memorandum on October 12, Mr. Fernandez attests that he signed the "Addendum" in the left hand margin of all three pages; this is repeated by Mr. Zerpa who says he saw Mr. Fernandez sign the document in this fashion. *Fernandez Decl.*, ¶15; *Zerpa Decl.*, ¶16. However, the copy of the "Addendum" submitted by the Plaintiffs on October 12, as Attachment 2 to Mr. Fernandez's own affidavit, bears his signature in the left-hand margin only on pages one and two but not on page three (the page that bears Minister Ramirez's purported signature). What this shows is that Plaintiffs themselves can't figure out which of these different fakes they hope to pass off as real.

Second, the photocopy of the "Addendum" that Plaintiffs claim to be the very one that Mr. Zerpa asked his secretary to make for Mr. Fernandez, and which Mr. Fernandez claims to have kept in his safe ever since, is in color; the letterhead of the Ministry of Energy and Mines is in red, and the seal affixed over the Minister's purported signature is in blue. This color photocopy was produced by Plaintiffs (to Defendants' counsel but not to the Court) on October 24, and was represented to be the actual first generation photocopy of the "Addendum" received and safeguarded by Mr. Fernandez. However, this cannot be true because Mr. Zerpa's secretary, Maira Olivera, and each of the other secretaries who worked in his department, have sworn that there were no color photocopiers, and that they never made a color photocopy for Mr. Zerpa or anyone else.

4

Their affidavits are attached hereto as Exhibits K, L, M, and N. A photocopy of the document produced to Defendants' counsel on October 24 -- showing its colors and therefore its illegitimacy -- is attached as Exhibit O.

Third, the typed signature line "Ing. Rafael Ramírez" immediately below the Minister's purported signature is substantially out of line with the rest of the text on the same page, which means it could not have been placed there at the same time that the rest of the page was typed. This is shown graphically by one of Defendants' handwriting and document experts, Alan Robillard (a former FBI document examiner), who placed a grid over page three of the "Addendum" to demonstrate this anomaly. *Ex. A*, Figure 5. According to Mr. Robillard: "there are several measurable and demonstrable independent variables which suggest that the machine-produced text, 'Ing. Rafael Ramirez' on the ["Addendum's"] signature page is the product of a mechanical fabrication." *Ex. A*, p. 7.

Analysis by Defendants' other expert, William Flynn, who served for 18 years as Questioned Document Supervisor for the Arizona Department of Public Safety, shows "multiple anomalies" in the "Addendum," typical of those found in "manipulated documents." In particular, pages 1 and 2 have different vertical line spacing from page 3; pages 1 and 3 have different horizontal line spacing from page 2; the signature block of "Ing. Rafael Ramírez" does not fall on a normal typographical line spacing compared with the rest of page 3; and the resolution of "Ing. Rafael Ramírez" is different from that of other text in the document -- all of which strongly suggest "page substitution" and "cut and paste" with regard to the signature block. *Ex. B*, pp. 2-3. According to Mr. Flynn: "In the opinion of the undersigned, there IS forensic evidence indicating that [the

5

"Addendum"] has either had the various pages manipulated or has had the signature transferred from another document." *Ex. B*, pp. 2-3.

Even Plaintiffs' handwriting expert, Gus Lesnevich, concedes that it is impossible to tell from the photocopy of the "Addendum" that he examined whether the Minister's signature was written by his own hand or transplanted there from a different document. Indeed, Plaintiffs' counsel have admitted to the Court that their expert "cannot attest to how the signature came to be on the document." *Ex. J*, p. 3. The only conclusion reached by Mr. Lesnevich is that the signature on the "Addendum" is pictorially the same as the Minister's signature on other documents whose genuineness is not disputed. But this only begs the question, because it is exactly what would occur if the signature on the "Addendum" were lifted from a genuine document and placed on one fabricated by Plaintiffs. And both Plaintiffs' counsel and Mr. Lesnevich concede that it is impossible for them to supply an expert opinion that this did not happen.

