EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Compañia del Bajo Caroni (Caromin), C.A., and
V.M.C. Mining Company, C.A.,

        Plaintiffs,

v.                                                        Case No. 07-CV-3179 (NRB)

Bolivarian Republic of Venezuela and
Ministry of Basic Industries and Mines,

        Defendants.

## DECLARATION OF JANIS H. BRENNAN

I, Janis H. Brennan, an attorney duly-admitted to practice law, declare:

(1)    I am a member of the bar of the District of Columbia and a partner in the firm

Foley Hoag LLP, counsel to Defendants the Bolivarian Republic of Venezuela and Ministry of

Basic Industries and Mines in the above-captioned matter. I make this declaration in support of

Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Complaint.

(2)    Attached hereto is a true and correct copy of the Report of Alan T. Robillard,

forensic document examiner, dated November 16, 2007, containing Mr. Robillard's analysis of

the "Addendum" at issue in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C.
      November 20, 2007

                                    _____
                                    Janis H. Brennan

# Forensic Science Applications

Examination of Questioned Documents

# REPORT

**DATE:** November 16, 2007

**FSA    #2736A**

**TO:** Ms. Janis H. Brennan
Foley Hoag LLP
1875 K Street NW, Suite 800
Washington, D.C. 20006-1238

**Re:** Compania del Bajo Caroni (Caromin) C.A. et al. *v.*
Bolivarian Republic of Venezuela, et al.
Case No. 1:07-cv-03179-NRB

**EVIDENCE RECEIVED:** On October 24, 2007 at Washington, D.C.

**Specimens:**

Q1          A color copy of a three (3) page document entitled,
"Addendum" prepared in the Spanish language

- Q1A – first Page – headed with the word "Addendum"

- Q1B – second Page – beginning with the words,
"asi como en este ………"

- Q1C – third Page – beginning with the words,
"designado conforme al …….." and bearing a "Rafael
Ramirez" questioned signature

K-1 to K1-20          Twenty (20) original inked signature of Rafael Ramirez

In addition to examining the evidence described above, I also reviewed as "Preliminary"
documents:

- a copy of the Q1 questioned Addendum that was filed with the Court by the
Plaintiffs as Exhibit 1 to a letter dated August 10, 2007

- a copy of the "Plaintiffs' Opposition to Defendants' Motion to Dismiss the
Complaint" filed with the Court on October 12, 2007

<u>Requested Examinations</u>

I was requested to determine whether the questioned "Rafael Ramirez" signature present
on page Q1C of the questioned Addendum is or is not authentic.

21 Oakwood Lane    Vineyard Haven, Massachusetts 02568    Tel. 508-693-5635    •    Fax 508-693-5636

FSA Report #2736A
Page 2 of 12

Limitations[1]

Although I was not allowed to conduct a microscopical examination of the questioned document during my field examination, the photographs that I made at that time and the color photocopies I requested gave me sufficient data to make the determinations that I make in this report.

Conclusions

My conclusions in this matter are derived from my education, knowledge, training and experience as an examiner of questioned documents, and where appropriate I adhered to an established protocol which is published by the American Society for Testing and Materials (now ASTM International) Designation: E2290-07, Standard Guide for Examination of Handwritten Items. (Copy attached)

Conclusion 1: Left Margin Signature

It is my opinion that the reliability of the signature page of the Addendum is called into question due to the absence of the "Manuel Alfredo Fernandez" signature in the left margin of the questioned document that I examined on October 24, 2007.

Basis for Conclusion 1

The questioned Addendum that I examined on October 24, 2007 was identified to me as the actual three (3) page document that Mr. Fernandez declared that he had in his possession and which had been made for him by Mr. Zerpa's secretary prior to Mr. Fernandez's leaving Mr. Zerpa's office at the Ministry of Energy and Mines on December 22, 2003. Additionally, Mr. Fernandez stated that he had held the three (3) pages of the Addendum in safekeeping since that date.

---

[1]. The limitations encountered in this case relate to the effect of the copying process on the handwritten image while from the perspective of conducting a thorough forensic document examination, the lack of an original document precludes many other types of comparisons. Access to an original document would allow for examinations and comparisons involving paper, printing processes, indented writing, latent marks left by the printer, ink identification, and possibly ink dating as well as the development of latent fingerprints.

FSA Report #2736A
Page 3 of 12

It is noted that the signature page (Q1C) of the most recently provided version of the document does not exhibit a "Manuel Alfredo Fernandez" signature in the left margin; yet the signature page of the "preliminary" Addendum attached to the August 10, 2007 letter to the Court as Exhibit 1 does bear, such as a signature in the left margin. Therefore, this finding concerning the absence of the "Fernandez" signature in the left margin of the most recently produced document (Q1C, October 24, 2007) contradicts the statements made by Mr. Fernandez and Mr. Zerpa in their declarations and forms a different version of the questioned Addendum. Please see Figure 1 which depicts the differing versions of specimen Q1C.

It is also noted that the left margins of the signature pages of copies of the questioned Addendums that are seen in four (4) different sections of the Plaintiffs' Opposition To Defendants' Motion To Dismiss The Complaint filed on October 12, 2007, do not bear a "Fernandez" signature. The copies may be seen attached to the declaration of Manuel Alfredo Fernandez, dated October 12, 2007 as Exhibits 2 and 6; attached to the declaration of Adrian Zerpa Zeon, dated October 10, 2007 as Exhibit 2 and as Exhibit H to the declaration of James W. Perkins, dated October 12, 2007.

Conclusion 2: "Rafael Ramirez" Questioned Signature

It is my conclusion that due to significant limiting factors imposed by the reproduction and/or printing process, no conclusion can be reached as to whether or not the questioned "Rafael Ramirez" signature is authentic.

The conclusion and discussion that I am offering regarding the authenticity of the questioned "Ramirez" signature is provided as if the questioned signature were being considered in isolation of other factors that might reflect on the Addendum's credibility. This conclusion rests on merits of handwriting procedures alone and does not take into account other conclusions that I am providing.

Basis for Conclusion 2

My conclusion[2] regarding the questioned "Rafael Ramirez" signature is one where I have no confidence either way as to the signature being authentic or not authentic for the following reasons.

_____

[2]. *Attached to this report is ASTM Designation: E1658-96, Standard Terminology for Expressing Conclusions for Forensic Document Examiners, which offers the recommended terms for conclusions and describes the conditions for use.*

FSA Report #2736A
Page 4 of 12

Handwriting examinations are effected using a systematic process which involves the analysis, comparison and evaluation of the evidence. The progression from the analysis phase to the comparison phase is dependant on the evidence meeting certain criteria. Some such criteria are the writing being original or copied, the writing being freely and naturally prepared, and whether the writing is complex enough to be compared with any degree of significance.

Early in my examination of the questioned "Ramirez" signature, I determined that it was the product of a color copying/printing process and the highly stylized signature had enough complex pen movements and length to be compared with known writings. However, the criteria that had not been decided dealt with estimating whether the copied signature represented natural writing. [3] The decision regarding natural writing is essential to the overall determination, because characteristics concerning natural writing encompass many fine and subtle details that must be considered along with other characteristics of writing.

Characteristics[4] of writing are separated into two (2) general groups, the first being style or *design characteristics* and second being *execution characteristics*. Design characteristics relate to features of writing, such as size, slant, shape, connecting strokes and structures of letters while execution characteristics relate to qualities, such as speed, relative pen pressure, rhythm, natural lifts of the pen, the tapering of beginning and ending strokes and line quality. Execution characteristics sometimes also reflect information about the conditions under which the writing was prepared; for example, the type of pen or the writing surface.

