UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
COMPANIA DEL BAJO CARONI (CAROMIN)
and V.M.C. MINING COMPANY, C.A.,                :

                        Plaintiffs,            :   **MEMORANDUM AND ORDER**

        - against -                            :    07 Civ. 3179 (NRB)

BOLIVARIAN REPUBLIC OF VENEZUELA,              :
and MINISTRY OF BASIC INDUSTRIES
AND MINES,                                     :   USDC SDNY
                                                   DOCUMENT
                        Defendants.            :   ELECTRONICALLY FILED
                                                   DOC #:
-------------------------------------------x       DATE FILED: 4/30/08

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

        Compania del Bajo Caroni ("Caromin") and V.M.C. Mining
Company, C.A. ("VMC") brought this action against the Bolivarian
Republic of Venezuela ("Venezuela") and its Ministry of Basic
Industries and Mines, formerly known as the Ministry of Energy and
Mines ("Ministry"), claiming that defendants breached an agreement
to compensate them for the early redemption of their mining
concessions.  As with any action against a foreign state, or its
agents or instrumentalities, the Court is faced with the threshold
jurisdictional question of whether the defendants are entitled to
immunity from suit pursuant to the Foreign Sovereign Immunities Act
("FSIA").  The complaint predicates subject matter jurisdiction on
an express waiver of sovereign immunity executed by the Minister of
Energy and Mines, Rafael Ramirez ("Minister Ramirez").  Defendants
filed a Fed. R. Civ. P. 12(b)(1) motion to dismiss challenging the
authenticity of that document.  For the reasons stated herein,

defendants' motion is GRANTED.

## BACKGROUND

Caromin and VMC operated gold and diamond mining concessions along the Caroni River until February, 2002, when the Venezuelan government seized the properties because they had been deemed integral to its plans for the Tocoma Hydroelectric Power Plant ("Tocoma project").[1]  Plaintiffs sought, and received, a court order enjoining CVG-EDELCA, the government-controlled corporate entity charged with coordinating the Tocoma project, from initiating any construction or development activity on the properties.[2]  Although the injunction was eventually set aside by the Supreme Court of Justice on the grounds that the Ministry of Energy and Mines, and not CVG-EDELCA, was the proper defendant, the litigation precipitated an administrative review of the seizures. On December 2, 2003, the Office of the Director General of Mines issued an administrative order sanctioning the taking as justified by the public benefits of the Tocoma project while also recognizing plaintiffs' right to compensation for the early redemption of their mining concessions.[3]

---

[1]

See Declaration of Manuel Alfredo Fernandez in Opposition to Defendants' Motion to Dismiss ("Fernandez Decl.") ¶ 4, Ex. 1; Complaint ("Compl.") ¶¶ 12-14.

[2]

See Fernandez Decl. ¶ 5.

[3]

See id. ¶¶ 6-7; Compl. ¶¶ 14-15.

2

To address the issue of valuation left open by the order, Francisco Salas Blanco ("Salas"), the Director General of Mines, established a working group consisting of: various government officials, including Martha Acosta Garcia ("Acosta"), the Director of Mining Concessions, Adrian Zerpa Leon ("Zerpa"), the Head of the Mining Processing Division, and Rosa Toro ("Toro"), an attorney in the Legal Department of the Ministry; and plaintiffs' representatives, Manuel Alfredo Gonzales ("Fernandez"), the sole shareholder of plaintiffs' parent corporations, and Luis Andres Guerrero Rosales ("Guerrero"), counsel for plaintiffs.    At a meeting of the working group held on December 12, 2003, the parties agreed in principle to have the properties appraised by a jointly-appointed expert whose findings would be conclusive of the amounts owed to plaintiffs.    This understanding was memorialized in an agreement, the "Pliego de Condiciones," executed on December 17, 2003 and, four months thereafter, the designated expert issued a report valuing the concessions at $209,764,446.14.[4]

Following several unsuccessful attempts to persuade the Ministry and other government officials to meet their payment obligations under the Pliego de Condiciones, plaintiffs filed the instant action on April 20, 2007.

---

[4]    See Fernandez Decl. ¶¶ 8-10; Compl. ¶ 16.