Defendants' experts concur that it is impossible to conclude, from any of the photocopies that Plaintiffs have thus far produced, that the Minister's signature is genuine. However, given the clear indications that the entire document is a fabrication, as carefully laid out in the detailed reports of Mr. Robillard and Mr. Flynn (*Exs. A and B*), there is every reason to doubt that the "Addendum" was actually signed by the Minister. Plaintiffs themselves added fuel to these doubts when they refused to allow Defendants' experts to conduct a routine examination of their so-called "first generation copy" of the "Addendum," in disregard of the Court's instruction that they do so and their own commitment that they would. To be sure, Plaintiffs produced what they claimed was their "first generation copy" for examination by Mr. Robillard at their counsel's office on

6

October 24. But they refused to allow him to examine the document (and the Minister's alleged signature) under the microscope he brought with him, which is a normal and necessary part of the examination of a questioned document.[1]

As Mr. Robillard explains in his report, it is a simple process to lift a signature off an authentic document and transfer it to an inauthentic one to make it appear as though the signer of the former also signed the latter. All the forger has to do is find a document with a genuine signature, remove the signature manually or electronically by means of a scanner, and transfer it to a fabricated document. *Ex. A*, pp. 7-8 and Figure 3. Plaintiffs seem to have mastered this "art." The "Addendum" is not the only document with a transplanted signature submitted by Plaintiffs. In their opposition papers, Plaintiffs supplied two other fake documents to the Court: a purported memo from Mr. Salas to Ms. van den Brule sent on December 17, 2003; and another one from attorney Toro to Ms. Van den Brule dated December 18. In their affidavits attached hereto as Exhibits H and I, Mr. Salas and attorney Toro attest that they never wrote or signed these memoranda. And Ms. van den Brule attests in her affidavit that she never received them. Tellingly (and he is telling us more than he apparently intended), Mr. Fernandez avers that he had free access to the Ministry's files, and was able to extract and copy any document he wanted. *Fernandez Decl.*, ¶19. Thus, by his own admission he had ample opportunity to obtain for himself authentic documents signed by Mr. Salas and attorney Toro (as well as by Minister Ramírez) and to transfer their signatures to documents he himself created. According to the experts, this appears to be just what Mr. Fernandez did. In his report, Mr. Flynn observes, for example, that the signature block on the purported Toro memo:

---

[1] Plaintiffs' commitment to allow a proper document examination resulted from the Court's instruction to them at the conclusion of the status conference on August 22, and is reflected in their communications with Defendants' counsel between October 12 and 22.

7

>...does not fall on the typographic line spacing utilized throughout the document. In addition, the signature block text has a rotational misalignment with the other machine prepared text. It is likely therefore that the signature block data has been affixed to this document in an unnatural manner. In the opinion of the undersigned, the vertical and rotational misalignment of the signature block text constitute evidence indicating that the signature block has been appended to this document rather than prepared and signed in a normal manner. *Ex. B*, p. 3.

Plaintiffs' trickery also includes the submission of a copy of the "Addendum" purportedly bearing a stamp of Venezuelan Ministry of Finance showing that it was included in the file received by that Ministry on June 29, 2004. It costs exactly $33.50 (including tax and shipping) to have an identical stamp made, which could then be affixed to a copy of the "Addendum" and photocopied so that it would appear to have been received by the Ministry of Finance on the date indicated on the stamp. Attached as Exhibit P is the work product of Defendants' counsel, which shows how easily (and cheaply) such a document can be created. Attached as Exhibit Q is the affidavit of Martha Acosta, the former Director of Mining Concessions, attesting to the fact that the file never included the "Addendum," and that consequently the Ministry of Finance could not have received it. Moreover, the copy of the "Addendum" that Plaintiffs submitted with the purported stamp of the Ministry of Finance bears Mr. Fernandez's signature in the left margins of only two of its pages, not all three, contrary to his affidavit testimony that he signed his name in the left margin of all three pages (and at variance with the version of the same document Plaintiffs' Counsel submitted to the Court on August 10).