Design characteristics are traits that have been learned and often reflect the handwriting system that was taught. However, it is the deviation from the copy book systems that eventually become habits which translate into individualizing design features that separate one person's design from another's. In general, it can be said that it is design characteristics that give a writing its pictorial effect. Design characteristics as a whole are considered in what is commonly referred to as the "Bank Teller's Test".

---

[3]. *Natural writing is defined in the ASTM Standard Guide for Examination of Handwritten Items as "any specimen of writing executed without an attempt to control or alter its usual quality of execution".*

[4]. *The term "characteristics" used here is sometimes seen in the literature as "elements", "qualities", "features", and "identifying individualities". Whatever the term, it refers to traits that can sometimes be differentiated from one individual to the next.*

FSA Report#2736A
Page 5 of 12

Frequently, with a quick glance, the teller is satisfied that a signature is authentic, because it "looks" like the signature on the driver's license. The teller does not consider the execution characteristics of the writing which require equal scrutiny.

The questioned "Ramirez" signature possesses enough complexity to be intercompared in a side-by-side manner with design feature compared to design feature, but it is mandatory that I also make a determination about its naturalness which pertains to execution characteristics. Execution characteristics like design features are also individualizing idiosyncrasies that help separate the writings of different people and should not be overlooked.

In this case, the examination was stalled in the analysis phase, because I was presented with a copy of the questioned "Ramirez" signature that did not allow me to make adequate determinations about execution characteristics. In essence, the resolution of the copy itself prevented me from fully estimating the execution characteristics[5]. The copying instrument's ability to resolve fine detail and to create accurate reproductions of the detail is of paramount importance to the overall analysis. A reliable conclusion concerning handwriting identification considers all of the characteristics of a writing and in a case where the execution characteristics cannot be fully determined, a "no conclusion" type opinion is warranted and is an obligation[6]. Simply stated to reach any conclusion based on design features alone and to not weigh the execution characteristics would be a guess at the truth.

You should also note that poor copy resolution not only masks characteristics needed to reach an authenticating type conclusion, but determinations regarding *"traced"* and *"simulated"* forgeries are equally affected. A traced forgery involves writing atop an authentic signature that is used as a model replicating a pictorial likeness. A simulated forgery is prepared after studying the design of the writing and then attempting to write the signature without any underlying model.

---

[5] *Documents that bear photocopied writing are examined on a daily basis by questioned document examiners. The decision to offer an opinion with some level of certainty is dependant on the quality of the image and how much information can be discerned from the image. Some late model copiers offer excellent resolution and many subtle features of the writing can be determined.*

[6] *The ASTM Designation: E2290-07 Standard Guide for Examination of Handwritten Items, Section 7.5.1, advises, "…..If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.".*

FSA Report #2736A
Page 6 of 12

In both of these types of forgeries the design features of the authentic signature are transposed to the forgery, but the execution qualities frequently differ from the known writer. Therefore, traced and simulated forgeries are, in part, detected, because the forger cannot execute the forgery in a free and natural manner. In the event a photocopy precludes making adequate determinations regarding execution characteristics, an examiner cannot offer an opinion regarding forgery either and is also obliged to provide a "no conclusion" opinion[7].

I have included Figure 2 which contains two (2) photographs with the uppermost depicting a portion of the writing of the questioned "Ramirez" signature and with the lower photo showing a portion of the writing of an original known Ramirez signature (K1-1). Figure 2 illustrates how the ink line of the questioned signature (upper photo) has been relegated to a series of dots, thus preventing any significant determination concerning execution characteristics in this portion of the signature.

I have also placed annotations on the lower photo depicting some characteristics of execution that can be seen when viewing an original inked signature. The information concerning execution that is gained by viewing the photograph of the original signature is obviously not available when the copied signature is likewise observed; for example, the photocopied signature of Q1C (upper) does not provide you with information regarding line quality, pressure changes, or the rhythmic movement seen in Ramirez's known writing. You should also note that although Figure 2 is composed of photographs of the evidence, these photographs are accurate representations of what I would expect to see if the documents were being viewed through the lens of a microscope.

To summarize my findings, I again state that I can reach no conclusion regarding the authenticity of the questioned Rafael Ramirez signature found on specimen Q1C, because no significant determinations can be made regarding the execution qualities of the questioned signature. Characteristics regarding execution as well as design features are necessary to reach any type of definitive opinion which relates to authenticity.

I have read the report of Mr. Gus Lesnevich, dated September 19, 2007 concerning this matter and disagree with Mr. Lesnevich to the extent that he offers a conclusion regarding the authenticity of the Q1C questioned "Rafael Ramirez" signature. Mr. Lesnevich admits to the reader that he cannot determine the characteristics that

_____

[7]. *There may be some circumstances where regardless of the resolution of the photocopy, the design features are so grossly different from the known sample that a qualified opinion may be offered regarding the likelihood that a signature is not authentic.*

FSA Report #2736A
Page 7 of 12

pertain to execution when he states, **"However, it was not possible with an examination of copies, to determine the execution of the questioned "Rafael Ramirez" signature."** (2nd paragraph, page 3). Just prior to making that statement, he also states, **"While the design of the letters may be the eye catching feature, the execution of a signature is just as important."** (1st paragraph, page 3). These two (2) statements are incongruous with his conclusion; because while he tells the reader he cannot determine the execution which he acknowledges as being important, he then offers an opinion which does not incorporate characteristics of execution.

Mr. Lesnevich tries to overcome this flaw in his process by qualifying his opinion with statements, such as, **"if the questioned "Rafael Ramirez" signature was naturally written"** (last paragraph, page 4) but does not express alternatives to the word "if" by explaining that "if", on the other hand, the questioned signature was not naturally prepared, then it could be the product of poor writing conditions, a traced forgery, a simulated forgery or even a mechanical fabrication.[8]

Conclusion 3:  Indications of Mechanical Fabrication

It is my opinion that there are several measurable and demonstrable independent variables which suggest that the machine produced text, **"Ing. RAFAEL RAMIREZ"** on the Q1C signature page is the product of a mechanical fabrication.

Basis of Conclusion 3

For the purposes of background information, a fraudulent ***"mechanical fabrication"*** is the type of forgery where a document is a compilation of two (2) or more documents and is offered for what it represents on its face. The process involves removing features, text, or signatures from an authentic document(s) and joining them in some manner to create the fraudulent final product.

---

8.   *Albert S. Osborn is the author of a text entitled, "Questioned Documents", with the second edition published in 1929. Although the text is dated, the principles have been time tested and are often referred to in current writings regarding handwriting examinations.  On Page 287, Mr. Osborn makes the following statement.  "An imitation of a writing will naturally resemble the writing imitated and most errors in identifying writing are due to the improper assumption that this "general character" is proof of genuineness." On Page 263, Mr. Osborn states, "This instant recognition of a writing by intuition the experienced examiner not only does not attempt but studiously avoids; he reserves judgment until all the qualities of the writing have been observed and compared."*

FSA Report #2736A
Page 8 of 12

Figure 3 graphically illustrates the mechanical fabrication process using computer software that is commonly available. In this figure, I first created the "recipient" document using standard word processing technology. Then I chose to use specimen Q1C as a source document which conveniently had a "Rafael Ramirez" signature, an image of a wet seal, and the typewritten name, "Ing. Rafael Ramirez".

Using a scanner, I "removed" the signature block from the source document and inserted it into the space that I left blank on the recipient document. Had I been careful, I would have insured that the font between the recipient and source documents was similar and that the placement of the insertion was properly aligned with the text of the recipient paragraphs. Of course, there can never be an "original" document, because a mechanical fabrication is a compilation of parts and has to be offered as a copy.