3

### The Waiver of Sovereign Immunity

While there are few, if any, material disputes over the facts preceding the execution of the Pliego de Condiciones, the parties' accounts of what ensued are widely divergent.  Plaintiffs maintain that certain members of the working group continued to deliberate on specific open terms, mostly concerning the enforcement of the parties' obligations under the agreement and related jurisdictional matters, and eventually inked a second agreement.  This "Addendum" to the Pliego de Condiciones is alleged to have been signed by Minister Ramirez, and have provided, in pertinent part:

> In case of a breach on the part of the MEM
> [Ministry of Energy and Mines], the city of New
> York, State of New York, United States of America,
> is elected as special domicile, to the exclusion of
> any other, under the jurisdiction of the courts of
> the State of New York, and the process shall be
> governed by the law or statute governing said
> court(s). . . . The applicable law in this case
> shall be that of the United States of America.
> ***
> In this regard, the MEM, acting in behalf and
> representation of the Bolivarian Republic of
> Venezuela, submits to the contents of the 1976
> Sovereign Immunity Act of the United States . . . .
> [and] has agreed to waive and not sue for
> exceptions such as immunity from jurisdiction,
> forum non conveniens, minimum contacts . . . .[5]

Defendants challenge every aspect of this narrative, from the alleged discussions over the proper forum for enforcement proceedings to the existence of the Addendum itself. We review the evidence supporting plaintiffs' version of events in detail,

---

[5]  See Compl. Ex. 3.

4

pointing out conflicts with defendants' proffer, where they exist, in the footnotes accompanying the text of the opinion.

According to plaintiffs, the Pliego de Condiciones did not resolve any of the outstanding issues concerning their stated demand for the right to enforce the government's payment obligations in the Southern District of New York.[6]   The same day the Pliego de Condiciones was signed, Fernandez, on behalf of plaintiffs, approached Salas, the Director General of Mines, with the draft of a second agreement, the "Documento Complemetario," which included an express waiver of immunity from suit in the United States.[7]  Salas forwarded the Documento Complemetario, along with a memorandum authored by him that reviewed the merits of a waiver, to Julia van der Brule ("van der Brule"), the executive assistant to Minister Ramirez.[8]  Following a series of discussions

---

[6]
See Fernandez Decl. ¶ 11; Declaration of Adrian Zerpa Leon in Opposition to Defendants' Motion to Dismiss ("Zerpa Decl.") ¶ 22 (corroborating Fernandez's account).

Other members of the working group, including Salas, Acosta, and Toro, have denied that these issues were either raised in the first instance or discussed after the Pliego de Condiciones was executed. See Defendants' Reply Memorandum ("Def. Reply"), Ex. H, Supplemental Declaration of Francisco Salas ("Salas Supp. Decl.") ¶¶ 3-6; Def. Reply, Ex. Q, Supplemental Declaration of Martha Acosta ("Acosta Decl.") ¶¶ 3-5; Def. Reply, Ex. F, Declaration of Rosa Toro ("Toro Decl.") ¶ 5.

[7]
See Fernandez Decl. ¶ 11; Zerpa Decl. ¶ 22 (corroborating Fernandez's account).

Salas stated that he has never seen the "Documento Complemetario" and definitely did not receive any such document from Fernandez on December 17, 2003. Acosta and Toro, members of the working group who were present for the closing on that date, do not recall Salas being handed any such document by Fernandez. See Salas Supp. Decl. ¶ 6; Acosta Decl. ¶ 5; Toro ¶ 5.

[8]
See Fernandez Decl. Ex. 4 (copy of memorandum from Salas to van der Brule). Salas has disavowed any knowledge of the Documento Complemetario and denied authorship of the memorandum attributed to him by the plaintiffs.  Minister

5

with van der Brule and Fernandez over the finer points of plaintiffs' proposal,[9] Toro revised the agreement, renamed it "Addendum," and sent it to van der Brule under cover of letter dated December 18, 2003.[10]

Zerpa received an executed version of the Addendum from Salas on December 19 and, based on his familiarity with Minister Ramirez's signature and the seal and logo used by the Ministry for official documents, concluded that the document was genuine.[11]  As per Salas's instructions in the note accompanying the signed Addendum, Zerpa called Fernandez to notify him that the agreement awaited his review and countersignature.   Fernandez arrived at Zerpa's offices three days later and signed the Addendum once below the Minister's signature and again, as was his practice, in the

Ramirez's assistant, van der Brule, has also disclaimed any knowledge of the document or receipt of the Salas memorandum. See Salas Supp. Decl. ¶¶ 7-8; Def. Reply Ex. F, Declaration of Julia van der Brule ("van der Brule Decl.").

[9]

See Fernandez Decl. ¶ 12, 13.
Both van der Brule and Toro, an attorney in the Legal Department of the Ministry and a member of the working group, deny having seen the Documento Complemetario or discussed that document with Fernandez. See Toro Decl. ¶¶ 9-10; van der Brule Decl.