Plaintiffs' opposition papers are remarkable not only for what they include, but also for what they don't include. As indicated at the beginning of this Memorandum, Plaintiffs have failed to produce an original "Addendum;" they have failed to provide

8

eyewitness testimony to the Minister's signing of the document; and they have failed to submit expert opinion that the Minister signed it. Significantly, they have also failed to submit a statement by the Venezuelan lawyer who represented them in all of their dealings related to this matter. Plaintiffs' affidavit witnesses have attested that this lawyer, Luis Guerrero, was present at a meeting on December 17, 2003 when they claim that they first presented a draft of the "Addendum" to Mr. Salas, whom they say agreed to forward it with his written recommendation to Ms. van den Brule the same day. Attorney Guerrero was not only present at that meeting, but was also involved subsequently in obtaining and inspecting the complete file on this matter maintained by the Ministry. If there were an "Addendum" in December 2003, or in June 2004, or at any other time prior to the filing of this lawsuit, attorney Guerrero would certainly have known about it -- and presumably been willing to supply his longstanding client with a statement to that effect.

But Plaintiffs have provided the Court with absolutely nothing from Mr. Guerrero. Attached hereto as Exhibits R and S are two documents from Defendants' files that were authored by him: (1) a memorandum written to the Ministry of Energy and Mines in December 2006 describing the history of the case in Venezuela – without making any mention of the "Addendum;" and (2) a letter dated April 23, 2007, three days after the Complaint was filed in this action (and the "Addendum" surfaced for the first time), announcing his withdrawal as counsel for Plaintiffs. The obvious conclusion is that attorney Guerrero wants no part of Plaintiffs' fraudulent lawsuit, and that he has distanced himself as far away from it as possible. If the facts were otherwise, Plaintiffs surely would have provided the Court with a statement from him. Their failure to do so underscores the already preponderant evidence that the "Addendum" is a fake.

9

Plaintiffs, of course, bear the burden of proving by a preponderance of the evidence that the "Addendum" is *not* a fake, and that the signature on it was put there by the Minister himself. Under FRE 901(a), "[T]he proponent of evidence has the burden of proving its authenticity....Unless the proponent has sustained its burden...an objection on that ground should be sustained." Wright & Gold, 31 FED. PRAC. & PROC. EVID., §7104 (2007). *See also, United States v. Gelzer,* 50 F.3d 1133, 1140-41 (2d Cir. 1995) ("Under [FRE] 901, authentication seeks to establish that the evidence offered is what its proponent claims it to be, and must be shown by a preponderance of the evidence"). Plaintiffs erroneously argue in their opposition papers that the burden is not theirs to prove that the "Addendum" is authentic, but Defendants' to prove that it is not. Plaintiffs are wrong, but in this case it makes no difference. For the reasons stated above, even if Defendants bear the burden of proving that the document is inauthentic, they have plainly done so, and by much more than a preponderance of the evidence.[2]

In conclusion, Plaintiffs have failed to demonstrate that Defendants have waived their sovereign immunity under Section 1605(a)(1) of the Foreign Sovereign Immunities Act. Accordingly, Defendants are immune from the jurisdiction of this Court, and their Motion To Dismiss the Complaint must be granted forthwith.

---

[2] Indeed, the inadmissibility of the "Addendum" is even more apparent here than in other cases in this Circuit where copies of purported originals were not allowed into evidence under FRE 1003 because of an insufficient showing of their authenticity. *See, e.g., Pro Bono Investment, Inc. v. Gerry,* 2005 WL 2429777, *6-7 (S.D.N.Y., September 30, 2005) (where the face of the purported copy of a missing promissory note raised serious questions as to the alleged original's authenticity, the evidence suggested that the purported signatory may never have signed the note, and plaintiffs' witnesses had no personal knowledge of whether he actually signed it, genuine issues as to authenticity of the original existed and it would be unfair to admit the alleged copy in the circumstances); *Opals on Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362, 370-72 (2d Cir. 2003) (District Court's exclusion of copy of an alleged contract under FRE 1003 was proper, where defendant contended that Opals had altered a note that defendant's signatory had added to the agreement).

          Respectfully submitted,

          */s/ Ronald E.M. Goodman*

          Ronald E.M. Goodman (RG6698)
          Paul S. Reichler
          Foley Hoag LLP
          1875 K Street, N.W.
          Washington, D.C. 20006
          (202) 223-1200
          Attorneys for Defendants Bolivarian
          Republic of Venezuela and Ministry of
          Basic Industries and Mines

Dated: November 20, 2007