The primary and absolute method of proving the fraud is to locate the source document(s) and determine that the signature on the recipient document is a virtual duplicate to the source signature. In the absence of a source document, another method for detecting a mechanical fabrication is to rely on techniques that take into account properties associated with machine produced text.

The pathway that the Q1 Addendum reportedly followed is straightforward, in that Fernandez and Zerpa report that they both viewed the original three (3) page Addendum, a copy was made by Zerpa's secretary and given to Fernandez to be held in his possession. If that scenario were accurate, certain properties concerning the machine printed text should be reflected by the Addendum that the Plaintiffs put forward for my review on October 24, 2007.

In an effort to be clear about what may seem confusing, I am offering the following descriptions:

*"Primary"* Addendum - the Addendum (3 pages) that Zerpa reportedly first saw on December 19, 2003 and both he and Fernandez reportedly viewed on December 22, 2003

*"Secondary"* Addendum - the copy (3 pages) of the primary Addendum that Fernandez took from the Ministry of Energy and Mines on December 22, 2003, held in his safe and was provided to me for examination on October 24, 2007

*October 24, 2007* Addendum - the copy of the secondary document that I requested be made for me on October 24, 2007 in Washington, D.C. and took to my laboratory

The factors that I detected on the secondary Addendum that are suggestive of a mechanical fabrication relate to differences which pertain to *vertical line spacing, interlineation, and resolution.*

FSA Report #2736A
Page 9 of 12

<u>Vertical Line Spacing Differences Q1A/Q1C</u>

The measurements that I made regarding the spacing between the lines of text on specimens Q1A and Q1C were completed using the October 24, 2007 Addendum. This procedure is acceptable and reliable, since copies made subsequent to the primary Addendum reflect information pertaining to the primary Addendum in a fixed aspect ratio. In other words, if there was some type of distortion because of the copying process, it would have affected all of the copies equally; and, therefore, measurements made using the October 24, 2007 copies are reliable, because they reflect the relative spatial distances of the primary Addendum.

When I created a grid of equally spaced lines to measure the space between each line of text of specimen Q1A, I found that there is a consistent line spacing which shows that each line is evenly spaced from the top line of the top paragraph to the last line of the bottom paragraph. This equal spacing would have been initially fixed by the machine used to create page Q1A of the primary Addendum. This finding is normal and what is expected.

When I applied the same sized grid to specimen Q1C, I found that the grid did not fit on the Q1C signature page which is an anomaly, because the pathway that these pages (Q1A and Q1C) reportedly followed did not diverge and they should exhibit similar vertical line spacings.

Figure 4 illustrates the finding I described above. I have placed a portion of the Q1A and Q1C pages on this figure reducing the size, so I might illustrate them in a side-by-side fashion. The Q1A illustration depicts how each line of text sits on evenly spaced horizontal lines.[9]

I also demonstrate what happens when the Q1A sized grid is applied to Q1C. The red arrow calls your attention to how the Q1A grid does not "fit" on Q1C. To determine if specimen Q1C had its own evenly spaced lines, I then created a new sized grid different from Q1A's grid and determined that the new grid aligned itself on the paragraphs of the Q1C signature page. (See far right image on Figure 4.)

---

[9] *Even though I am using horizontal lines, I am, in fact, measuring the vertical distance between the lines. The vertical lines on this grid are of no consequence to the analysis and only would be important if I were measuring the "horizontal" space which is not relevant to this particular procedure.*

FSA Report #2736A
Page 10 of 12

Interlineation Differences

As was discussed earlier, lines of text are placed on the document in an evenly spaced manner by the machine which produced the image of the text. In this matter, I detected that the **"Ing. Rafael Ramirez"** line of text on specimen Q1C is misaligned with the lines of text of the paragraphs above it. This finding suggests that the "Ing. Rafael Ramirez" text is an insertion onto the Q1C page from a different source and is what I consider to be an anomaly to the process of the stated "pathway".

Figure 5 illustrates my findings concerning the interlineation determination. I've provided you with an overview of the Q1C page with a grid using the dimensions of the appropriate evenly spaced lines that I created for the Q1C page. I've also given you a larger view of the area of concern with a red arrow calling your attention to how the questioned machine printed text is offset.

Resolution Quality Differences

My discussion that follows concerning resolution quality differences is based on photographs of the secondary Addendum that I prepared on October 24, 2007. I am confident that these photographs are reliable representations of the images that are present on the secondary document.

Under normal circumstances, not only should the inter-page and intra-page vertical spacing dimensions be similar which in this case are seen to be different, but the degree of resolution of the machine printed text should be consistent. Most certainly there should not be significant resolution differences between images of machine printed text on two (2) areas of the same page that are separated only by a few inches.

In this case, I found that the bold styled[10] "Ing. Rafael Ramirez" text (the "questioned image") on the Q1C signature page of the secondary document has a lesser degree of resolution than similar bold styled text on pages Q1A and Q1B and is even different from machine printed text from the same page on which it is located.

The resolution quality differences that I detected relate to the *"intensity of color"*, a *"printing feature"* and a characteristic I'm referring to as *"fill-in"*.

---

[10] "Bold styled" simply means the typist selected a style which created a character that has more ink/toner. When conducting my examination on October 24, 2007, I made photographs of bold styled text from all three (3) pages of the secondary Addendum.

FSA Report #2736A
Page 11 of 12

The intensity of color difference that I detected can be described as the questioned image being lighter in color than similar bold styled images of text on all three (3) pages of the secondary Addendum.

The printing feature difference that I found relates to a characteristic that I am referring to as "bordering". Bordering is a term that I am using to describe the extra ink that is apparent at the base and some other areas of the non-questioned bold styled text. The bordering is evident to a similar degree on bold styled text on the three (3) pages of the secondary Addendum with the exception of the questioned image.

Figure 6 is provided to illustrate the degree of intensity of color as well as the differences of the bordering effect. The two (2) upper photographs are of letters from the word, **SEXTA**", on the signature page of the secondary Addendum (Q1C), while the two (2) lower photographs are of letters from the questioned image, "Ing. Rafael Ramirez", of the secondary Addendum (Q1C). I've placed red arrows to call your attention to the bordering effect on the "SEXTA" letters which is absent on the questioned image. You will also note the difference of the intensity of color with the "SEXTA" letters being darker and the questioned image letters being "grayer".

Another resolution quality difference that I detected is "fill-in" which manifests itself as degradation of the resolution of the image by adding ink or toner to an area that is designed to have "white space". Fill-in usually occurs during the copying and recopying process, because the copier cannot resolve the white space between two (2) very closely spaced letters. Once the white space begins to degrade, it is usually carried from one copy to the next generation and generally becomes more pronounced.

In this case, I detected fill-in between some closely spaced letters of the questioned image and did not detect a similar quality in bold styled letters of the non-questioned images of specimens Q1A, Q1B and Q1C.

The fill-in finding as well as those regarding the intensity of color and bordering suggest that the questioned image itself is a product of a different generation copy than the surrounding text (Q1C) as well as the text on specimens Q1A and Q1B.

I have attached Figure 7 which depicts images of words and bold styled letters from the non-questioned area of the secondary Addendum to illustrate the white space between the letters. The photographs in this figure can also be used to view the consistent amount of "bordering" on different letters from different pages of the secondary Addendum.