[10]

See Fernandez Decl. Ex. 5 (copy of letter from Toro to van der Brule enclosing a copy of the final version of the Addendum).
Toro apparently never drafted any such correspondence and van der Brule has denied receiving it. See Toro Decl. ¶¶ 6-10; van der Brule Decl.

[11]

See Zerpa Decl. ¶ 13.
Minister Ramirez has not only categorically denied any knowledge of the Addendum and disclaimed the signature on that document but also explained how he lacked legal authority to waive immunity. Salas claims that he neither sent the Addendum to Zerpa nor prepared a cover memorandum discussing the same. See Defendants' Motion to Dismiss ("Def."), Declaration of Minister Rafael Ramirez ("Ramirez Decl."); Def. Reply, Ex. C, Supplemental Declaration of Minister Rafael Ramirez ("Ramirez Supp. Decl."); see Salas Supp. Decl. ¶ 9.

left-hand margin of each page.[12]  Zerpa then asked his secretary, Maira Olivera, to make a copy of the Addendum for Fernandez and send the original to the file room maintained by the Office of the Director General of Mines.[13]

An internal Ministry memorandum, dated March 30, 2007, relates how certified copies of the records concerning the plaintiffs' concessions were made available to the Ministry of Finance in August, 2005 (ostensibly to effectuate payment) but both these and the Ministry's originals were eventually lost or accidentally destroyed.[14]     Since    Fernandez    periodically    reviewed    the administrative file and had made personal copies of the various internal memoranda and correspondence therein, Guerrero was able to furnish the Ministry with a replacement copy of the entire file,[15] which included four duplicate documents of particular relevance to this case: (i) the December 17, 2003 memorandum from Salas to van der Brule discussing the parties' discussions to date and enclosing

12

See Zerpa Decl. ¶ 16; Fernandez Decl. ¶ 15.

13

See Zerpa Decl. ¶ 17; Fernandez Decl. ¶ 15.
The copy of the Addendum produced by the plaintiffs was in color.  Maria Olivera, Zerpa's secretary, and other administrative assistants have filed sworn affidavits stating that, on or about December, 2003, there were no color photocopiers in either the Bureau of Mining Concessions or the Division of Mining Applications, where Zerpa maintained his offices. See, e.g., Def. Reply Ex. K, Maira Olivera Declaration ("Olivera Decl."); see also Acosta Decl. ¶ 7 (stating she never saw any such document in the Ministry's files).

14     See Fernandez Decl. Ex. 8; id. ¶ 18-22.  The authenticity of this memorandum has not been disputed by the defendants.

15

See id. Ex. 8 (Paredes memorandum noting that the file had been lost); id. ¶ 23.

7

a copy of the Documento Complemetario ("Salas memorandum"); (ii) the December 18, 2003 letter from Toro to van der Brule enclosing the final version of the Addendum for the Minister's review and approval ("Toro letter"); the Addendum executed by Minister Ramirez; and a copy of the Addendum stamped "Received by Ministry of Finance on June 29, 2004."[16]

# DISCUSSION

## I.   Legal Standards

The Foreign Sovereign Immunities Act generally provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," and thus, every suit brought against a foreign sovereign necessarily raises the threshold question of whether an enumerated exception to sovereign immunity permits the exercise of federal jurisdiction.   See 28 U.S.C. § 1604; Robinson v. Gov't of Malaysia, 269 F.3d 133, 140-41 (2d Cir. 2001).  Here, the only applicable FSIA exception is set forth in 28 U.S.C. § 1605(a):

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver . . . .

16

See Fernandez Decl. Exs. 2, 4, 5, 7.

The legislative history of the FSIA suggests that an express waiver
of "immunity in a contract with a private party" is one of the most
basic, and least controversial, triggers of this so-called "waiver
exception." H.R. Rep. No. 94-1487, at 18 (1976), reprinted in 1976
U.S.C.C.A.N. 6604, 6616-17; see also Cabiri v. Government of
Republic of Ghana, 165 F.3d 193, 201 (2d Cir. 1999) (discussing
express and implied waiver); Phoenix Consulting Inc. v. Republic of
Angola, 216 F.3d 36, 38-39 (D.C. Cir. 2000) (same).