Figure 8 illustrates the fill-in that I detected. The red circled area of the "EZ" of the questioned "Ramirez" signature is detailed in the center photograph. The bottom left photograph provides an illustration of the letter "M" from the word "Addendum" at the top of page Q1A and is placed next to the "M" of "Ramirez" (Q1C) with a circled area

FSA Report #2736A
Page 12 of 12

calling your attention to a further example of fill-in affecting the resolution where the legs of the letter "M" meet at an acute angle.

In summary, the independent variables relating to vertical line spacing, interlineations, and resolution that should be similar given the stated pathway, exhibit differences which cause me to conclude that when considered as a whole, the evidence suggests that a mechanical fabrication has occured with regard to the machine printed line of text, "Ing. Rafael Ramirez" of the specimen Q1C.

Curriculum Vitae

My curriculum vitae is attached.

Testimonies

A list of my sworn testimonies since 1996 is attached.

Compensation

My rate for all types of services is $200/hour.

Charts for Demonstration

Figures 1 to 8 are attached to this report for demonstration purposes.

Alan T. Robillard

Attachments – Figures 1 to 8
        Curriculum vitae (2 pages)
        Listing of Testimonies (5 pages)
        ASTM Designation E2290-07 (4 pages)
        ASTM Designation E1658-96 (2 pages)
        Copy of Q1 (Black and White Copy) (3 pages)
        Copy of K1-1 to K1-20 (20 pages)

FIGURES 1 to 8

# Figure 1

Signature Page (Q1C) submitted 8/10/07 (Buchwald letter)

"Preliminary" evidence compared to evidence examined on 10/24/07

"Fernandez" signature - present



Signature page (Q1C) examined on 10/24/07

"Fernandez" signature - absent



FSA 2736A

**Figure 2**

Detail photograph of portion of the questioned "Ramirez" signature



Detail photograph of an original inked known signature of Rafael Ramirez



FSA 2736A

# Figure 3. MECHANICAL FABRICATION PROCESS EXAMPLE



2. Find source document (for this demonstration use a copy of Q1C)

1. Create recipient document



3. Remove signature, stamped impression and typed name from source document

4. Join recipient document and signature block creating mechanically fabricated document

FSA 2736A

# Figure 4 – VERTICAL LINE SPACING

**Q1A**

Por cuanto, en fecha 17 de dicie
(MEM) por órgano de la Direc
Condiciones con el represention
Minera del Bajo Caroní (CABC
EMPRESAS), a los fines de da
rescate anticipado por cuanto e
estableció las consecuencias de
contenido por ambas partes, pc
representación de la República E

PRIMERO: En caso de existir
arriba señaladas, tales como: a
República Bolivariana de Vene
rescate anticipado contenido en
de diciembre de 2003, b) No pro
documentos y data de las conce
B, Delta C y Delta D. c) No cum
Condiciones. Se elige como dor
ciudad de Caracas, a la jurisdic
así como, la legislación y la ley
Venezuela.

SEGUNDO: En caso de incump
especial y excluyente de cualc
Nueva York, Estados Unidos d
estado de Nueva York y se regir
dicho (s) tribunal (es). Se entie
Contravenir el contenido de la
proporcionar al perito que sea
concessiones mineras, la ley ap
América. No obstante lo anterio
derecho de intentar la acción de
de los Estados Unidos de Amér
el estado donde este ubicado di
empresas tendrán el derecho
precautelares, embargo preve
embargo, ejecución del propio t
ciudad de Nueva York. Por lo
preaventura de embargo, secuest
tribunal podría ser ejecutada por
Por otra parte, el MEM reconoc

**Q1C**

Set at Q1A spacing

designado conforme al f
SEXTA: Domicilio de la
C.A.} y V.M.C.Mining }
Ferrominera Quinta Ar
persona del Represent
Gonzalo, y en caso de
las mismas, abogado Lu
la República Bolivarian
Avenida con Calle 51 E
ha designado al Cónsu
ciudad de Nueva York
dicho consulado para r
intentado en contra de
estatal o federal en la ci

Notifíquese al represer
quien deberá firmar al b

Agréguese a la carpeta
número 2084.

En Caracas, a los dieci
(2003).

**Q1C**

Set at appropriate spacing different from Q1A

designado conforme al
SEXTA: Domicilio de
C.A.} y V.M.C.Mining
Ferrominera Quinta I
persona del Represer
Gonzalo, y en caso d
las mismas, abogado
la República Bolivaria
Avenida con Calle 51
ha designado al Cóns
ciudad de Nueva Yor
dicho consulado para
intentado en contra d
estatal o federal en la

Notifíquese al represe
quien deberá firmar al

Agréguese a la carpe
número 2084.

En Caracas, a los die
(2003).

FSA 2736A

**Figure 5**

Q1C signature page with evenly spaced grid



designada conforme al pliego de condiciones serán candelabros por el MEM.

SEXTA: Domicilio de las partes: Compañía Minera del Bajo Caroni. (CAROMIN) C.A.) y V.M.C Mining Company, C.A.: Calle Cuenta, Manzana 7, Campo B de Ferrominera, Quinta Analiu, Puerto Ordaz, Estado Bolívar, exclusivamente en la persona del Representante Legal de las empresas: Manuel Alfredo Fernández Gonzalo. Y en caso de ausencia de éste, en la persona del apoderado judicial de las mismas, abogado Luis Andrés Guerrero Rosales. MEM: Consulado General de la República Bolivariana de Venezuela en Estados Unidos de América. Séptima Avenida con Calle 51, Este, Nueva York, Nueva York 10022. En este caso, el MEM ha designado al Cónsul General de la República Bolivariana de Venezuela en la ciudad de Nueva York. Y en caso de ausencia de éste, a cualquier otro oficial de dicho consulado para darse por citado o notificado de cualquier acción o juicio intentado en contra de la República Bolivariana de Venezuela, en cualquier corte estatal o federal en la ciudad de Nueva York y/o de los Estados Unidos de América.

Notifíquese al representante legal de las empresas anteriormente mencionadas quien deberá firmar al pie en señal de conformidad.

Agréguese a la carpeta segregada del expediente administrativo, identificado con el número 2084.

En Caracas, a los diecinueve (19) días del mes de diciembre del año dos mil tres (2003).

Ing. RAFAEL RAMIREZ



En Caracas, a los diecinueve (19) días del mes de diciembre del año (2003).

→ Ing. RAFEL RAMIREZ

Detail of "Ing RAFEL RAMIREZ" Line

**Figure 6 – Intensity of color and "bordering"**



"SEXTA"

"bordering"



"RAMIREZ"



"SEXTA"

"bordering"



"RAMIREZ"

FSA 2736A

**Figure 7**

Non - Questioned Bold Style Lettering







FSA 2736A

**Figure 8  - Effects of "Fill-in" on Resolution Quality**

Questioned "Ing. RAFEL RAMIREZ" machine printed text (Q1C)

"Fill – in"

Detail of "EZ" from Questioned "RAMIREZ" text

"M" From "Ing RAFEL RAMIREZ" (Q1C)

"Fill – in"

"M" From typed word "ADDENDUM" ( Q1A)

FSA 2736A

CURRICULUM VITAE

# Forensic Science Applications

Examination of Questioned Documents

## CURRICULUM VITAE

### Alan T. Robillard

**Occupation**

Examiner of Questioned Documents

**Court Qualified Expertise**

Questioned Documents

Microscopic Analysis

Testimony provided in Federal, State and local courts.
List of Sworn Testimonies Available

**Forensic Science Experience**

Consultant; Questioned Documents                    May 1996 to Present

Federal Bureau of Investigation - Laboratory Division    December 1977–September 1994
Qualifications:    **Certified Questioned Document Examiner**
                   **Certified Forensic Microscopist**

Federal Bureau of Investigation - Special Agent        April 1976 – May 1996

**Forensic Science Managerial Experience:**

Chief, Questioned Documents Unit; Federal Bureau of Investigation, Laboratory Division, Washington, D.C.