A Rule 12(b)(1) challenge to the assertion of subject matter
jurisdiction may call into question either the legal sufficiency of
the plaintiff's allegations or the accuracy of the jurisdictional
facts alleged. See Robinson, 269 F.3d at 140-41. Where, as here,
defendants dispute the factual basis of the court's jurisdiction,
plaintiffs have "the burden of going forward with evidence showing
that, under exceptions set forth in FSIA, immunity should not be
granted, although the ultimate burden of persuasion remains with
the alleged foreign sovereign." Cargill Int'l S.A. v. M/T Pavel
Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993).[17] "[I]n assessing
whether a plaintiff has sufficiently alleged or proffered evidence
to support jurisdiction under the FSIA, a district court must
review the allegations in the complaint, the undisputed facts, if

---

[17]

A defendant asserting a sovereign immunity defense shoulders the initial
burden of presenting prima facie evidence that it is a "foreign state" within the
meaning of the FSIA. Id. at 1016; see Compl. ¶ 8-9 (conceding the Bolivarian
Republic of Venezuela is a "foreign state" and the Ministry of Basic Industries
and Mines, the successor entity to the Ministry of Energy and Mines, is an
"agency or instrumentality" of Venezuela").

9

any, placed before it by the parties, and - if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue - resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion."  Id.; Robinson, 269 F.3d at 140-41; Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (noting that this burden must be met by a preponderance of the evidence).  Courts must look beyond the pleadings and consider competent evidence submitted by the parties, including any affidavits, "if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction."  See Robinson, 269 F.3d at 140 n.6; Phoenix Consulting Inc., 216 F.3d at 40; Kensington Intern. Ltd. v. Itoua, 505 F.3d 147, 153 (2d Cir. 2007); see also Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).

## II.   **The Existence of a Genuine Waiver of Sovereign Immunity**

There is no dispute that defendants qualify as "foreign states" within the meaning of the FSIA and thereby enjoy a presumption of immunity from suit in the United States unless one of the statutory exceptions applies to the instant action.  In this regard, plaintiffs contend that Minister Ramirez, on behalf of the defendants, executed an express waiver of sovereign immunity.  The evidence adduced by plaintiffs in support of this claim consists of:  Fernandez and Zerpa's affidavit testimony describing the

10

process by which the purported waiver was drafted, sent to the
Minister for execution, and then returned to Fernandez; two copies
of the waiver document titled "Addendum," one of which is stamped
"Received" by the Ministry of Finance; copies of correspondence
between Ministry officials, such as the Salas memorandum and Toro
letter; other waivers of sovereign immunity executed by
representatives of the Venezuelan government in the course of
commercial dealings in the United States.   While plaintiffs'
account of the origins and disposition of the Addendum suffices to
meet their burden of production on the waiver issue, we
nevertheless conclude that defendants have succeeded in
establishing, by a preponderance of the evidence, the lack of a
genuine and authentic waiver of sovereign immunity.

At the outset, we note that the copies of the Addendum relied
upon by the plaintiffs raise facial issues of authenticity. First,
it appears that plaintiffs have introduced two versions of the
Addendum that differ with respect to whether Fernandez's signature
is affixed to the left margin of the third page.[18]   The copy of the
Addendum attached to the complaint does bear such an endorsement,
whereas the copy attached as an exhibit to the plaintiffs'
opposition papers does not.  This is troubling since, according to
Fernandez's affidavit, a single copy of the Addendum was made and

---

[18]

    Compare Compl. Ex. 3; Def. Reply Ex. A, pp. 2-3 with Zerpa Decl. Ex. B;
Fernandez Decl. Ex. 2, 7; Def. Reply Ex. O.

then secured in Fernandez's safe until being produced in the instant action. And the version of the Addendum that is not endorsed as described also directly contradicts Fernandez and Zerpa's sworn statements that Fernandez signed each page of the original Addendum in the left margin before requesting a copy for his files.[19] Second, the duplicate Addendum produced to the defendants' experts for inspection was a color copy.[20] This is remarkable because, according to the unrebutted affidavit testimony of Zerpa's secretary and other administrative assistants employed by the Bureau of Mining Concessions and the Division of Mining Applications in December, 2003, there were no color photocopiers in the building at the time.[21]

Moreover, it is undisputed that Minister Ramirez and his assistant, van der Brule, were traveling in the United States when the Addendum is alleged to have been executed. Minister Ramirez and van den Brule boarded a private jet bound for Washington D.C. at about 6 P.M. on December 17 and returned to Venezuela just before 8 P.M. on December 19, 2003.[22] Discussions over the language of waiver are alleged to have been ongoing at least through December 18. Zerpa claims to have received the Addendum, signed in

---

19

    See Zerpa Decl. ¶ 16-17; Fernandez Decl. ¶ 15.

20

    See Def. Reply Ex. O.

21

    See Def. Reply Exs. K, L, M, N.