Chief, DNA Analysis Unit; Federal Bureau of Investigation, Laboratory Division, Washington, D.C.

Chief, Hairs and Fibers Unit; Federal Bureau of Investigation, Laboratory Division, Washington, D.C.

Assistant to the Chief of the Scientific Analysis Section; Federal Bureau of Investigation, Laboratory Division, Washington, D.C.

**Forensic Science Training**

Questioned Documents -- Federal Bureau of Investigation Laboratory
Two (2) Year Syllabus -- Trained full-time under the direct supervision of experienced, court-qualified questioned document examiners.

Forensic Microscopy -- Federal Bureau of Investigation Laboratory
One (1) Year Syllabus (separate from above) -- Trained full-time under the supervision of experienced, court-qualified forensic microscopists.

**Education**

Masters of Forensic Science - George Washington University, Washington, D.C. 1980
Masters of Arts, Crime in Commerce, (course work completed) - George Washington University, Washington, D.C.
Bachelor of Science, Textile Technology - University of Massachusetts, Dartmouth 1967

**Memberships**

American Academy of Forensic Sciences
Northeastern Association of Forensic Scientists
Society of Former Special Agents of the Federal Bureau of Investigation

**Professional Services**

Handwriting Comparisons including:                    Indented Writing Examinations
  - Signature Authentifications                       Mechanical Printing Examinations
  - Extended Writing Examinations                     Plastic Bag Examinations
  - Hand Printing Examinations                        Torn Edge Examinations
Typewriting Comparisons                               Package Tampering Examinations
Anonymous Letter Examinations                         Photocopy Examinations
Altered Document Examinations                         Trial-Attorney Preparation
Obliterated Writing Examinations                      Ink Comparisons
Medical Record Examinations

**Military Experience**

United States Marine Corps -- Active Duty; June 1967 -- June 1973
Rank attained -- Captain
Position -- Pilot
Vietnam Veteran

2

# SWORN TESTIMONIES

# ALAN T. ROBILLARD

## Sworn Testimonies (Since Leaving F.B.I. 5/96)

| DATE | REFERENCE # | CASE NAME | TYPE | LOCATION |
|------|-------------|-----------|------|----------|
| 10/8/97 | 701 | Commonwealth v. Silva | Trial | New Bedford, MA Bristol County Superior Court |
| 2/25/98 | 716 | Providence Ambulatory Health Care Foundation v. Virginia Walker | Hearing | Providence, RI |
| 10/26/98 | 824 | Margro v. Margro | Trial | Brockton, MA Plymouth County Probate Court |
| 2/9/99 | 905 | Fyans v. Kilaru, M.D. | Trial | Springfield, MA |
| 3/8/99 | 904 | U.S. v. David Allen | Trial | Boston, MA Federal Tax Court |
| 6/30/99 | 911B | Fleet Finance Inc. v. Patricia A. Sammarco, Et Al | Deposition | Norwell, MA |
| 7/7/99 | 911C | Fleet Finance Inc. v. Patricia Sammarco, Et Al | Trial | Boston, MA Suffolk County Court |
| 9/27/99 | 808 | Pronovost v. MassMutual | Deposition | Springfield, MA |
| 10/21/99 | 907C | U.S. v. Arthur D'Amario | Trial | Providence, RI U.S. District Court |
| 11/3/99 | 942A | Objections of Keith Millet to Referendum Petition | Hearing | Springfield, MA |
| 12/4/99 | 942B | Objections of Keith Millet | Deposition | Springfield, MA |

1

| Date | Number | Case | Type | Court |
|---|---|---|---|---|
| 5/22/00 | 004A | Commonwealth v. Perkins | Trial | Worcester MA Superior Court |
| 7/00 | 001 | Commonwealth v. Raposa | Trial | New Bedford MA Bristol County Superior Court |
| 8/15/00 | 038 | Steinhart v. Blue Cross | Trial | Rockingham NH District Court |
| 2/16/01 | 107A | Edlin v. Edlin | Trial | Cambridge MA Middlesex Probate Court |
| 3/9/01 | 102A | Ventura v. Ventura | Trial | Brockton, MA Plymouth Probate Court |
| 3/28/01 | 003A | Jones v. Windsor Hall, Inc. | Trial | Boston MA U.S. District Court |
| 6/28/01 | 128A | McBurney v. Roskowski | Trial | Superior Court Providence, RI |
| 11/9/01 | 059A | Hsu v. Hsu | Trial | Middlesex Superior Court Cambridge MA |
| 11/27/01 | 120A | Safeco Insurance Co. v. Stokes + Peaslee | Deposition | Concord NH |
| 1/28/02 | 147D | Talon Lewis et al v. William Long, M.D. and Miles Memorial Hospital | Deposition | Weymouth MA |
| 5/31/02 | 227 | Museum Towers v. Bruce Ziskind et al | Trial | District Court Cambridge MA |
| 9/26/02 | 901 | Estate of Mildred Georges | Trial | Barnstable MA Probate Court |

2

| Date | Number | Case | Type | Court/Location |
|---|---|---|---|---|
| 10/29/02 | 023 | Lamperelli v. Outten | Trial | Supreme Court Buffalo NY |
| 11/7/02 | 130 | Harris v. Athol School District | Deposition | Wellesley MA |
| 12/12/02 | 106 | Raymond Schettino v. Nader Modanlo et al | Deposition | Lincoln RI |
| 04/23/03 | | Commonwealth v. DeJesus | Trial | Middlesex Superior Court Cambridge MA |
| 6/12/03 | | Rhode Island v. Jose Andujar | Trial | Superior Court (South County) Wakefield RI |
| 6/19/03 | 106 | Raymond Schettino v. Nader Modanlo et al | Trial | Rockville MD Superior Court |
| 7/23/03 | 316B | Commonwealth v. Fred Weichell | Hearing | Middlesex Superior Court Cambridge MA |
| 8/8/03 | 326A | U.S. v. Janice Douglas | Trial | Boston MA U.S. District Court |
| 2/12/04 | 410A | Watson Insurance v. Lisa Sullivan | Hearing | Hillsboro County Superior Manchester NH |
| 3/16/04 | 330A | Hawes v. Southern Pioneer Insurance | Arbitration Hearing | Oklahoma City OK |
| 4/22/04 | 945 | Louis Giuliano, et al v. Gary Piontkowski, et al | Deposition | Boston MA |
| 5/12/04 | 945 | Louis Giuliano, et al v. Gary Piontkowski, et al | Trial | Suffolk MA Superior Court |

3

| Date | Number | Case | Type | Location |
|---|---|---|---|---|
| 6/21/04 | 166 | James Hallas v. Charles J. Mozzochi | Deposition | East Haven CT |
| 9/15/04 | 327 | Ikon Solutions v. Lee Publications | Trial | Supreme Court Wampsville NY |
| 10/2/04 | 106 | Raymond Shettino v. Nader Modanlo | Deposition | Washington DC |
| 10/8/04 | 417 | Inkstone Printing v. North East Printing Machinery | Trial | Superior Court Brockton MA |
| 10/19/04 | 253 | Rith Chhim v. Im Kom | Trial | Superior Court Lowell MA |
| 3/2/05 | 460 | Busak v. Obuchowski, et al | Trial | Superior Court Stamford CT |
| 8/4/05 | 463 | Metinx Inc. v. Hewlett Packard Company | Deposition | Boston MA |
| 3/7/06 | 537 | Tommy Montgomery, Estate of Anita Jackson v. Jessie Jackson | Trial | Land Court Boston MA |
| 3/24/06 | 328 | Estate of Alvina Machado | Trial | Superior Court Fall River MA |
| 6/6/06 | 2636 | Estate of Louis J. Giuliano | Trial | Probate Court Smithfield RI |
| 7/21/06 | 2603 | Trader Publishing Company v. Pride Ford/Chrysler-Jeep | Trial | Superior Court Fall River MA |
| 9/12/06 | 2616 | New World TMT LTC v. PrediWave | Deposition | San Francisco CA |
| 11/13/06 | 553 | Mass. DOC v. Stephen Bearce | Arbitration Hearing | Boston MA |
| 12/13/06 | 2671 | U.S. v. James Glover | Trial | Boston MA |