22    See Def. Reply Exs. D-G.

"pen and ink," from Salas via interoffice mail on December 19. While we cannot conclusively rule out the possibility that the waiver was executed in Washington D.C. and timely delivered to Salas by international courier or diplomatic pouch, there has been no suggestion in the record that there was any urgency that would have led to transmission by carrier or pouch, and any such suggestion is belied by Fernandez's testimony that he waited three days to countersign that document.

Additionally, the Addendum is supposed to have been signed by Minister Ramirez after extensive negotiations that culminated in the General Agreement, a document that notably makes no mention of any open terms. An agreement between such sophisticated parties, particularly in a transaction valued by plaintiffs at $209,764,446.14, likely would have included a provision addressed to the parties' remedies and memorialized any meeting of the minds, even an intermediate understanding that certain open issues pertaining to enforcement would be tabled for further discussions and then reduced to writing in a second agreement. The absence of any such provision lends credence to defendants' version of the facts, namely that the parties' negotiations focused exclusively on the valuation of the redeemed concessions, without regard for the forum in which any enforcement actions might be brought.[23]

---

[23]
    See Salas Supp. Decl. ¶ 3-5 (no discussion of enforcement issues); Toro Decl. ¶ 5 (same); Acosta Decl. ¶¶ 3-5 (same); contra Fernandez Decl. ¶ 10 ("All members of the working group were fully aware that additional issues had to be addressed, in particular my demand for assurances that the payment obligations

13

The record also admits of other silences pregnant with meaning. The parties introduced two documents recounting the events preceding this action in great detail: a December 5, 2006 letter from plaintiffs' attorney, Guerrero, to the Ministry of Mines requesting indemnification in accordance with the General Agreement; and a March 30, 2007 internal memorandum acknowledging the obligation and recommending immediate payment.[24] Neither makes even passing reference to a waiver of immunity, the likelihood of an enforcement proceeding being brought in the United States, the alleged discussions concerning the first draft of the Addendum, or Minister Ramirez's consent to the terms of the Addendum. Furthermore, Orlando Ortegano, the Deputy Minister of Mines during the relevant time frame, and Salas have explained how documents presented to the Minister typically proceeded through an internal document control process pursuant to which a director would approve an "action slip" attached to the document and forward the matter to Ortegano's attention. Neither affiant recalls seeing an action slip for the Addendum.[25]

It should also be emphasized that the conclusions of plaintiffs' handwriting expert are entirely consistent with the

could be enforced in the U.S. courts in the event that the Government of Venezuela failed to meet those obligations."); Zerpa Decl. ¶ 11, 14.

[24]

See Fernandez Decl. Ex. 8; Def. Reply Ex. R.

[25]

See Def., Declaration of Orlando Ortegano ("Ortegano Decl.") ¶¶ 3-5; Salas Decl. ¶ 7.

probability of fraud. The expert reports submitted by the parties make clear that, as presaged at the August 22, 2007 conference, a duplicate document is not susceptible of the level of analysis required by a handwriting expert to reach a definitive conclusion as to the authenticity of a signature. In issuing a qualified opinion that Minister Ramirez did sign the Addendum, plaintiffs' expert assumed that the "signature was naturally written" because "it was not possible, with an examination of copies, to determine the execution" of the handwriting at issue.[26]   Of course, this assumption conveniently sidesteps the core issue in the case - was the signature "unnaturally" or fraudulently placed on the document by, for example, mechanically or electronically transplanting an original signature?[27]   Not only have defendants' experts answered this question in the affirmative, their analyses of the differences in resolution and line spacing between the signature block and the other text on the same page are compelling evidence of fraud.[28]

Finally, we address the credibility of three documents - the

---

[26]

See Perkins Decl. Ex. H. The "execution" of a handwriting sample includes such features as: (i) intraword connections (or the lack of a continuous writing movement); (ii) pen emphasis or pressure applied on particular strokes, often called shading; (iii) the direction of strokes in letter formation; (iv) the speed of execution as evidence by line quality; (v) smoothly rounded, sharply curving or elliptical or angular connecting strokes between letters; (vi) the starting of the initial writing movement before or after the pen contacts the paper; (vii) finishing the final writing movement before or after the pen leaves the paper; and (viii) habitual retouching or lack of it. Id.

[27]

See Def. Reply Ex. A at 5, 7.

[28]

See id. Ex. A at 9-11; id. Ex. B at 2.