4

| Date | Number | Case | Type | Location |
|---|---|---|---|---|
| 4/3/07 | 2604 | Armament Systems and Procedures, Inc. v. Emissive Energy Corp. et al. | Deposition | Providence, RI |
| 5/3/07 | 2604 | Armament Systems and Procedures, Inc. v. Emissive Energy Corp. et al. | Trial | Green Bay WI |
| 5/26/07 | 2619 | MERS v. William A. Horvath | Trial | County Court Pittsburgh, PA |
| 7/12/07 | 2731 | Millett v. LUTCO | Hearing | Mass. Discrimination Board |

ASTM STANDARDS

Designation: E 2290 – 07

# Standard Guide for
# Examination of Handwritten Items[1]

This standard is issued under the fixed designation E 2290; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This guide provides procedures that should be used by forensic document examiners (E 444) for examinations and comparisons involving handwritten items and related procedures.

1.2 These procedures are applicable whether the examination and comparison is of questioned and known items or of exclusively questioned items.

1.3 These procedures include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

1.4 The particular methods employed in a given case will depend upon the nature of the material available for examination.

1.5 This guide may not cover all aspects of unusual or uncommon examinations of handwritten items.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory requirements prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]
E 444 Descriptions of Scope of Work Relating to Forensic Document Examiners
E 1658 Terminology for Expressing Conclusions of Forensic Document Examiners
E 1732 Terminology Relating to Forensic Science

E 2195 Terminology Relating to the Examination of Questioned Documents

## 3. Terminology

3.1 For definitions of terms in this guide, refer to Terminologies E 1732 and E 2195.

3.2 *Definitions:*

3.2.1 *known, n/adj—*of established origin associated with the matter under investigation. **E 1732**

3.2.2 *questioned, n/adj—*associated with the matter under investigation about which there is some question, including, but not limited to, whether the questioned and known items have a common origin. **E 1732**

3.3 *Definitions of Terms Specific to This Standard:*

3.3.1 *absent character, n—*a character or character combination which is present in one body of writing but is not present (for example, does not have a corresponding character) in another body of writing.

3.3.2 *character, n—*any language symbol (for example, letter, numeral, punctuation mark, or other sign), other symbol, or ornament.

3.3.3 *characteristic, n—*a feature, quality, attribute, or property of writing.

3.3.4 *comparable, n/adj—*pertaining to handwritten items that contain the same type(s) of writing and similar characters, words, and combinations. Contemporaneousness and writing instruments may also be factors.

3.3.5 *distorted writing, n—*writing that does not appear to be, but may be natural. This appearance can be due to either voluntary factors (for example, disguise, simulation) or involuntary factors (for example, physical condition of the writer, writing conditions).

3.3.6 *handwritten item, n—*an item bearing something written by hand (for example, cursive writing, hand printing, signatures).

NOTE 1—As used in this standard "handwriting" and "handwritten" are generic terms. Writing is generally, but not invariably, produced using the hand, and may be the result of some other form of direct manipulation of a writing or marking instrument by an individual.

---

[1] This guide is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.
Current edition approved March 15, 2007. Published April 2007. Originally approved in 2003. Last previous edition approved in 2003 as E 2290 – 03.
[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

1

Case 1:07-cv-03179-NRB    Document 27-2    Filed 11/20/2007    Page 35 of 64

**E 2290 – 07**

3.3.7 *individualizing characteristics, n*—marks or properties that serve to uniquely characterize writing.

3.3.7.1 *Discussion*—Both class characteristics (marks or properties that associate individuals as members of a group) and individual characteristics (marks or properties that differentiate the individual members in a group) are individualizing characteristics.

3.3.8 *item, n*—an object or quantity of material on which a set of observations can be made.

3.3.9 *natural writing, n*—any specimen of writing executed without an attempt to control or alter its usual quality of execution.

3.3.10 *range of variation, n*—the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual. (See *variation*, 3.3.15).

3.3.11 *significant difference, n*—an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

3.3.12 *significant similarity, n*—an individualizing characteristic in common between two or more handwritten items.

3.3.13 *sufficient quantity, n*—that amount of writing required to assess the writer's range of variation, based on the writing examined.

3.3.14 *type of writing, n*—refers to hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures.

3.3.15 *variation, n*—those deviations among repetitions of the same handwriting characteristic(s) that are normally demonstrated in the habits of each writer.

3.3.15.1 *Discussion*—Since variation is an integral part of natural writing, no two writings of the same material by the same writer are identical in every detail. Within a writer's range of variation, there are handwriting habits and patterns that are repetitive and similar in nature. These repetitive features give handwriting a distinctive individuality for examination purposes. Variation can be influenced by internal factors such as illness, medication, intentional distortion, etc. and external factors such as writing conditions and writing instrument, etc.

Note 2—The phrase "written by the same person(s)" refers to physical generation of the writing, not to intellectual ownership of the content.

## 4. Significance and Use

4.1 The procedures outlined here are grounded in the generally accepted body of knowledge and experience in the field of forensic document examination. By following these procedures, a forensic document examiner can reliably reach an opinion concerning whether two or more handwritten items were written by the same person(s).

## 5. Interferences

5.1 Items submitted for examination may have inherent limitations that can interfere with the procedures in this Guide. Limitations should be noted and recorded.

5.2 Limitations can be due to submission of non-original documents, limited quantity or comparability, or condition of the items submitted for examination. Other limitations can

come from the quantity or comparability of the writing submitted, and include absent characters, dissimilarities, or limited individualizing characteristics. Such features are taken into account in this guide.

5.3 The results of prior storage, handling, testing, or chemical processing (for example, for latent prints) may interfere with the ability of the examiner to see certain characteristics. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled appropriately to avoid compromising subsequent examinations (for example, with clean cloth gloves).

5.4 Consideration should be given to the possibility that various forms of simulations, imitations, and duplications of handwriting can be generated by computer and other means.

## 6. Equipment and Requirements

6.1 Appropriate light source(s) of sufficient intensity to allow fine detail to be distinguished.

Note 3—Natural light, incandescent or fluorescent sources, or fiber optic lighting systems are generally utilized. Transmitted lighting, side lighting, and vertical incident lighting have been found useful in a variety of situations.

6.2 Magnification sufficient to allow fine detail to be distinguished.

6.3 Other apparatus as appropriate.

6.4 Imaging or other equipment for recording observations as required.

6.5 Sufficient time and facilities to complete all applicable procedures.

## 7. Procedure

7.1 All procedures shall be performed when applicable and noted when appropriate. These procedures need not be performed in the order given.

7.2 Examinations, relevant observations, and results shall be documented.

7.3 At various points in these procedures, a determination that a particular feature is not present or that an item is lacking in quality or comparability may indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The reasons for such a decision shall be documented.