15

Salas memorandum, the Toro letter and the Ministry of Finance copy of the Addendum – offered by plaintiffs as evidence that the Addendum was stored in the files of the Venezuelan Ministry of Finance and discussed by government officials who were also members of the working group established in December, 2003. Each of these suffers from the same defects as the Addendum itself. They lack any indicia of receipt into the Ministry of Energy and Mines's records,[29] and have not been authenticated by a custodian, an author, a witness to their creation or execution,[30] or a handwriting expert who could unqualifiedly vouch for the genuineness of the documents.[31]  In short, the provenance of the Addendum has been brought into question by evidence that is far more credible and probative than these documents.

Though certainly not dispositive of the matter, it is also helpful to put the plaintiffs' position in a real world context and recognize that there is no apparent nexus between either the parties or the dispute and the United States.  The action was commenced by two Venezuelan corporations, neither of whom has any

---

[29]

Compare Fernandez Decl. Ex. 8 with id. Exs. 4, 5, 7.

[30]

Salas, van den Brule, and Toro have disavowed any knowledge of these documents or of discussions with Fernandez concerning the waiver. See Def. Reply Ex. F; Ex. H ¶¶ 6-8; Ex. I ¶¶ 6-10. Likewise, Acosta has denied seeing any of this correspondence in the administrative file pertaining to plaintiffs' mining concessions. See Def. Reply Ex. Q ¶¶ 6-7.

[31]

Indeed, defendants' expert who was tasked with assessing the authenticity of the Toro memorandum concluded that it is "likely" a forgery. See Def. Reply Ex. B at 3.

16

contacts with or connections to New York or the United States, against the Venezuelan government and its Ministry of Basic Industry and Mines for their alleged refusal to compensate plaintiffs for the early redemption of mining concessions.[32]  This exercise of "eminent domain rights" was prompted by an administrative determination that the continuing operation of the mines would impede the development of the Tocoma project.[33]  In a dispute over such decidedly local concerns, we would not expect a foreign sovereign to exhibit any willingness to litigate in a forum that, as compared to its domestic courts, would be perceived as both inconvenient and hostile to its defenses.  It is equally implausible that plaintiffs, having mounted a successful legal challenge to the redemption in the courts of Venezuela and subsequently brought the Venezuelan government to the proverbial bargaining table,[34] would feel a need to pursue any remaining claims in a foreign forum.

These inferences are undisturbed by the fact that the Venezuelan government has previously waived immunity from suit in New York courts when availing itself of commercial opportunities

---

[32]

   Compl. ¶¶ 6-9.

[33]

   Plaintiffs' August 10, 2007 Letter to the Court, pp. 1, 3.  Compl. Ex. 1 at Sec. III, ¶ 6.

[34]

   See Fernandez Decl. at ¶¶ 4-8.

17

within the United States.[35]  It is one thing for Venezuela to waive
sovereign immunity in the course of its domestic commercial
dealings and quite another to submit to federal jurisdiction in a
dispute involving indemnification to Venezuelan corporations for
the taking of Venezuelan lands.  A waiver might be a necessary
assurance to domestic investors, partners, and contractual parties
unfamiliar with the laws and regulatory framework of the Bolivarian
Republic of Venezuela.[36]  Moreover, foreign governments are more
likely to create domestic commercial entities or commission
domestic agents to minimize the burdens of managing their affairs

---

[35]

See Declaration of James Perkins in Opposition to Defendants' Motion to
Dismiss ("Perkins Decl.") Exs A-G.  One of these documents, a contract for the
sale of crude oil between the Ministry and Free Market Petroleum LLC ("Free
Market contract"), has been offered by plaintiffs as evidence that Minister
Ramirez personally authorized waivers of sovereign immunity.  Even setting aside
our preliminary concerns regarding the admissibility of the Free Market contract,
an unauthenticated copy downloaded from the internet, we cannot credit that
document as relevant evidence since it has not been executed by Minister Ramirez
or, for that matter, by any other putative party to the agreement.

[36]

Indeed, the FSIA expressly provides for a "commercial activity" exception
to sovereign immunity:

> (a) A foreign state shall not be immune from the
> jurisdiction of courts of the United States or of the States
> in any case--
> * * *
> (2) in which the action is based upon a commercial activity
> carried on in the United States by the foreign state; or
> upon an act performed in the United States in connection
> with a commercial activity of the foreign state elsewhere;
> or upon an act outside the territory of the United States in
> connection with a commercial activity of the foreign state
> elsewhere and that act causes a direct effect in the United
> States;

28 U.S.C. § 1605(a)(2).

in the forum.[37]  Indeed, the sample waivers proffered by plaintiffs have the opposite of their intended effect, serving only to highlight the marked differences between the typical case in which the Venezuelan government waives immunity and the context of the instant controversy and to provide further support for the notion that consent to a waiver of sovereign immunity in this case would have been an unprecedented act.