7.4 Determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

7.5 Determine whether the questioned writing is original writing. If it is not original writing, request the original.

Note 4—Examination of the original questioned writing is preferable.

7.5.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

2

⊕ E 2290 – 07

7.6 Determine whether the questioned writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.6.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. If the available questioned writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.7 Evaluate the questioned writing for the following:

7.7.1 *Type of Writing*—If there is more than one type of writing within the questioned writing, separate the questioned writing into groups of single types of writing.

7.7.2 *Internal Consistency*—If there are inconsistencies within any one of the groups created in 7.7.1 (for example, suggestive of multiple writers), divide the group(s) into sub-groups, each one of which is consistent.

7.7.3 Determine range of variation of the writing for each group or sub-group of the questioned writing created in 7.7.1 and 7.7.2.

7.7.4 Determine presence or absence of individualizing characteristics.

7.7.5 If the examination is a comparison of exclusively questioned writing, go to 7.12.

7.8 Determine whether the known writing is original writing. If it is not original writing, request the original.

Note 5—Examination of the original known writing is preferable.

7.8.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.9 Determine whether the known writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.9.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. It should be determined whether additional known writing would be of assistance, and if so, it should be requested. If the available known writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.10 Evaluate the known writing for the following:

7.10.1 *Type of Writing*—If there is more than one type of writing within the known writing, separate the known writing into groups of single types of writing.

7.10.2 *Internal Consistency*—If there are inconsistencies within any of the groups created in 7.10.1 (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

7.10.3 Determine range of variation of the writing for each group of the known writing created in 7.10.1 and 7.10.2.

7.10.4 Determine presence or absence of individualizing characteristics.

7.11 Evaluate the comparability of the bodies of writing (questioned writing to known writing or exclusively questioned writing).

7.11.1 If the bodies of writing are not comparable, discontinue comparison and request comparable known writing, if appropriate.

7.11.1.1 If comparable known writing is made available, return to 7.10. If comparable known writing is not made available, discontinue these procedures and report accordingly.

7.12 Conduct a side-by-side comparison of comparable portions of the bodies of writing.

7.12.1 Determine whether there are differences, absent characters, and similarities.

7.12.2 Evaluate their significance individually and in combination.

7.12.3 Determine if there is a sufficient quantity of writing (questioned writing, or known writing, or both).

7.12.3.1 If writing (questioned writing, or known writing, or both) is not sufficient in quantity for an elimination or an identification, continue the comparison to the extent possible. When appropriate, request more known writing. If more known writing is made available, return to 7.10.

7.12.4 Analyze, compare, and evaluate the individualizing characteristics and other potentially significant features present in the comparable portions of the bodies of writing.

Note 6—Among the features to be considered are elements of the writing such as abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacings; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation.

Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and guide lines of various forms should be evaluated when present.

Potential limiting factors such as: age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; deliberate attempt at disguise or auto-forgery should be considered.

For further details, see the referenced texts.

7.12.5 Evaluate the similarities, differences, and limitations. Determine their significance individually and in combination.

7.13 Form a conclusion based on results of the above analyses, comparisons, and evaluations.

## 8. Reporting Conclusions

8.1 The conclusion(s) or opinion(s) resulting from the procedures in this Guide may be reached once sufficient examinations have been conducted.

8.2 The bases and reasons for the conclusion(s), opinion(s), or finding(s) should appear in the examiner's documentation and may also appear in the report.

3

∰ E 2290 – 07

8.3 Refer to Terminology E 1658 for reporting conclusion(s) or opinion(s).

## 9. Keywords

9.1 forensic sciences; handwriting; questioned documents

## REFERENCES

(1) Conway, J. V. P., *Evidential Documents*, Springfield, IL, Charles C. Thomas, 1959.
(2) Harrison, W. R., *Suspect Documents*, London, Sweet and Maxwell, 1958 and 1966.
(3) Hilton, O., *Scientific Examination of Questioned Documents*, New York, Elsevier, 1982.
(4) Huber, R. A. and Headrick, A. M., *Handwriting Identification: Facts and Fundamentals*, Boca Raton, FL, CRC Press, 1999.
(5) Osborn, A. S., *Questioned Documents*, 2d ed., Albany, NY, Boyd Printing Co., 1929.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

4

 **Designation: E 1658 – 96$^{e1}$**

# Standard Terminology for Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E 1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions based on their examination.

1.2 This terminology is based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science which was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners[2,3].

## 2. Referenced Documents

2.1 *ASTM Standards:*
E 444 Guide for Description of Work of Forensic Document Examiners[2]

## 3. Significance and Use

3.1 Document examiners should always begin their handwriting examinations from a point of complete neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. We must be careful that the expressions we use in separating the gradations of opinions do not become strongly defined "categories" that will always be used as a matter of convenience; instead, these expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume

that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, *i. e,* to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E 444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the

---

[1] This terminology is under the jurisdiction of ASTM Committee E-30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved March 10, 1996. Published March 1997. Originally published as E 1658 – 95. Last previous edition E 1658 – 95.

[2] McAlexander, T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol. 36, No. 2, March 1991, pp. 311–319.

[3] *Annual Book of ASTM Standards*, Vol 14.02.

Copyright © ASTM, 100 Barr Harbor Drive, West Conshohocken, PA 19428-2959, United States.

**E 1658**

known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

Discussion—Some examiners doubt the desirability of differentiating between **strong probability** and **probable**, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "grey scale" of degrees of confidence may wish to use this or a similar term.

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the "virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material *probably* wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

Discussion—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "grey scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I found *indications* that the John Doe of the known material *did not* write the questioned material but the evidence is far from conclusive.

See Discussion after indications.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material *probably did not* write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably did not* write the questioned material.

Discussion—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

Discussion—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

Discussion—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions:*
4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a

2

COPY OF QUESTIONED ADDENDUM (Q1)
3 PAGES

REPÚBLICA BOLIVARIANA DE VENEZUELA
MINISTERIO DE ENERGÍA Y MINAS
Despacho del Ministro

## ADDENDUM

Por cuanto, en fecha 17 de diciembre de 2003, este Ministerio de Energía y Minas (MEM) por órgano de la Dirección General de Minas ha suscrito el Pliego de Condiciones con el representante legal de las sociedades mercantiles Compañía Minera del Bajo Caroní (CAROMIN), C.A. y V.M.C Mining Company, C.A. (LAS EMPRESAS), a los fines de darle continuidad al procedimiento administrativo de rescate anticipado; por cuanto, el Pliego de Condiciones anteriormente señalado, no estableció las consecuencias de los posibles incumplimientos a los acuerdos en él contenido por ambas partes, por lo tanto, este Ministerio, actuando en nombre y representación de la República Bolivariana de Venezuela, acuerda lo siguiente:

**PRIMERO:** En caso de existir algún incumplimiento por parte de las empresas arriba señaladas, tales como: a) La iniciación de nuevos juicios en contra de la República Bolivariana de Venezuela, el MEM y/o CVG-EDELCA relacionado al rescate anticipado contenido en la Providencia Administrativa No. 003, de fecha 02 de diciembre de 2003. b) No proporcionar al perito evaluador que sea designado los documentos y data de las concesiones mineras Alfa1, Alfa 2, Alfa 3, Delta A, Delta B, Delta C y Delta D. c) No cumplir con las obligaciones asumidas en el Pliego de Condiciones. Se elige como domicilio especial y excluyente, de cualquier otro, a la ciudad de Caracas, a la jurisdicción de cuyos tribunales se someten ambas partes; así como, la legislación y la ley aplicable será la de la República Bolivariana de Venezuela.