Given the totality of the evidence presented, we find it considerably more probable than not that Minister Ramirez did not execute a waiver of sovereign immunity and, accordingly, dismiss the action for lack subject matter jurisdiction.[38]

---

[37]

See, e.g., Perkins Decl. Ex. A (CT Corporation System listed as authorized agent); id. Ex. D, F (Arnold & Porter LLP listed as counsel).

[38]     Accordingly, we need not address the alternative bases for dismissal in the defendants' 12(b)(1) motion, such as the act-of-state doctrine, lack of personal jurisdiction, and forum non conveniens.

## III. Plaintiffs' Request for Further Discovery [39]

For the benefit of any reviewing court, we address the plaintiffs' alternative argument that they should be afforded additional discovery to substantiate their waiver claim. For the reasons set forth above and below, we reject this argument as well.

As noted earlier, supra Section I, we must resolve disputed issues of jurisdictional fact by looking beyond the bare pleadings to the record evidence submitted by the parties, including any affidavits.   See Robinson, 269 F.3d at 140 n.6.   The district courts exercise "considerable latitude in devising the procedures it will follow" to compile this record and "to ferret out the facts pertinent to jurisdiction." Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000); Lehigh Val. Industries, Inc. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975) (district court exercises broad discretion in deciding propriety of jurisdictional discovery); Washington v. Norton Mfg., Inc., 588

---

[39]

The defendants' 12(b)(1) motion, filed on July 27, 2007, relied principally on the affidavit testimony of Minister Ramirez, who disavowed any knowledge of a waiver of sovereign immunity and flatly denied signing any such waiver. The existence of a disputed jurisdictional fact - the authenticity of the duplicate Addendum attached as an exhibit to the complaint - prompted the Court to schedule a conference on August 22, 2007 to discuss with the parties how best to proceed. At that conference, both parties indicated that they were prepared to support their accounts with further affidavits from witnesses with knowledge of the facts surrounding the execution of the waiver. Wary of imposing undue burdens on a sovereign that may prove to be immune from suit, we thought the most prudent course would be to direct the parties to supplement their submissions on the motion with expert reports, affidavits from the lay witnesses identified, and any other relevant documentary evidence deemed relevant to the instant controversy and then revisit the question of whether more intrusive jurisdictional discovery would be necessary to resolve the factual disputes presented by the motion.

F.2d 441, 443 (5th Cir. 1979) (district court may find jurisdictional facts "by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery").

In the context of an action against a foreign sovereign that has interposed an immunity defense, this fact-gathering exercise must be circumscribed to account for comity concerns implicated by permitting jurisdictional discovery.    See    First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998).   Were that not the case, the discovery obligations imposed on the sovereign would ineluctably "frustrate the significance and benefit of entitlement to immunity from suit."  El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996); Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 849 (5th Cir. 2000) ("FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation.").   Although plaintiffs must be afforded an "ample opportunity to secure and present relevant evidence," APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003), courts are directed to conduct "a delicate balancing between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery."   First City, Texas-Houston, N.A., 150 F.3d at 176 (citation and quotation marks omitted).

The propriety of jurisdictional discovery may turn on whether, for example, the plaintiff has pointed to specific facts that it desires to controvert, Gualandi v. Adams, 385 F.3d 236, 244-45 (2d Cir. 2004); Exchange Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir. 1976), the disputed facts are "peculiarly within the knowledge" of the sovereign, Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986), and the requests are "reasonably calculated to elucidate whether an FSIA jurisdictional exception applies." Millicom Intern. Cellular v. Republic of Costa Rica, 1997 WL 527340, at *4 (D.D.C. Aug. 18, 1997); id. (resulting discovery should "materially affect the court's analysis" with regard to the applicability of the FSIA); Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1147 (D.C. Cir. 1994). When the parties' submissions both contradict and support the allegations of an applicable exception to sovereign immunity pleaded in the complaint, the district court "should consider all the submissions of the parties and may hold an evidentiary hearing, if it considers that such a hearing is warranted, in resolving the question of jurisdiction." Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); see also Filetech S.A. v. France Telecom S.A., 304 F.3d 180, 183 (2d Cir. 2002) (evidentiary hearing unnecessary if all disputed fact issues are "readily ascertainable" from the record).