**SEGUNDO:** En caso de incumplimiento por parte del MEM, se elige como domicilio especial y excluyente, de cualquier otro, a la ciudad de Nueva York, estado de Nueva York, Estados Unidos de América, a la jurisdicción de los tribunales del estado de Nueva York y se regirá el proceso por la Ley o estatutos que gobiernen a dicho (s) tribunal (es). Se entiende por incumplimiento del MEM, lo siguiente: a) Contravenir el contenido de la Cláusula Quinta del Pliego de Condiciones. b) No proporcionar al perito que sea designado, permiso de acceso al área de las concesiones mineras. La ley aplicable en este caso, será la de Estados Unidos de América. No obstante lo anterior, las parte acuerdan que la empresas tendrán el derecho de intentar la acción de cobro de dinero en cualquier otro tribunal o corte de los Estados Unidos de América, en cuyo caso la aplicación de la Ley será la de el estado donde este ubicado dicho tribunal. Asimismo, las partes acuerdan que las empresas tendrán el derecho de solicitar y ejecutar medidas precautelativas, precautelares, embargo preventivo, secuestros previos al fallo, ejecución de embargo, ejecución del propio fallo en cualquier otro tribunal diferente a los de la ciudad de Nueva York. Por otra parte el MEM acuerda que cualquier medida preventiva de embargo, secuestro o de naturaleza similar decretada por cualquier tribunal podrá ser ejecutada por cualquier otro tribunal de Jurisdicción competente. Por otra parte, el MEM, reconoce que en la celebración del Pliego de Condiciones

así como en este addendum actúa en nombre y representación de la República Bolivariana de Venezuela, por lo que las empresas tendrán derecho de ejecutar las medidas aquí mencionadas contra cualquier activo(s), ingreso(s) o propiedad(es) perteneciente(s) a la República Bolivariana de Venezuela que se encuentren ubicado en los Estados Unidos de América. Asimismo las partes acuerdan que en caso de acciones legales en los tribunales de Estados Unidos de América, quedan fuera de la Jurisdicción de dichos tribunales, los activos, de la República Bolivariana de Venezuela ubicados dentro de territorio venezolano.

**TERCERO:** Las partes, igualmente acordaron, que bajo ninguna circunstancia los tribunales de Nueva York y/o de los Estados Unidos de América podrán emitir o conocer como materia de juicio aspectos inherentes a la validez del proceso administrativo de rescate anticipado, sólo considerarán aspectos referidos a la indemnización y/o al pago oportuno, o a lo sumo a las consecuencias legales y/o económicas del proceso del rescate anticipado. En tal sentido, el MEM, actuando en nombre y representación de la República Bolivariana de Venezuela, se somete a lo contenido en la Ley sobre la Inmunidad Soberana Extranjera de Estados Unidos de 1976, y bajo ningún respecto utilizará los tribunales venezolanos en caso de incumplimiento de pago, en cuanto a este proceso. Es por ello que, una vez culminado el juicio en contra del MEM, en alguno de los tribunales arriba señalados, la sentencia se podrá hacer cumplir en cualquier otro tribunal o Corte de jurisdicción competente; por lo tanto, el MEM ha acordado renunciar y no demandar excepciones tales como la inmunidad de la jurisdicción, foro no conveniente, contactos mínimos, señalar otro proceso legal o judicial durante el procedimiento por ante tribunales ubicados en la República Bolivariana de Venezuela. Esta renuncia también incluye inmunidad a medidas accesorias, excepciones o defensas de naturaleza similar a medidas precautelativas, precautelares, embargo preventivo, secuestros previos al fallo, ejecución de embargo, ejecución del propio fallo. Asimismo, el MEM se compromete a no iniciar ningún proceso legal en tribunales venezolanos, una vez que las empresas inicien demandas o procesos judiciales de cobro en los tribunales de la ciudad de Nueva York y/o los Estados Unidos de América.

**CUARTO:** Este addendum entrará en vigencia, si a los 24 meses siguientes a la entrega del informe del perito avaluador, el MEM no hubiera cancelado la indemnización integral que llegue a fijar el perito designado por ambas partes. El MEM acuerda en esta cláusula cancelar intereses moratorios a las empresas desde el momento en que el perito escogido por las partes entregue su informe respectivo, siempre que las empresas sean obligadas a iniciar acciones legales de cobro. En caso que el MEM u otro organismo de la Administración Pública cancele el monto indemnizatorio a las empresas, las mismas no podrán reclamar pago de intereses. En caso de acciones legales de cobro por parte de las empresas, el MEM acuerda en cancelar a las mismas la tasa del Ocho coma Cinco (8,5%) por ciento anual, a partir del momento de la entrega del informe del perito avaluador, así como también los costos de juicio(s) y los honorarios de abogado a que haya lugar.

**QUINTA:** Las partes acuerdan que los honorarios del perito avaluador que sea

designado conforme al pliego de condiciones serán cancelados por el MEM.

**SEXTA:** Domicilio de las partes: Compañía Minera del Bajo Caroní, (CAROMIN, C.A.) y V.M.C Mining Company, C.A.: Calle Cuenca, Manzana 7, Campo B de Ferrominera, Quinta Analu, Puerto Ordaz, Estado Bolívar, exclusivamente en la persona del Representante Legal de las empresas, Manuel Alfredo Fernández Gonzalo, y en caso de ausencia de éste, en la persona del apoderado judicial de las mismas, abogado Luis Andrés Guerrero Rosales. MEM: Consulado General de la República Bolivariana de Venezuela en Estados Unidos de América, Séptima Avenida con Calle 51 Este, Nueva York, Nueva York 10022. En este caso, el MEM ha designado al Cónsul General de la República Bolivariana de Venezuela en la ciudad de Nueva York, y en caso de ausencia de éste, a cualquier otro oficial de dicho consulado para darse por citado o notificado de cualquier acción o juicio intentado en contra de la República Bolivariana de Venezuela, en cualquier corte estatal o federal en la ciudad de Nueva York y/o de los Estados Unidos de América.

Notifíquese al representante legal de las empresas anteriormente mencionadas, quien deberá firmar al pie en señal de conformidad.

Agréguese a la carpeta separada del expediente administrativo identificado con el número 2084.

En Caracas, a los diecinueve (19) días del mes de diciembre del año dos mil tres (2003).

Ing. RAFAEL RAMIREZ

Acepto los términos y condiciones arriba señalados
Fecha: 22/1/2003

# COPIES OF KNOWN WRITING SAMPLES
## K1-1 to K1-20

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.

Firma:

Fecha: 15/08/07 .

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07

RR3

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15 / 08 / 07.

Yo, Rafael D. Ramírez; firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 17/00/07

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromín), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15 / 08 / 07 .

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañia del Bajo Caroní (Caromín), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.

Firma:

Fecha: 15/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroni (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañia del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 17/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha:  15/08/07.

Yo, Rafael D. Ramirez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañia del BajoCaroni (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.

Firma:

Fecha: 15/08/07.

KL-15

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma: _____

Fecha: 15/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromín), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.

Firma: 

Fecha: 17/08/07



Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.

Firma:

Fecha: 17/08/07

Yo, Rafael D. Ramirez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañia del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07.

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.



Firma:

Fecha: 15/08/07

Yo, Rafael D. Ramírez, firmo esta página para proveer un ejemplar de mi firma actual con el fin de que sea evaluado por el experto grafotécnico designado en el caso Compañía del Bajo Caroní (Caromin), C.A. et al v. Bolivarian Republic of Venezuela, et al, Case No. 07-CV-3179 en la corte federal del Distrito del Sur de Nueva York.

Firma: 

Fecha: 15/08/07.