An abstract request for additional discovery such as the

plaintiffs' might well have been granted were we considering the application on a barren record. However, defendants have produced, inter alia: two reports from handwriting experts; affidavits from most of the principals involved in the redemption of plaintiffs' mining concessions and from various administrative assistants describing the copy facilities within the Bureau of Mining Concessions and the Division of Mining Applications; and detailed documentation of Minister Ramirez's travel itinerary for the date(s) on which the Addendum was allegedly signed. Likewise, plaintiffs have adduced their own handwriting expert report,[40]

---

[40]

Newly retained counsel appeared in the matter on February 5, 2008 and requested a stay for ninety (90) days to review the case file and to determine whether the plaintiffs' offer of proof could benefit from a rebuttal expert report. We denied the request as both untimely and unwarranted.

The opposition and reply submissions had been timely filed on October 12 and November 20, 2007, respectively. On January 4, 2008, Greenberg Traurig, LLP and Colson Hicks Edison sought leave to withdraw as counsel for the plaintiffs. The application was granted almost immediately and plaintiffs were placed on notice that defendants' motion to dismiss would be treated as fully briefed and oral argument on the motion would proceed as previously scheduled on January 24, 2008, unless, if plaintiffs were unrepresented on that date, it would be cancelled. See Compania del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela, No. 07 CV 3179 (S.D.N.Y. Jan. 7, 2008).

Substitute counsel argued that defendants' reply papers appeared to represent a total change in litigation posture. This was surprising, to say the least, since the six weeks preceding the Court's January 7 Order had passed without any indication that the reply papers included arguments outside the scope of any previous submissions or that the record could benefit from further development.

Moreover, Minister Ramirez's affidavit in support of defendants' motion stated "I did not sign this document . . . [and] with regard to the signature imprinted on the alleged "Addendum" dated December 19, 2003, it is not my signature . . . ." Plaintiffs tried to undermine this two-part statement through affidavits and internal Ministry correspondence purporting to trace the path of the Addendum to the Minister ("I did not sign this document") and an expert report concluding that the signature belonged to Minister Ramirez ("it is not my signature"). Defendants responded to plaintiffs' account of the facts by introducing an expert report concluding that the signature on the Addendum, though it may be Minister Ramirez's, was the product of "mechanical fabrication." Given that the central question from the outset was the authenticity of a signature on a duplicate document, the possibility of "mechanical fabrication" lay at the forefront of the instant controversy. We raised this precise concern at the August 22, 2007 conference and plaintiffs clearly recognized the need to

affidavits from two of the principals involved in the drafting and execution of the Addendum, and internal memoranda and correspondence acknowledging the existence of that document. Absent any indication of the specific facts or statements that plaintiffs could challenge through additional jurisdictional discovery, we decline to impose further litigation burdens upon the defendants, who have made a compelling, if not overwhelming, demonstration of their entitlement to sovereign immunity.

This conclusion is supported by the lack of any suggestion that the disputed facts are "peculiarly within the knowledge" of the sovereign. See Kamen, 791 F.2d at 1011. Plaintiffs concededly possess all of the documents in the Ministry's files pertaining to the redemption at issue; indeed, according to Fernandez's affidavit and the Paredes memorandum, the Ministry's records are merely duplicates of those retained by plaintiffs. While this unique aspect of the case obviously facilitated the development of a more complete record in the first instance, it also renders improbable the suggestion that further document discovery would not be duplicative and unduly burdensome. See, e.g., Gear, Inc. v. L.A.

rebut Minister Ramirez's affidavit testimony that he "did not sign the document." Plaintiffs' expert specifically left open the possibility that the signature was "unnaturally" placed on the Addendum and the onus was on the plaintiffs to close that gap, which defendants eventually relied upon to support their reply submission.

Accordingly, we found that plaintiffs had fair notice of all the arguments in the defendants' reply and, absent any showing of excusable neglect, denied counsel's application for a stay to decide whether a supplemental submission should be filed with the Court. See Compania del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela, No. 07 CV 3179 (S.D.N.Y. Feb. 25, 2008); see also Davidson v. Keenan, 740 F.2d 129, 132 (2d Cir. 1984).

24

Gear California, Inc., 637 F. Supp. 1323, 1328 (S.D.N.Y. 1986) (discovery "need not be granted to allow plaintiff to engage in an unfounded fishing expedition for jurisdictional facts . . . .").

### CONCLUSION

For the foregoing reasons, defendants' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is GRANTED.

DATED:    New York, New York
          April 30, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

25

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiffs:
Nathan Schwed, Esq.
Yoav M. Griver, Esq.
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022

Counsel for Defendants:
Kenneth S. Leonetti, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210-2600

Geraldine R. Fischer, Esq.
Ronald E.M. Goodman, Esq.
Foley Hoag LLP
1875 K Street, NW
Washington, DC 20006